UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT YOUNG,

        Petitioner,

   v.

CONNIE GIPSON, Warden, et al.,

        Respondents.

Case No. 11-cv-04985-JST (PR)

**ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Robert Young, challenging the validity of a judgment obtained against him in state court.  Respondent has filed an answer to the petition, and petitioner has filed a traverse.  For the reasons set forth below, the petition is granted in part and denied in part.

## I.  PROCEDURAL HISTORY

On October 17, 1990, in a capital case trial, an Alameda County Superior Court jury found petitioner guilty of three counts of first degree murder, Cal. Penal Code § 187 (counts 1, 5, and 8), two counts of robbery, id. at § 211 (counts 2 and 7), two counts of attempted murder, id. at §§ 664/187 (counts 3 and 6), and one count of attempted robbery, id. at §§ 664/211 (count 4).  The jury found true the enhancement allegations that petitioner personally used a firearm during the commission of each crime, id. at §§ 1203.06, 12022.5, and found true the enhancement allegations attendant to the count 2 robbery and count 3 attempted murder that petitioner inflicted great bodily injury upon his victim, id. at §§ 1203.075, 12022.7.  The jury additionally found true the robbery-murder special circumstance allegation charged attendant to the count 1 and count 5 murders, id. at § 190.2(a)(17)(i) (now (a)(17)(A)), and lastly found the multiple-murder special circumstance

United States District Court
Northern District of California

1  allegation true as well, id. at § 190.2(a)(3)).  Ex. A at 992-99, 1006-15; Ex. B at 3719-26.[1]

2  Petitioner subsequently admitted the truth of a prior-conviction allegation.  Ex. A at 1022; Ex. B at

3  3728-30.

4     On November 8, 1990, the jury returned its penalty-phase verdict against petitioner, fixing

5  his punishment at death.  Ex. A at 1067; Ex. B at 4103-04.

6     On December 17, 1990, the trial court sentenced petitioner to death on the count 1 and

7  count 5 first degree murder convictions, and sentenced him to life in prison without the possibility

8  of parole on the count 8 first degree murder conviction.  With respect to the remaining convictions

9  and enhancements the trial court imposed a 45-year determinate state prison sentence, but ordered

10  that sentence stayed under Cal. Penal Code § 654.  Ex. A at 1088-93; Ex. B at 4135-40.

11     Petitioner's automatic appeal to the California Supreme Court proceeded.  Petitioner filed

12  his Appellant's Opening Brief on April 13, 2001, Ex. C, the People of the State of California filed

13  their Respondent's Brief on October 1, 2001, Ex. D, and petitioner subsequently filed his

14  Appellant's Reply Brief, Ex. E.  Petitioner made 11 attacks on the guilt-phase judgment against

15  him in his briefing, including claims of insufficient evidence, prosecutorial misconduct, and

16  instructional error.  Exs. C, E.  Petitioner also made numerous attacks on the death judgment

17  against him.  Id.

18     On April 23, 2003, petitioner filed a Petition for Writ of Habeas Corpus in the California

19  Supreme Court, again making allegations attacking the guilt-phase judgment against him,

20  including claims of ineffective assistance of counsel and some of the claims he had raised on

21  direct appeal.  Ex. F.  In his state habeas application petitioner also attacked the penalty-phase

22  judgment against him, and argued therein that he had established a prima facie case that he was

23  mentally retarded.  Id. (citing Atkins v. Virginia, 536 U.S. 304 (2002) (holding the execution of a

24  mentally retarded person violates the Eighth Amendment)).

25     On December 30, 2003, with respect to petitioner's state habeas application, the People of

26  the State of California filed an Informal Response to Petition for Writ of Habeas Corpus in the

27

28  _____
[1] All references herein to exhibits are to the exhibits submitted by respondent in support of the
answer, unless otherwise indicated.

2

California Supreme Court.  Ex. G.

On January 31, 2005, the California Supreme Court issued its opinion in petitioner's direct appeal, rejecting all of his assignments of error and affirming both the guilt and death judgments against him.  Ex. H; <u>People v. Young</u>, 34 Cal. 4th 1149 (2005).

On February 2, 2005, in the California Supreme Court, petitioner filed a Reply to Informal Response to Petition for Writ of Habeas Corpus.  Ex. I.

On May 6, 2005, petitioner filed a Petition for Writ of Certiorari in the United States Supreme Court, seeking discretionary review of the California Supreme Court's decision on direct appeal.  Ex. J.  On October 3, 2005, the United States Supreme Court denied certiorari.  <u>Young v. California</u>, 546 U.S. 833 (2005).

On October 11, 2006, the California Supreme Court issued the following order in petitioner's state habeas proceeding:

> Each request for judicial notice is denied.  (*People v. Rowland* (1992) 4 Cal.4th 238, 268, fn. 6.)  The Director of the Department of Corrections and Rehabilitation is ordered to show cause in the Alameda County Superior Court, when the matter is placed on calendar, why petitioner's death sentence should not be vacated and petitioner sentenced to life imprisonment without the possibility of parole on the ground that he is mentally retarded within the meaning of <u>Atkins v. Virginia</u>[,] [] 536 U.S. 304, as alleged in Claim XIII of the petition for writ of habeas corpus filed April 23, 2003.  (See *In re Hawthorne* (2005) 35 Cal.4th 40.)  The return is to be filed on or before November 9, 2006.  All other claims set forth in the petition for writ of habeas corpus are denied.  Each claim is denied on the merits.  Except insofar as they allege ineffective assistance of counsel as a substantive basis for relief, the following claims are additionally barred to the extent they were raised and rejected on appeal (*In re Harris* (1993) 5 Cal.4th 813, 825, 829-841; *In re Waltreus* (1965) 62 Cal.2d 218, 225): claims II, IV, V, and XXI.  Kennard, J., is of the opinion an order to show cause should be issued as to claims XV and XIX.

Ex. K.

On October 8, 2010, the Alameda County Superior Court issued an order granting petitioner habeas corpus relief vacating his death sentence.  The court found that petitioner had sustained his burden of proof that he is mentally retarded.  The court then resentenced petitioner to life imprisonment without the possibility of parole on counts 1 and 5.  Ex. L.

On October 7, 2011, petitioner filed a Petition for Writ of Habeas Corpus in this Court, raising 20 claims of federal constitutional error.  Docket No. 1.  These attacks on his convictions

United States District Court
Northern District of California

3

1  are ones he raised on direct appeal in state court, on state habeas, or both.

## II.  STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Supreme Court on direct appeal:[2]

### 1. The Attempted Murder and Robbery of Manzine Miller and the Murder of Terry Rivers

In the early morning hours of January 30, 1989, Manzine Miller and Terry Rivers were selling rock cocaine in front of Miller's house on East 24th Street in Oakland (Miller's house).  Around 2:30 a.m., Miller observed a black-over-green Ford turn onto Highland Avenue from East 24th Street and park.  Moments later, defendant and another man walked from Highland Avenue and approached Miller.  Defendant told Miller he wanted to purchase $50 worth of rock cocaine.  Miller indicated to defendant that he could sell him the drug, but would have to get it from his supplier.  Defendant told his companion to watch the street and then followed Miller along a pathway through a nearby vacant lot known as the "swamp," towards Miller's supplier.  As they walked, defendant pulled out a gun, told Miller to get on his knees, and robbed him of the rock cocaine he had in his pocket.  As Miller begged defendant not to shoot him, defendant shot him above his right hip.  Miller survived the gunshot wound and watched defendant walk back towards his (Miller's) house.  Miller heard three gunshots shortly after defendant left.  When the police arrived at Miller's house, they found the body of Terry Rivers lying across the front entryway.

### 2. Murder of Glen Frazier and Attempted Robbery of Melva Fite

Sometime after 2:00 a.m. on January 30, 1989, on 89th Avenue in Oakland, defendant exited a vehicle and approached Melva Fite and Glen Frazier as they talked with Frazier's cousin, Ricky Smith.  Defendant suddenly began shooting at Smith.  Smith ran to a house, and Fite and Frazier ran up 89th Avenue.  Defendant followed Fite and Frazier in his vehicle.  Defendant's cousin, Patrick Jackson, was riding in the front passenger seat.  When defendant caught up with Fite and Frazier near the intersection of 90th Avenue and Cherry Street, he exited the vehicle and demanded their money.  Frazier told defendant they did not have anything.  Defendant then accused Frazier of previously robbing him.  Frazier replied that he did not know defendant.  As he and Fite crouched down on their knees, they begged defendant not to shoot.  Defendant told Fite to run, and moments later, Fite heard two shots fired.  She saw Frazier slump to the ground.  Frazier died later that morning from a gunshot wound to his lower back.

//

_____

[2] This summary is presumed correct.  Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

*3. Murder of Sylvester Davis; Attempted Murder of Luther Thomas; Robbery of Gerald Livingston*

In the early morning hours of February 19, 1989, defendant crashed through the living room window of a "crack house" on 74th Avenue (74th Avenue house). Luther Thomas, Veronica Robinson, Joseph Lee Batiste, Gerald Livingston, Veronica Hackett, and Sylvester Davis were present in the house. Defendant immediately began shooting at Thomas, the "doorman," as he ran towards the kitchen. Thomas suffered a gunshot wound to his forearm and escaped from the house. During the commotion, Davis left the northwest bedroom, and entered the southwest bedroom where he jumped out of the window. Robinson, who had been hiding in the closet, followed Davis out of the window. Meanwhile, defendant entered the northwest bedroom and robbed Livingston of $40. Defendant then left the bedroom and entered the southwest bedroom. Livingston heard the sound of a window breaking, followed by three gunshots. Within minutes after the shooting stopped, defendant entered the northwest bedroom, looked at Livingston, and then left the house through the front door. Outside, Robinson had crawled toward the front of the house while Davis had crawled toward the rear of the house. Robinson heard Davis say, "Oh, they going to kill me" and another gunshot. Shortly after defendant left the house, Livingston went to the front door and looked out. He saw defendant standing on the sidewalk and heard Davis moaning in pain. A vehicle pulled up in front of the house as Livingston went back into the house.

*4. Ballistics Evidence*

Chester Young, a retired ballistics expert formerly employed by the Oakland Police Department, analyzed six bullets recovered from the three crime scenes in this case: the three bullets recovered from each of the bodies of Miller, Rivers, and Frazier; a bullet recovered from the living room wall at Miller's house; and two bullets recovered from the 74th Avenue house. Young explained to the jury that two bullets are declared "a positive match" when they share a particular number and type of identification characteristics. When the bullets do not share common identification characteristics, the presence of a "pseudo land impression," a very rare mark that is caused by a defect in the gun, very strongly suggests that the bullets were fired from the same gun. Based on his analyses, Young concluded that because all six bullets had one or two pseudo land impressions, there was a "very strong" likelihood that all of the bullets were fired from the same gun. That gun was never recovered.

People v. Young, 34 Cal. 4th 1149, 1166-68 (2005).

# III. DISCUSSION

A.     Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

United States District Court
Northern District of California

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412 (internal quotation marks omitted).  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, the California Supreme Court, in its opinion on direct review, addressed nine of the claims petitioner raises in the instant petition.  The California Supreme Court thus was the highest court to have reviewed the claims in a reasoned decision, and, as to those claims, it is the California Supreme Court's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).[3]  The remaining claims were presented to the California Supreme Court only in petitioner's state petition for writ of habeas corpus, which was summarily denied as to all claims other than the claim that petitioner's death sentence should be vacated on the ground that he is mentally retarded.  When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). This "[i]ndependent review . . . is not de novo review of the constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state court decision is objectively unreasonable."  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  See Harrington v. Richter, 131 S. Ct. 770, 784 (2011).

B.    Petitioner's Claims

Petitioner raises twenty claims for federal habeas relief in his petition.  The claims are most sensibly addressed in the following order, with the original enumeration shown in parentheses: 1) prosecutorial misconduct during jury selection (claim 3); 2) selective prosecution (claim 2); 3) prosecutorial misconduct in closing argument (claim 4); 4) prosecutorial  misconduct in presenting "false and misleading evidence" (claim 5); 5) prosecutorial misconduct in failing to disclose exculpatory evidence (claim 6); 6) ineffective assistance of counsel during guilt-phase investigation (claim 7); 7) ineffective assistance of counsel during guilt-phase performance (claim 8); 8) ineffective assistance of counsel in investigating and presenting mental health evidence

United States District Court
Northern District of California

---

[3]  The one exception is petitioner's Wheeler/Batson claim, to which the Court applies de novo review, as discussed below.  See discussion at III.B.1, ante.

(claim 9); 9) improper rebuttal (claim 10); 10) insufficient evidence as to count 1 (claim 11);

11) insufficient evidence as to count 5 (claim 12); 12) jury misconduct (claim 13);

13) instructional error in court's limiting of instructions (claim 14); 14) instructional error

regarding robbery-murder special circumstance (claim 15); 15) false and unreliable ballistics

evidence (claim 16); 16) actual innocence (claims 17-19); 17) missing record (claim 1); and

18) cumulative error (claim 20).

    1.    <u>Jury Selection</u>

    Petitioner claims that the prosecutor used peremptory strikes to remove from the jury pool

all of the African-American women.[4]  The parties do not dispute the California Supreme Court's

description of the relevant trial court proceedings, as follows:

> During jury selection, and after the prosecutor exercised his ninth peremptory challenge, defense counsel asserted that the prosecutor had used his peremptory challenges to strike all of the African-American female prospective jurors from the jury panel—namely, D.D., V.S., and B.W.[4]  He added that two African-American male prospective jurors were seated on the panel.  The trial court indicated it was not, at that time, finding a prima facie case of discrimination.  Counsel then noted for the record that "all of the black women called into the jury box at this time have been excused by the prosecution."  The parties proceeded to use their remaining peremptory challenges and ultimately selected a jury and four alternates.  Three African-American males were among the jurors selected.
>
> > Fn 4: Although defendant initially identified B.W. as one of the prospective jurors against whom the prosecutor discriminated, defendant now concedes that the prosecutor "may have had a legitimate basis for exercising a peremptory challenge" against this prospective juror given her apparent difficulty with accepting the testimony of drug users as credible evidence, and given many of the prosecution's percipient witnesses were drug users.  Therefore, our analysis is limited to whether defendant stated a prima facie case of purposeful discrimination only as to Prospective Jurors D.D. and V. S.
>
> Thereafter, out of the jury's presence, the trial court addressed defendant's *Wheeler* motion.  It identified the African–American female prospective jurors by name (D.D. and V.S.), noted they were members of two cognizable groups, i.e., women and African-Americans, and then ruled that the defense had not made a prima facie case of discrimination.

<u>Young</u>, 34 Cal. 4th at 1171-72.

    a.    <u>Equal Protection Standard</u>

    The use of peremptory challenges by either the prosecution or defense to exclude

---

[4] Petitioner is an African-American male.

United States District Court
Northern District of California

cognizable groups from a jury may violate the Equal Protection Clause.  See Georgia v. McCollum, 505 U.S. 42, 55-56 (1992).  The Supreme Court first held that the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race, see Batson v. Kentucky, 476 U.S. 79, 89 (1986), and later extended this protection to challenges solely based on gender, see J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 130-43 (1994)).[5]  Batson permits prompt rulings on objections to peremptory challenges under a three-step process: (1) the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race (or gender) "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose;" (2) if the prima facie case is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question; and (3) if the prosecutor carries the burden of showing a race-neutral explanation, the defendant has the burden to prove purposeful discrimination.  Batson, 476 U.S. at 93-94, 97-98.  A party establishes a prima facie equal protection violation based on race by showing that: (1) the defendant is a member of a cognizable racial group, (2) the group's members have been excluded from the jury, and (3) the circumstances of the case raise an inference that the exclusion was based on race.  Batson, 476 U.S. at 96.

> b.    Standard of Review

Here, petitioner challenged the prosecutor's use of peremptory strikes by way of a motion under People v. Wheeler, 22 Cal. 3d 258, 280 (1978).  The trial court denied the motion because it found, relying on Wheeler, no prima facie case of racial discrimination.  The Wheeler motion procedure used by California courts does not satisfy the constitutional requirement laid down for the first step of Batson, however.  Johnson v. California, 545 U.S. 162, 168 (2005); Wade v. Terhune, 202 F.3d 1190, 1197 (9th Cir. 2000).  California courts have routinely imposed the more stringent requirement that the defendant "show a strong likelihood," Wheeler, 22 Cal. 3d at 280, rather than merely "raise an inference," Batson, 476 U.S. at 96, that the prosecutor had excluded venire members from the petit jury on account of their race.  Wade, 202 F.3d at 1196-97.  Because

---

[5]  The California counterpart to Batson is People v. Wheeler, 22 Cal. 3d 258 (1978).

United States District Court
Northern District of California

California courts using the Wheeler procedure have not applied federal law as clearly established by the United States Supreme Court, a federal habeas court need not defer to the California court's findings as it would otherwise be required to do under 28 U.S.C. § 2254(d).  Wade, 202 F.3d at 1197.

In People v. Johnson, 30 Cal. 4th 1302 (2003), the California Supreme Court attempted to rectify the situation by concluding that "Wheeler's terms 'strong likelihood' and 'reasonable inference' state the same standard"—one that is entirely consistent with Batson. 30 Cal. 4th at 1313.  Batson, the state high court held, "permits a court to require the objector to present, not merely 'some evidence' permitting the inference, but 'strong evidence' that makes discriminatory intent more likely than not if the challenges are not explained."  Id. at 1316 (emphasis added).  The Supreme Court of the United States disagreed, and made clear that "California's 'more likely than not' standard is at odds with the prima facie inquiry mandated by Batson."  Johnson v. California, 545 U.S. at 173.  To satisfy Batson's first step, a defendant need not persuade the judge that the challenge was more likely than not the product of purposeful discrimination; rather, he need only produce evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.  Id. at 171.  Accordingly, federal habeas courts should continue to apply Wade's de novo review requirement whenever state courts use the "strong likelihood"/"more likely than not" standard, as these courts are applying a lower standard of scrutiny to peremptory strikes than the federal constitution permits.  Accord Paulino v. Castro, 371 F.3d 1083, 1090 (9th Cir. 2004) (applying de novo review where state court applied "strong likelihood" standard); Cooperwood v. Cambra, 245 F.3d 1042, 1047 (9th Cir. 2001) (same).

Here, the California Supreme Court upheld the trial court's finding that petitioner had not established a prima facie case of racial discrimination by the prosecutor.  The California Supreme Court's decision was announced after the United States Supreme Court had granted a petition for a writ of certiorari, but before it had announced its decision in Johnson v. California.  Consequently, the California Supreme Court applied California's "strong likelihood"/"more likely than not" standard in finding that petitioner had not made a prima facie case of discrimination under Batson.  Young, 34 Cal. 4th at 1172.  As that is the wrong standard, pursuant to Wade, this Court will

review de novo the California Supreme Court's finding of no prima facie case of discrimination.[6]

        c.        <u>Analysis</u>

As a preliminary matter, the Court notes that while <u>Batson</u> prohibits discrimination based on race or gender, neither the Supreme Court nor the Ninth Circuit has recognized that the combination of race and gender, such as "black males," may establish a cognizable group for <u>Batson</u> purposes.  <u>Turner v. Marshall</u>, 63 F.3d 807, 812 (9th Cir. 1998), <u>overruled on other grounds</u>, <u>Tolbert v. Page</u>, 182 F.3d 677, 685 (9th Cir. 1999) (en banc).  <u>See also</u> <u>United States v. Dennis</u>, 804 F.2d 1208, 1210 (11th Cir. 1986), <u>cert. denied</u>, 481 U.S. 1037 (1987) (holding <u>Batson</u> does not apply to claims based on "black men" or "black women").  Thus, this Court limits its inquiry to whether petitioner has made a prima facie case of racial discrimination under <u>Batson</u>, without regard to gender.[7]

Here, the first and second elements of the <u>Batson</u> prima facie case of discrimination are met because the prospective jurors are African-American and the prosecutor used peremptory strikes to remove them.  <u>See</u> <u>Batson</u>, 476 U.S. at 96.  The issue is whether the third element is met, namely whether the circumstances of the case raise an inference that the challenges were based on race.  <u>See</u> <u>id.</u>

In <u>Batson</u>, the Supreme Court noted that, in "'deciding whether the defendant has made the requisite showing,' and noted that a 'prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or <u>refute</u> an inference of discriminatory purpose.'"  <u>Williams v. Runnels</u>, 432 F.3d 1102, 1107 (9th Cir. 2006) (quoting <u>Batson</u>, 476 U.S. at 96-97).  The Supreme Court reiterated in <u>Johnson</u> that "a defendant may rely on 'any other relevant circumstances' to raise an

---

[6] Respondent correctly points out that, in footnote 6 of its order, the California Supreme Court acknowledged that the United States Supreme Court had granted cert in <u>People v. Johnson</u> and made clear that the exact test was not critical to its resolution because "the facts here do not give rise to <u>any</u> reasonable inference of discriminatory purpose."  <u>People v. Young</u>, 34 Cal. 4th at 1172 n.6 (emphasis added).  Thus there is support for respondent's argument that the California Supreme Court used the appropriate standard, making its opinion entitled to AEDPA deference.  <u>See</u> <u>Boyd v. Newland</u>, 467 F.3d 1139, 1144 (9th Cir. 2006).  This Court will nonetheless review the state court's findings de novo.

[7] In his petition, petitioner does not appear to claim that women generally improperly were excluded from the jury.

United States District Court
Northern District of California

1   inference of discriminatory purpose." Id. (quoting Johnson, 545 U.S. at 170).

2       In assessing "all relevant circumstances" surrounding challenged peremptory strikes, for

3   purposes of determining whether there is an inference of discrimination under Batson, "Supreme

4   Court precedent requires a comparative juror analysis." Boyd v. Newland, 467 F.3d 1139, 1149

5   (9th Cir. 2006). Comparative juror analysis involves determining whether non-challenged jurors

6   possess any of the characteristics on which the prosecution challenged jurors in the protected

7   group. Snyder v. Louisiana, 552 U.S. 472, 482-83 (2008); Boyd, 467 F.3d at 1150. Contrary to

8   the view of the California courts, comparative juror analysis should take place on appeal even

9   when the trial court did not engage in such analysis.[8] Id. at 1148-50.

10      In his petition, petitioner does not challenge the prosecution's decision to strike B.W.

11  Indeed, on direct appeal, petitioner ultimately conceded that the prosecutor may have had a

12  legitimate basis for excusing B.W., "given her apparent difficulty with accepting the testimony of

13  drug dealers as credible evidence, and given many of the prosecution's percipient witnesses were

14  drug dealers." Ex. H at 9, n.4. Petitioner contends, however, that the prosecutor's decision to

15  strike D.D. and V.S. was based on unconstitutional considerations. Petition at 63-65. The record

16  does not support this contention, however, as it reveals unique qualities of D.D.'s and V.S.'s

17  answers to the jury questionnaires and voir dire that provide race-neutral reasons for striking them.

18      As to D.D., the prosecutor learned that D.D. had worked with his office and with law

19  enforcement on sexual assault cases. Ex. B. at 1304, 2307-08. The prosecutor explained that he

20  had spoken with colleagues from his office and learned that they held the opinion that D.D. had "a

21  difficult time perceiving the truth" and that she had exaggerated her own credentials or

22  qualifications. See id. As the California Supreme Court further found, D.D. worked as a

23  therapist, and the prosecutor may have reasonably believed that D.D. would have difficulty setting

24  aside her own expertise as a therapist in evaluating the evidence, particularly the penalty phase

25  evidence pertaining to extreme mental disturbance or emotional illness. Young, 34 Cal. 4th at

26

27  _____

[8] On this point, the Ninth Circuit in Boyd amended its earlier opinion which had held to the
contrary. Boyd, 467 F.3d at 1144 (citing Boyd v. Newland, 393 F.3d 1008,1013 (9th Cir. 2004)).

28  In this case, the California Supreme Court did not conduct a comparative juror analysis, though it
did find race-neutral reasons for striking D.D. and V.S. See People v. Young, 34 Cal. 4th at 1174.

United States District Court
Northern District of California

1174.  Finally, D.D. stated in voir dire that she believed one explanation for the increase in crime

is an "increase in the double standard of our governmental system."  Ex. A at 6913; Ex. B at 1294.

And when asked in voir dire, "But you indicated there is no reason why you couldn't be a fair and

impartial juror after evaluating all the evidence in this case?," D.D. answered "I don't know."  Ex.

B at 1306.  Although these distinctive aspects of D.D.'s answers are not conclusive that she would

not have been a good juror, the Court is mindful that at the voir dire stage lawyers are only making

their best guess at how a prospective juror may act, and D.D.'s answers certainly provide a race-

neutral basis for the perception that she might not have been impartial.  No other jurors gave an

anti-government explanation for the increase in crime.  See United States v. Steele, 298 F.3d 906,

913-14 (9th Cir. 2002) (finding it permissible and race neutral to challenge a juror based on his

opinions of the criminal justice system, even where the opinion is that the system is racist).  Nor

did any other jurors have a therapy background or experience working with the district attorney's

office.  See Mayes v. Premo, 766 F.3d 949, 958-59 (9th Cir. 2014) (finding trial court's acceptance

of prosecutor's background checks was not an objectively unreasonable application of Batson).  As

a result, a comparative juror analysis does not raise an inference of discrimination as to D.D.

As to V.S., the prosecutor explained that she worked for the California State Automobile

Association where she assisted insurance defense lawyers.  Ex. B at 2308.  The prosecutor felt that

this made V.S. more likely to identify with the defense team.  Id.  The record supports this

explanation.  As summarized by the California Supreme Court:

> Regarding Prospective Juror V. S., the prosecutor reasonably might have challenged her
> because of her experience as an insurance claims specialist.  V.S. disclosed she assisted
> defense attorneys in preparation for litigation and arbitration.  In response to questioning,
> she indicated she sometimes took an active role in the process.  Although V.S. stated she
> might not speak up in settlement conferences or negotiations "[i]f our defense attorney is a
> strong attorney and he doesn't need my input," she said she would "have something to say"
> if the attorney "doesn't put forth something that I think is essential to evaluating the claim
> and helping the judge make a decision as to, you know, what is fair or in helping the
> judge."  In light of these voir dire responses, the prosecutor might reasonably have
> challenged V.S. on the basis that she might be overly defense oriented in evaluating and
> deliberating the charges against defendant.

Young, 34 Cal. 4th at 1174.  Finally, the prosecutor also noted that V.S. was pregnant and

expressed his opinion that someone who is "bearing new life" might "find it very difficult to

exterminate someone else's life."  Ex. B at 2308.  Again, there is nothing in the record showing

United States District Court
Northern District of California

that other jurors similarly situated to V.S. were permitted to remain on the jury.  There were no other jurors, for example, who reported that they worked in defense litigation or who reported that they were pregnant at the time of jury selection.  A comparative juror analysis does not raise an inference of discrimination.[9]

In sum, the record in this case does not create an inference of discrimination in the prosecutor's peremptory challenges to three African-American female prospective jurors.  The prosecutor did not strike all of the African-American or women venirepersons; the state courts found race-neutral reasons for striking the prospective jurors at issue; this was not a case that involved gender or race discrimination[10]; and a comparative juror analysis does not raise an inference of discrimination.  As a result, petitioner has not established a prima facie case of discrimination under the first step of the <u>Batson</u> analysis.

Accordingly, petitioner is not entitled to habeas relief on this claim.

2.      Selective Prosecution

Petitioner claims the prosecution and trial were "permeated with racial bias and discrimination," which the Court construes as a claim for selective prosecution.  Petition at 47-59.  Petitioner presented this claim to the California Supreme Court only in his state habeas petition, which was summarily denied on the merits.  Ex. F at 18-40.

Although the decision whether to prosecute and what charges to bring generally rests entirely in the prosecutor's discretion, this discretion is subject to constitutional constraints.

---

[9] The Court notes that petitioner also attempts to support his <u>Wheeler</u>/<u>Batson</u> claim based on the prosecutor's treatment of similarly situated venirepersons in other cases.  Petitioner made the same claim in his state habeas petition, which was summarily denied on the merits.  The United States Supreme Court has never held that one of the relevant circumstances in determining whether there existed an inference of discriminatory purpose in a prosecutor's peremptory challenges in a particular case is how he or she conducted voir dire in other cases.  Petitioner cites to no case law, nor is the Court aware of any, in which evidence of jury selection in unrelated cases was used to find a <u>Batson</u> violation.  Thus, the state court's decision here cannot be contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  <u>See Carey v. Musladin</u>, 549 U.S. 70, 77 (2006).  In any event, petitioner does not point to any other case in which the prosecutor here was found by the trial judge to have violated <u>Wheeler</u>/<u>Batson</u>.  Thus, the state court had reasonable grounds to deny this claim.

[10] <u>Cf</u>. <u>Johnson v. Campbell</u>, 92 F.3d 951, 953-54 (9th Cir. 1996) (insufficient prima facie case for exclusion based on sexual orientation where neither sexual orientation nor other discrimination was at issue in case and there were neutral reasons for challenge).

United States District Court
Northern District of California

United States v. Armstrong, 517 U.S. 456, 464 (1996).  One of these constraints is that the prosecutorial decision may not violate equal protection by resting on "'an unjustifiable standard such as race, religion, or other arbitrary classification.'"  Id.  Courts presume that prosecutors have properly discharged their official duties.  Id.  In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "'clear evidence to the contrary.'"  Id.  A prosecutor's charging decision cannot be judicially reviewed absent a prima facie showing that it rested on an impermissible basis, such as gender, race, or denial of a constitutional right.  United States v. Diaz, 961 F.2d 1417, 1420 (9th Cir. 1992).

To establish a prima facie case of selective prosecution, the claimant must show that the prosecutorial policy (1) had a discriminatory effect and (2) was motivated by a discriminatory purpose.  Armstrong, 517 U.S. at 465.  In order to establish a discriminatory effect, the claimant must show that similarly situated individuals of a different race were not prosecuted.  See id.  The fact that he is part of a protected class does not alone provide a colorable basis for believing that a selection has taken place; nor would evidence that other members of the protected class were prosecuted.  See United States v. Aguilar, 883 F.2d 662, 705-08 (1989), superseded by statute on other grounds, P.L. No. 99-603, 100 Stat. 3359, as stated in Khan v. Holder, 584 F.3d 773, 783 (9th Cir. 2009).

Petitioner supports his claim by pointing to declarations submitted by two Alameda County public defenders, Charles Denton and Michael Ogul, in the 1994 capital case of People v. Johnny Lee Barnes, Alameda County Superior Court, Case No. 103157.  Ex. 103 to Ex. F.  The Court has reviewed the declarations.  The Denton declaration offers evidence of Alameda County murder cases involving non-African-American defendants in which the prosecutor chose not to seek death at the penalty phase.  The declaration, and the cases discussed therein, are offered in support of petitioner's argument that the prosecution was racially motivated in bringing capital charges.  As discussed above, petitioner's death sentence has been vacated, and thus, this is no longer a capital case.  Petitioner's argument that the sentencing charges were discriminatory is therefore moot.

The Ogul declaration offers evidence of Alameda County murder cases involving non-African-American defendants in which special circumstances were either filed or could have been filed but the defendants were either not prosecuted for any special circumstances or the prosecution agreed to a disposition that did not result in the finding of any special circumstances. The Ogul declaration lists and describes nine cases, as follows:

Luis Chavez [ASC #H-14646], a Hispanic or Asian male was charged with murder with special circumstances.  Although he had previously suffered two prior convictions for murder, the Alameda County District Attorney's Office allowed him to plead guilty to second degree murder without any special circumstances.

David Misch [ASC #H-13958], a white male, was charged with murder and ultimately pled to second degree murder, although he was arrested for murder and violation of Vehicle Code section 1085, the evidence demonstrated probable cause to believe that a robbery special circumstance was true, and he had suffered at least three prior felony convictions in proceedings brought and tried separately.

Amalie Cooper [ASC #110025], a female, was charged with murder but pled guilty to voluntary manslaughter as a lesser offense although the evidence disclosed that she took the defendant's wallet during the commission of the homicide, thereby demonstrating probable cause to believe the truth of a robbery special circumstance; moreover, Ms. Cooper had a substantial record of previous criminal offenses.

John Jaco [ASC #H-16129A], a Hispanic male was allowed to plead guilty to second degree murder although the evidence demonstrated probable cause to believe that the murder occurred during the commission of a robbery, thereby supporting a robbery special circumstance, and despite the fact that he had previously suffered three felony convictions in separate proceedings, including a prior conviction for manslaughter.

Edwin Pauley [ASC #89786], pled guilty to second degree murder pursuant to a negotiated disposition with the Alameda County District Attorney's Office.  He was originally charged with murder, robbery, and a robbery-murder special circumstance.

Hal Haydon [ASC #95433] was charged with murder and one robbery-murder special circumstance but was allowed to plead guilty to second degree murder pursuant to a negotiated disposition with the Alameda County District Attorney's Office.

Joey Lockett, aka Mohammed Akmad [ASC #109424], was found guilty of first degree murder after a jury trial.  The jury had specifically been instructed on first degree felony murder during the commission of a robbery.  Although the evidence patently demonstrated probable cause to believe the truth of a robbery special circumstance, no special circumstance was charged—despite the fact that Mr. Lockett had suffered at least one prior felony conviction.

United States District Court
Northern District of California

16

Michael Horton [ASC #101599] was charged and convicted of first degree murder on a felony (robbery) murder theory.  The Court of Appeal subsequently reversed his conviction for instructional error, but specifically ruled that the felony murder instruction was proper and that the evidence was sufficient to support a conviction on that theory.  Nevertheless, Mr. Horton was never charged with any special circumstance.

James Hollister, Charles Ellis, and Caleb Ellis are currently charged with murder in Alameda County Superior Court [ASC #109256A, 10956B, and 109256C].  Although the evidence demonstrates probable cause to believe the truth of robbery or kidnapping murder special circumstances, none of the defendants is charged with any special circumstance.

Ex. 103 to Ex. F.  Petitioner uses this declaration to support his argument that the prosecutor in his case charged petitioner with special circumstances when similarly situated non-African-American defendants were not so charged.

As an initial matter, the Ogul declaration concedes that special circumstances were in fact charged in three of the above nine cases and is silent as to whether special circumstances were charged as to another three of these cases.  Thus only the last three of the listed cases, in which Ogul is clear that no special circumstances were charged, can be considered as support for petitioner's differential charging claim.  Three cases is not a large enough sample size to find differential charging.

In any event, the Court does not agree that the facts of these nine cases, as represented by Ogul, are more serious than the facts in the underlying case.  To reiterate, the evidence here shows that petitioner embarked on a heinous crime spree that covered two days and three locations and resulted in two robberies, two attempted murders causing serious bodily injury, and three murders performed via point-blank shootings.  Petitioner has not shown that the crimes committed in the nine above-listed cases were similar in seriousness, such that the prosecutor's decision to charge petitioner with robbery-murder and multiple-murder special circumstances was based on petitioner's race.  Thus, the state court had reasonable grounds to deny this claim.

Accordingly, petitioner is not entitled to habeas relief on this claim.[11]

---

[11] Although petitioner's claim is that his whole trial was "permeated" with racism, the main evidence he uses to support this claim comes from other cases.  Regarding petitioner's allegations of racism in the underlying trial, the Court has addressed his claim of racist jury selection above and will address his claim of juror racial bias below.

17

3.      Prosecutorial Misconduct in Closing Argument

Petitioner claims several instances of prosecutorial misconduct in closing argument. Petitioner contends that the prosecutor committed misconduct in several different comments he made during the guilt phase portion of the trial, and that, singly or cumulatively, this misconduct amounted to a due process violation.  Petition at 66-83.  Petitioner also contends that the prosecutor committed numerous acts of misconduct at the penalty phase, rendering his death sentence unconstitutional.  See id. at 66, 80-81, 83-94.  Given that petitioner is no longer subject to a death sentence, having been granted habeas relief in state court, the Court will not address his penalty phase allegations of prosecutorial misconduct.[12]

Prosecutorial misconduct is cognizable in federal habeas corpus; "the appropriate standard of review for such a claim . . . is the narrow one of due process, and not the broad exercise of supervisory power."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks omitted).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair.  Id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) (noting, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct "infected the trial with unfairness."  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial misconduct claim is decided by "examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation marks omitted).

With respect to the guilt-phase allegations of prosecutorial misconduct, petitioner specifically alleges that the prosecutor: (1) engaged in a pattern of attacks on defense counsel's honesty and integrity, Petition at 68-77; (2) engaged in a pattern and practice of denigrating

United States District Court
Northern District of California

---

[12] Indeed, petitioner appears to concede in his Traverse that the penalty phase allegations were not intended as separate claims but rather as "additional support" for his other prosecutorial misconduct claims.  Traverse at 27.

1

petitioner, <u>id.</u> at 77-78; and (3) argued "false 'facts' not in evidence," <u>id.</u> at 78-83.  Respondent

2

argues that this claim is procedurally defaulted, and, even if it were addressed on its merits, it must

3

be denied.

4

a.   <u>Procedural Default</u>

5

The state appellate court determined that petitioner had waived all three claims:

6

Defendant claims the prosecutor engaged in numerous acts of misconduct during closing arguments in the guilt phase.  Except as noted below, defense counsel failed to request an assignment of misconduct or an admonition, or both, as to each asserted claim of misconduct.  Defendant concedes we have held that, in general, failure to request an assignment of misconduct and an admonition forfeits a claim of prosecutorial misconduct on appeal unless an objection or request for admonition would have been futile or an admonition would not have cured the harm.  (*People v. McDermott* (2002) 28 Cal.4th 946, 1001, 123 Cal.Rptr.2d 654, 51 P.3d 874.)  He contends the trial court's responses to defendant's objections during summation and rebuttal suggested any objection or request for an admonition would have been futile.  Citing our decision in *Hill*, *supra*, 17 Cal.4th at pages 820–821, 72 Cal.Rptr.2d 656, 952 P.2d 673, defendant also argues he should be excused from the legal obligation to object to prosecutorial misconduct because the prosecutor's summation was "so poisonous" that repeated objections by counsel would have risked angering the court or the jurors.

Defendant, however, fails to show that any of these exceptions applies to any of his failures to object.  We therefore conclude that defendant has forfeited each claim of misconduct.

<u>Young</u>, 34 Cal. 4th at 1188.

A federal court will not review questions of federal law decided by a state court if the

decision also rests on a state law ground that is independent of the federal question and adequate

to support the judgment.  See <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30 (1991).  In cases in

which a state prisoner has defaulted his federal claims in state court pursuant to an independent

and adequate state procedural rule, federal habeas review of the claims is barred.  See <u>id.</u> at 750.

The rule cited here by the Court of Appeal, specifically, that a defendant must make a

contemporaneous objection at trial in order to preserve an issue on appeal, has been found to be a

sufficiently independent and adequate procedural rule to support the denial of a federal petition on

grounds of procedural default.  See <u>Paulino v. Castro</u>, 371 F.3d 1083, 1092-93 (9th Cir. 2004)

(finding claim procedurally defaulted based on California's contemporaneous objection rules).

The claim is therefore procedurally defaulted.

b.        Merits Analysis

Although the California Supreme Court found that the prosecutorial misconduct claims were procedurally waived, it also found that the claims failed on the merits.  In each instance, it found that either the prosecutor did not commit misconduct or that any misconduct he did commit was harmless even absent admonition.  Young, 34 Cal. 4th at 1188-98.  Given the length of the state court's discussion, this Court will not repeat it here.  This Court has reviewed the state court's analysis and finds that its basis for denying relief was objectively reasonable.  See id.  The state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Finally, even assuming any of the prosecutor's comments was inappropriate, it cannot be said that the comments "so infected the trial with unfairness" as to make the conviction a denial of due process.  See Johnson, 63 F.3d at 929.  The jury was instructed that the arguments of the attorneys were not evidence.  Young, 34 Cal. 4th at 1193, 1197.  See Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000) (rejecting prosecutorial misconduct claim in part because court had instructed jury that attorneys' statements were not evidence); Richardson v. Marsh, 481 U.S. 200, 206 (1987) (jury is presumed to have followed the trial court's instructions).  Finally, the evidence at trial—particularly the identification evidence, the testimony of Patrick Jackson, and the ballistics evidence—overwhelmingly pointed to petitioner's guilt.

Accordingly, petitioner is not entitled to habeas relief on this claim.

4.        Prosecutorial Misconduct in Presenting "False and Misleading Evidence"

Petitioner claims the prosecutor presented false and misleading evidence.  Petition at 94.  Specifically, he asserts that the prosecutor "attempted to insinuate to the jury that petitioner was responsible for a fourth killing that had not been charged, failed to control a government witness, and committed other misconduct in concealing, manufacturing, and manipulating evidence as well as presenting false and misleading evidence."  Id. at 95.

Petitioner cites four different events in support of this claim: prosecution questioning of Patrick Jackson; prosecution questioning of ballistics expert Chester Young; prosecution

20

questioning of surviving victim Manzine Miller; and intentional placement of a witness in petitioner's jail cell to create aggravating evidence for use in the penalty phase. Id. at 96-99. Once again, the Court does not address the last of these events as it concerns the penalty phase, and petitioner has already received state-court habeas relief vacating his death sentence.

The remaining allegations of guilt-phase prosecutorial misconduct concerning the presentation of evidence are ones that petitioner made on direct appeal in the California Supreme Court. Ex. C at 136-51. He reiterated them in his habeas petition in the California Supreme Court. Ex. F at 119-27. The California Supreme Court, on direct appeal, summarized and rejected the claim as follows:

> *a) References to Uncharged Homicides and the Valente Bullet*
>
> Defendant complains the prosecutor improperly implied defendant had committed uncharged homicides during his direct examination of Jackson, defendant's cousin. Jackson testified that shortly after defendant shot Frazier, defendant told Jackson he did so because Frazier had robbed him earlier. The prosecutor asked, "Aside from what you have testified here as to witnessing, did the defendant, your cousin, tell you that he had killed other people?" Defense counsel objected on relevance grounds. The trial court overruled the objection, and Jackson answered, "No." The prosecutor then asked, "Did you tell the police on March 13th of 1989 that your cousin had told you of other killings?" During a conference held outside the jury's presence, defense counsel objected to the prosecutor's questions on the ground of irrelevance because there was no evidence defendant was involved in either the Rivers or Davis murders or any other uncharged killings. The prosecutor explained he intended to ascertain only whether defendant told Jackson about the Rivers or Davis murders, and that the factual basis of his question was the transcript of an interview of Jackson by Sergeants Brian Thiem and Ramon Paniagua. The transcript, however, indicated only that the police officers asked Jackson if defendant told him of any other "shootings" and that Jackson responded, "Uh-huh." When Sergeant Thiem then asked Jackson what defendant said about other shootings, Jackson declined to discuss the matter further. The trial court indicated it was unsure whether there was a factual basis for the prosecutor's question, because Jackson was questioned only about other shootings, not other killings, and then sustained defense counsel's relevance objection on that ground. The trial court granted defense counsel's subsequent request to strike any references to "any other shootings," instead of "killings," and admonished the jury to "disregard any other reference to any other shootings," again instead of "killings."
>
> Contrary to respondent's assertion, we believe defendant has preserved his claim of prosecutorial misconduct for review. Although he did not request an assignment of misconduct or an admonition that the jury disregard the impropriety, through his relevance objection he gave the trial court an opportunity to correct the asserted abuse—an opportunity the court took advantage of by striking any references to "any other shootings" and admonishing the jury to "disregard any other reference to any other shootings."

 Although preserved for review, defendant's claim of prosecutorial misconduct nonetheless fails on the merits.  It is well established that a prosecutor may not "'ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist.'"  (*People v. Bolden* (2002) 29 Cal.4th 515, 562, 127 Cal.Rptr.2d 802, 58 P.3d 931.)  In other words, "a prosecutor may not examine a witness solely to imply or insinuate the truth of the facts about which questions are posed."  (*People v. Visciotti* (1992) 2 Cal.4th 1, 52, 5 Cal.Rptr.2d 495, 825 P.2d 388.)  Here, contrary to defendant's assertion, the trial court did not find the prosecutor lacked a good faith belief for his question regarding other killings defendant may have mentioned to Jackson; instead, the court concluded it was unsure whether there was a factual basis for the question.  Further, the circumstance that the prosecutor failed to distinguish between "other shootings" and "other killings" in his question to Jackson is unremarkable in this case because each of the three murder victims—Rivers, Frazier, and Davis—was killed in a shooting.  We therefore conclude the prosecutor's question about other killings was not improper.

* * *

Defendant next complains that during the direct examination of its ballistics expert, the prosecutor improperly insinuated a second time that he had committed uncharged homicides.  The expert testified regarding his comparison of the bullet recovered from Frazier's body with bullets recovered from the 74th Avenue house.  The prosecutor then asked the expert whether he had received a "request from homicide" to examine other bullets.  The expert responded that he retrieved four bullets from the property room, identifying  them as the "Rivers," "Frazier," "Miller," and "Valente" bullets.  When the prosecutor began to question the expert specifically regarding his examination of the Valente bullet, defense counsel objected to the question as follows: "If it please the court, it has no relevance."  The prosecutor interjected, "That is why we are getting rid of it right now."  The prosecutor and defense counsel ultimately stipulated the Valente bullet had different characteristics and was not related to this case or to defendant, and this stipulation was read to the jury. Assuming the contention was preserved for appellate review, any misconduct was harmless given the stipulation that the Valente bullet had nothing to do with defendant's case.

*b) Miller's "No Remorse" Response*

Defendant contends the prosecutor engaged in misconduct by intentionally eliciting inadmissible and prejudicial testimony from prosecution witness Manzine Miller.  He further complains this misconduct constituted error under *Griffin v. California* (1965) 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, by implying, contrary to his Fifth Amendment privilege against compelled self-incrimination, that defendant's failure to testify supported an inference of guilt.

At the conclusion of the prosecutor's redirect examination of Miller, the prosecutor asked, "Is there any doubt in your mind that the defendant shot you?" Miller answered, "There's no doubt.  He still has that same look when he did shoot me, no remorse whatsoever." Defense counsel objected that the response was "purposely conclusionary on the part of the witness" and moved that the response be stricken.  The trial court overruled counsel's objection and effectively denied the motion to strike.

We reject defendant's claim of prosecutorial misconduct at the threshold because he failed to request an assignment of misconduct or an admonition that the jury disregard the

United States District Court
Northern District of California

impropriety on the ground now asserted.  (*Ayala*, *supra*, 23 Cal.4th at p. 284, 96 Cal.Rptr.2d 682, 1 P.3d 3.)

We also reject the claim on the merits.  A prosecutor engages in misconduct by deliberately eliciting inadmissible testimony.  (*People v. Valdez* 2004) 32 Cal.4th 73, 125, 8 Cal.Rptr.3d 271, 82 P.3d 296 (*Valdez*).)  Here, no such misconduct occurred.  Miller's "no remorse" remark was nonresponsive.  Further, there is no reasonable likelihood that the jury would have understood Miller's response as referring to defendant's failure to testify.  (See *Clair*, *supra*, 2 Cal.4th at pp. 662–663, 7 Cal.Rptr.2d 564, 828 P.2d 705, citing *Griffin v. California*, *supra*, 380 U.S. at pp. 611–615, 85 S.Ct. 1229.)  Thus, no *Griffin* error occurred.

Young, 34 Cal. 4th at 1185-88.

In light of the foregoing, petitioner's allegations—that false and misleading evidence was presented amounting to prosecutorial misconduct—fail.  First, the Miller "no response" allegation is procedurally defaulted pursuant to California's contemporaneous objection rule.  See Coleman, 501 U.S. at 729-30; Paulino, 371 F.3d at 1092-93.

Second, the Court finds that the state court's analysis denying relief was objectively reasonable.  Applying the legal principles on prosecutorial misconduct outlined above to petitioner's current allegations, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Finally, even assuming error, the evidence of petitioner's guilt was so strong that any due process violation did not have a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  As discussed above, petitioner's identity as the murderer was supported by physical evidence, identification evidence, and the testimony of witnesses.

Accordingly, petitioner is not entitled to habeas relief on this claim.

5.     Prosecutorial Misconduct – Failure To Disclose Exculpatory Evidence

Petitioner claims that the prosecutor committed misconduct by suppressing possibly exculpatory evidence.  Specifically, petitioner claims the prosecution suppressed: (1) evidence of possible third party culpability, (2) impeachment evidence regarding prosecution witness Melva Fite, and (3) evidence that government agents used force and coaching to obtain Patrick Jackson's statement implicating petitioner.  Petition at 99.  Petitioner presented these claims in state court only in his state habeas petition, which the California Supreme Court summarily denied on the

United States District Court
Northern District of California

1   merits.

2       In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that "the suppression

3   by the prosecution of evidence favorable to an accused upon request violates due process where

4   the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith

5   of the prosecution." <u>Id</u>. at 87. In order to succeed on a <u>Brady</u> claim, a petitioner must show:

6   (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or

7   impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and

8   (3) that it was material (or, put differently, that prejudice ensued). <u>Banks v. Dretke</u>, 540 U.S. 668,

9   691 (2004). Evidence is material if "there is a reasonable probability that, had the evidence been

10   disclosed, the result of the proceeding would have been different." <u>Cone v. Bell</u>, 556 U.S. 449,

11   469-70 (2009).

12                    a.      <u>Third Party Culpability</u>

13       As to evidence of possible third party culpability, the jury convicted petitioner of the

14   attempted murder of Luther Thomas, the robbery of Gerald Livingston, and the murder of

15   Sylvester Davis (counts 6, 7, and 8, respectively), all of which occurred in the early morning hours

16   of February 19, 1989, at the "crack house" located at 2661 74th Avenue in Oakland. Petitioner

17   contends that the prosecution "withheld evidence which would have provided powerful evidence

18   of third-party culpability" for these three convictions, "including evidence of numerous robberies

19   and armed assaults" that occurred at 2661 74th Avenue prior to February 19, 1989. Petition at 99,

20   ¶ 267.

21       Petitioner supported this alleged <u>Brady</u> violation in state court, and continues to support

22   the allegation, with the declaration of one Joseph Lee ("J.L.") Batiste, who lived at 2661 74th

23   Avenue in 1988 and 1989. Petition at 101-02 (citing Ex. 51 to Ex. F). Therein Batiste declared:

24           Two days before Sylvester Davis was killed the house was robbed. This was at
             about five o'clock in the morning. I was in the living room with Tyrice Ross and two
25           or three other people. There was a knock on the door, and when I opened it, two men
             were standing there wearing masks and pointing guns at me. The men wore black ski
26           masks, but I could tell they were black men by their voices. They were much taller
             and bigger than I was, but I cannot accurately estimate their height today. One of
27           them said "Give me the money. Give me the dope." He repeated this several times. They
             also said, "don't be looking at us," and made us lie down on the floor. I told
28

United States District Court
Northern District of California

1

them we didn't have any money or dope, and they warned us, "Don't sell dope out of this place no more."  They then left the house.

2

Ex. 51 to Ex. F at p. 2, ¶ 8.

3

4

5

6

7

8

9

10

The "Tyrice Ross" to whom Batiste referred provided a declaration to substantially the same effect as Batiste's.  See Ex. 64 to Ex. F at 2, ¶ 7.  According to petitioner, during the February 17 incident "the perpetrators used language strikingly similar to that used by the perpetrators of the February 19 incident, announced that the house was in their turf, stated that they had warned Batiste previously against selling drugs in the house, and warned they would return if they heard Batiste or others were selling drugs again. . . . Had these reports been disclosed, the defense could have presented convincing evidence that Davis was killed not by petitioner, but by third parties. . . ."  Petition at 101-02.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The California Supreme Court reasonably rejected this claim of Brady error.  Richter, 131 S. Ct at 789.  Petitioner's claim that the prosecution withheld this "third-party culpability" information from the defense in violation of Brady fails because Batiste specifically disclaimed that police came to the home after this February 17 incident and that he spoke to the occupants about it.  Ex. 51 to Ex. F at 2-3, ¶ 8.  Ross offered nothing to the contrary.  Ex. 64 to Ex. F.  The United States Supreme Court has never held that law enforcement has actual or constructive knowledge of an unreported crime that occurred days before at the scene of the crime, such that law enforcement has a Brady obligation to turn the unreported information over to the defense. Carey v. Musladin, 549 U.S. at 74-77 (denying habeas relief in absence of clearly established federal law).  Further, the only commonality between the February 17, 1989 and February 19, 1989 incidents is that the assailant used the language along the lines of, "Give me money.  Give me dope."  Ex. 51 to Ex. F at 2-3, ¶¶ 8, 9.  The state court could have reasonably concluded that this slim link was insufficient to show that the February 17 perpetrators were also culpable of the February 19 incident.  Cone, 556 U.S. at 469-70.[13]

25

26

Batiste also averred in his declaration to the California Supreme Court that in December 1988 his cousin Demard Williams and Demard's girlfriend, Dorthea ("Dot") Johnson, were also

27

28

_____

[13] Indeed, even assuming there was a way for the evidence to be "turned over," the prosecution may have argued that petitioner was one of the February 17 perpetrators.

United States District Court
Northern District of California

living at 2661 74th Avenue, and that on the 14th:

> I was in my room in the basement of the house when gunmen came in, robbed the house, and shot Dot.  I remember the date because it was my birthday.  The police were called to the house and took reports after that incident.

Ex. 51 to Ex. F at 1, ¶ 4.

The California Supreme Court reasonably rejected this claim of <u>Brady</u> error because the information is not material.  <u>Richter</u>, 131 S. Ct. at 789.  There is no reasonable probability—a probability sufficient to undermine confidence in the outcome—that had the prosecution disclosed this evidence to the defense petitioner would have received a different result on counts 6, 7, and 8.  <u>Cone</u>, 556 U.S. at 469-70.  The state high court could have reasonably concluded that it was pure conjecture by petitioner that had the jury learned that a robbery and shooting occurred at 2661 74th Avenue on December 14, 1988, by unidentified "gunmen," that the jury would have then had a reasonable doubt in the testimony of Luther Thomas and Gerald Livingston, who identified petitioner as the perpetrator of the attempted murder, robbery, and murder that occurred at 2661 74th Avenue on February 19, 1989.  Ex. B at 2926-30, 2990-91, 3022.

Petitioner next claims, "At least two other home invasion felonies were committed in this residence during a period of approximately six months prior to the Davis homicide.  However, no reports of any of these incidents were disclosed to the defense."  Petition at 101, ¶ 269.  The California Supreme Court could have reasonably rejected this claim of <u>Brady</u> error on the grounds it was a conclusory allegation, given that petitioner did not submit any evidence substantiating the other alleged home invasion felonies.  Nor does petitioner provide any documentation to support the claim herein.[14]  Clearly established federal law does not permit the grant of habeas relief on conclusory and unsupported claims.  <u>Jones v. Gomez</u>, 66 F.3d 199, 204-05 (9th Cir. 1995) (mere conclusions of violations of federal rights in a federal habeas petition without specifics do not state a basis for habeas corpus relief).

---

[14] The Batiste declaration refers to one robbery occurring "several months" before the February 19, 1989 incident, but he specifically refers to the perpetrator as a man named Sergio.  Ex. 51 to Ex. F at 1, ¶ 3.

1    Accordingly, petitioner is not entitled to habeas relief on this claim.

2         b.    Melva Fite

3    As to evidence allegedly impeaching Melva Fite, the eyewitness to the killing of Glen

4    Frazier, petitioner asserts that the prosecution suppressed evidence that Fite "was addicted to crack

5    cocaine and alcohol, had a long history of lying and dissembling to the courts, and suffered from

6    psychiatric illness which caused her to fabricate and fantasize accounts."  Petition at 102, ¶ 270.

7    In support of this claim, petitioner cites to the report and other documents from the probation

8    officer's file of Fite's 1987 forgery case.  Petition at 102-03 (citing Exs. 86-87 to Ex. F).

9    Specifically, petitioner relies on a July 1987 letter from Fite's probation officer to Fite's trial court,

10   in which the officer states that Fite had given the officer "much false information, especially with

11   regard to data in the Social Services files from Children's Protective Services.  She has a history of

12   non-compliance and non-cooperation as well as lying and dissembling to the Court, according to

13   Social Services information.  She has not cooperated properly during the presentence period and

14   has failed to keep one of her two scheduled appointments and submit information requested of

15   her."  Id.  Petitioner next points out that a September 1987 probation department memo to the

16   same court stated that Fite had become homeless and lost each of her six children to foster care,

17   and admitted "a recent problem with both alcohol and drug abuse."  Id.  The probation officer told

18   the court that she had referred Fite "to a community health program for psychotherapy, in view of

19   her painful childhood experiences of rejection and abuse, about which she fantasizes and

20   fabricates various accounts."  Id.  Petitioner asserts that the foregoing evidence "would have

21   permitted the defense to thoroughly demolish the credibility of Melva Fite's testimony, both with

22   respect to her version of the events of January 30, 1989, and with respect to her identification of

23   petitioner as the perpetrator of the Glen Frazier killing."  Petition at 103, ¶ 272.

24   A review of the record shows that defense counsel did impeach Fite with her felony

25   forgery conviction.  Ex. B at 2744, 2754.  Defense counsel also challenged Fite's identification of

26   petitioner as the perpetrator.  Specifically, on cross-examination of Melva Fite during her

27   testimony in the prosecution's guilt-phase case-in-chief, and also during the defense guilt-phase

28   case, defense counsel established that on March 1, 1989, Fite viewed a photo lineup that included

United States District Court
Northern District of California

a picture of petitioner.  She identified that picture as the photo of the man who assaulted her and

killed Frazier, but was not absolutely sure.  Ex. B at 2656-57, 2659-61, 2751-52, 2757-58.  Fite

told the police that she could identify the assailant in person, but at a physical lineup held on

March 3, 1989—a lineup that included petitioner—she did not identify anyone, and only

expressed uncertainty about someone other than petitioner.  Id. at 2657-58, 2661-68, 2744-47,

2758, 3235-40.

Defense counsel also challenged Fite's version of events.  Specifically, at the prosecution's

guilt-phase case-in-chief, Fite testified that in the early morning hours of January 30, 1989, as she

and Glen Frazier proceeded up 89th Avenue, the assailant and another person pulled up to them in

a black-over-green Ford LTD.  Ex. B at 2639-42, 2748-49, 2680-8.  Petitioner, whom Fite had

never seen before, exited the passenger seat and, in Fite's words, "walked behind me and Glen

going towards Plymouth and 89th.  And then he turned around looking towards Rick and asked:

are you talking to me?"  Id. at 2642, 2648-49, 2727.  Fite denied having told Oakland Police

officer Derek Norfleet that the gunman had exited a blue Cadillac, and denied telling Norfleet that

the driver never exited the car.  Ex. B at 2686-87, 2693.

In the defense case, by way of impeachment, petitioner presented evidence that when

Officer Norfleet took a statement from Melva Fite on the morning of January 30, 1989, she was

"shocked" and very emotional.  Ex. B at 3161-62, 3168-70, 3175-76.  Norfleet testified that Fite

had told him that earlier that morning she saw two men in the same car at both 89th and 90th

Avenues and that it was the passenger who got out and did the shooting at both locations.  Id. at

3164-65.  At no point did Fite tell Norfleet that the driver had exited the car.  Id. at 3165, 3183.

She did say that she thought the car was as an older model blue Cadillac.  Id. at 3180.

Oakland Police sergeant Brian Thiem also took a statement from Fite at headquarters when

Norfleet brought her there at around 7:35 a.m. on January 30, 1989.  Ex. B at 3230, 3233, 3241-

42.  Fite initially told Thiem that the person who had fired the gun at both 89th and 90th Avenue

exited the passenger's side of the car.  Id. at 3231-32.  However, later in the interview Fite said she

thought the shooter might have gotten out of the driver's side of the car at 90th Avenue.  Id. at

3245-47.  Even later in the interview, after further discussion, while still sure the shooter had

28

exited the passenger's side on 89th Avenue, Fite became convinced the shooter had exited the driver's side of the car on 90th Avenue.  Id. at 3247-51.  Fite repeated that the same person had gotten out of the car at both locations and said she remembered this clearly because of the jacket the gunman wore, and also because of his face.  Id. at 3250-51.

When Sergeant Thiem showed Fite a book that contained pictures of cars, she was sure the gunman's car was either a Chevrolet Impala or a Chrysler New Yorker, of approximately a 1972 vintage.  Ex. B at 3233-34, 3253-55, 3259.  Fite described the color as "turquoise greenish, bluish," with a dark top.  Id. at 3256-57.

Finally, in guilt-phase summation, defense counsel vigorously attacked Fite's credibility. Ex. B at 3514-18, 3521-24, 3526-30, 3534.  For example, defense counsel argued in closing that:

> Melva Fite kept adapting her statements to fit the situation that existed at the time she was giving the statement.
>
> * * *
> Ms. Fite is the person that [the prosecution] would like to have you believe.  And she is a person who has been convicted of forgery, a felony.  Now, she tells you she thinks it is a misdemeanor.  Well, it is not a misdemeanor at all.  The record reflects it is a felony.  She had been convicted of a felony.  Forgery is saying something is genuine when, in fact, it isn't.
>
> Well, that is exactly what she is doing in this courtroom.  She is saying that this is the genuine article that committed that crime against Frazier when, in fact, it isn't.

Ex. B at 3514-18.

In light of the above, the state court could have reasonably found that any additional impeachment evidence that could be garnered from Fite's 1987 probation file, had it been presented at trial, would not have changed the result of the proceeding.

Accordingly, petitioner is not entitled to habeas relief on this claim.

c.    Patrick Jackson

As to petitioner's cousin, Patrick Jackson, petitioner contends that the prosecution "failed to reveal that Jackson's tape-recorded statement to [police investigators], obtained on or about March 13 and 15, 1989, was obtained through physical intimidation and threats which occurred prior to the time when the officers turned on the tape recorder and read Jackson the Miranda

warnings."  Petition at 107, ¶ 284.  Petitioner further contends that the officers periodically coached Jackson on what to say at times when the tape recorder was turned off.  Id.

The record reflects that on March 13, 1989, Oakland Police sergeants Brian Thiem and Ramon Paniagua traveled to a California Youth Authority facility in Sacramento and interviewed Patrick Jackson regarding the January 30, 1989 killing of Glen Frazier.  Ex. B at 3125-26.  At petitioner's guilt-phase trial, Jackson testified under a grant of immunity and essentially corroborated the testimony of Melva Fite by giving testimony from which the jury could have reasonably inferred that his cousin, petitioner, shot Glen Frazier on an Oakland street on the morning of January 30, 1989.  Id. at 2767-2811.  At various points during that testimony, in an attempt to refresh recollection, the prosecutor provided Jackson with the transcript of his tape-recorded March 13, 1989 interview with Paniagua and Thiem.  Ex. B at 2771-73, 2786-87, 2806-07, 2808-09.

Petitioner offered the California Supreme Court no documentation supporting his allegation of police coercion and coaching of Jackson.  For example, petitioner does not provide a declaration from Jackson recanting the testimony or attesting to the conditions of the police interview.  The state court could have therefore reasonably denied the claim as conclusory.  Richter, 131 S. Ct. at 789; Jones v. Gomez, 66 F.3d at 204-05.  Further, Jackson appeared at trial for cross-examination regarding his out-of-court testimony and the police interrogation techniques; a fact that courts have recognized safeguards admission of such statements against a due process violation.  Nasrichampang v. Woodford, 288 F. App'x 367, 368 (9th Cir. 2008) (quoting Williams v. Woodford, 384 F.3d 567, 596 (9th Cir. 2004)).

Accordingly, petitioner is not entitled to habeas relief on this claim.[15]

---

[15] Petitioner tacks on an argument that the prosecution failed to disclose jail medical records showing petitioner suffered from sprained and broken ankles prior to the offenses.  Petition at 108, ¶ 285.  This evidence and its relevance are discussed more below.  Suffice it to say that the state court reasonably denied this claim given petitioner and/or defense counsel already knew or should have known about petitioner's medical condition.  See Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998) ("There is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose.") (omission in original) (internal quotation marks omitted).  Indeed, petitioner, not the prosecution, was in the best position to know about his medical condition.

6.      Ineffective Assistance of Counsel – Guilt-Phase Investigation

Petitioner asserts multiple claims of ineffective assistance of his trial counsel, Alexander Selvin and Bud Meloling.  All claims variously allege that counsel failed to investigate and present exculpatory evidence pertaining to the guilt-phase of his trial.  Petition at 108-132.  Petitioner presented this claim only on state habeas to the California Supreme Court, which summarily denied it on the merits.

Claims of ineffective assistance of counsel are examined under Strickland v. Washington, 466 U.S. 668 (1984).  In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two factors.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, id. at 687-88, "not whether it deviated from best practices or most common custom," Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (citing Strickland, 466 U.S. at 690).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  Id. at 787 (quoting Strickland, 466 U.S. at 689).

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.  Where the petitioner is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."  Id. at 695.  "The likelihood of a different result must be substantial, not just conceivable."  Richter, 131 S. Ct. at 792 (citing Strickland, 466 U.S. at 693).  It is unnecessary for a federal court considering an ineffective assistance of counsel claim on habeas review to address the prejudice prong, i.e., the second factor of the Strickland test, if the petitioner cannot establish incompetence, as required under the first prong.  Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential, and when the two apply in tandem, review is doubly so."  Richter, 131 S. Ct. at 788 (quotation marks

1    and citations omitted).  "[T]he question [under § 2254(d)] is not whether counsel's actions were

2    reasonable.  The question is whether there is any reasonable argument that counsel satisfied

3    Strickland's deferential standard."  Id.

4        "[S]trategic choices made after thorough investigation of law and facts relevant to

5    plausible options are virtually unchallengeable; and strategic choices made after less than

6    complete investigation are reasonable precisely to the extent that reasonable professional

7    judgments support the limitations on investigation."  Strickland, 466 U.S. at 690-91.  "In any

8    ineffectiveness case, a particular decision not to investigate must be directly assessed for

9    reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

10   judgments."  Id. at 691.

11       That an attorney might have conducted a more thorough investigation does not establish

12   deficient performance.  Burger v. Kemp, 483 U.S. 776, 794 (1987).  "[T]he duty to investigate

13   does not force defense lawyers to scour the globe on the off chance something will turn up;

14   reasonably diligent counsel may draw a line when they have good reason to think further

15   investigation would be a waste."  Rompilla v. Beard, 545 U.S. 374, 383 (2005).  The question is

16   not what the best lawyer or even what most good lawyers would have done, but whether a

17   reasonable lawyer could have acted as defense counsel did.  Coleman v. Calderon, 150 F.3d 1105,

18   1113 (9th Cir. 1998), rev'd on other grounds, 525 U.S. 141 (1998).  Thus, the relevant inquiry is

19   not what trial counsel could have done, but whether counsel's actions were reasonable.  Babbitt v.

20   Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998).

21       To succeed on a claim that counsel was ineffective in failing to call a favorable witness, a

22   federal habeas petitioner must identify the witness, provide the testimony the witness would have

23   given, show the witness was likely to have been available to testify and would have given the

24   proffered favorable testimony, and demonstrate a reasonable probability that, had such testimony

25   been introduced, the jury would have reached a verdict more favorable to the petitioner.  See

26   Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003).  A petitioner's mere speculation that

27   the witness would have given helpful information if interviewed by counsel and called to the stand

28   is not enough to establish ineffective assistance.  See Bragg v. Galaza, 242 F.3d 1082, 1087 (9th

United States District Court
Northern District of California

Cir.), amended, 253 F.3d 1150 (9th Cir. 2001).

In Dows v. Wood, 211 F.3d 480 (9th Cir. 2000), the Ninth Circuit denied a petitioner's claim that his counsel had been ineffective in failing to investigate and call a witness, where the petitioner only provided his own "self-serving affidavit" and no other evidence, such as "an affidavit from [the] alleged witness," that the witness would have given helpful testimony.  Id. at 486-87; cf. Alcala, 334 F.3d at 872 & n.3 (distinguishing, inter alia, Dows; finding ineffective assistance of counsel where petitioner submitted interviews reflecting testimony missing witnesses would have provided).

At the outset, the Court notes petitioner has offered only his own conclusory statements and fails to provide a factual showing that his trial counsel in fact failed to investigate the purported exculpatory information.  Petitioner thus fails to show ineffectiveness on the part of defense counsel.  See United States v. Schaflander, 743 F.2d 714, 721 (9th Cir. 1984) (holding petitioner must make sufficient factual showing to substantiate ineffective assistance of counsel claim).  On this basis alone, the state court had reasonable grounds to deny the claims.  Richter, 131 S. Ct. at 786.  The Court nonetheless addresses each claim below.

a.      Crimes Against Manzine Miller and Terry Rivers

Petitioner alleges the following claims of alleged ineffective assistance of counsel in the investigation of the Rivers homicide and Miller shooting incident (counts 1, 2, and 3).

i.      Miller's Identification of Petitioner

Petitioner claims defense counsel did not properly investigate victim Manzine Miller's eyewitness identification of petitioner as his assailant in connection with count 2 (robbery) and count 3 (attempted murder).  Petition at 110-11.  Petitioner states that had counsel conducted a proper investigation they would have learned that Miller's identification suffered from many of the "biasing factors" that empirical social science research data has established "taint" identifications (e.g., Miller had never seen petitioner before; attacks are stressful and the accuracy of eyewitness identification "plummets when the observer is in a stressful situation"; Miller had ingested a large amount of alcohol and crack cocaine; there is no correlation between certainty and accuracy; and the lineup procedures the police used with Miller "were themselves suspect").  Id.  Petitioner

1   concludes that counsel should have "retain[ed] an expert witness to analyze Miller's testimony or

2   to testify regarding the inaccuracy of eyewitness testimony or Miller's identification of petitioner, .

3   . . and it is at least reasonably probable that a more favorable result would have been obtained had

4   counsel retained such an expert and presented evidence undercutting the credibility of Miller's

5   identification." Id. at 111.

6          Petitioner has offered no evidence that an identification expert would have provided

7   favorable testimony at trial.  He merely speculates that such an expert could be found.  Such

8   speculation is insufficient to establish prejudice.  See Grigsby v. Blodgett, 130 F.3d 365, 373 (9th

9   Cir. 1997) ("Speculation about what an expert could have said is not enough to establish

10  prejudice.").

11         Further, closing argument shows that defense counsel defended against counts 2 and 3 by

12  acknowledging that petitioner went into the swamp with Miller, but arguing that petitioner didn't

13  rob Miller, and shot him only because he (petitioner) credibly felt that Miller was about to rob

14  him.  Ex. B at 3500-09, 3513.

15         Now, if you believe Mr. Miller that, in fact, [petitioner] took his rock of
           cocaine as part of a break yourself, give me all your money routine, then it is a
16         robbery.  The law is clear it is a robbery.  But I submit to you before you come to that
           conclusion, you consider the other factors; whether or not something like that under
17         those conditions could even be observed under those facts.

18         Did he shoot him because he was afraid he was going to get ripped off himself?
           That is more reasonable.  And if the evidence points to two possible reasonable
19         interpretations of the facts, you have to adopt the reasonable.  I am sorry.  If one is
           reasonable and one is unreasonable, you adopt the reasonable, even if it points to his
20         innocence.

21         If both are reasonable, you still have to adopt the one that points to his
22         innocence.

23         If one is reasonable and one is unreasonable, the one that is reasonable points to
24         guilt, then you find the one that points to guilt and you find him guilty.  That is what
           circumstantial evidence is all about.

25
           Did he intend to kill Manzine Miller?  He shot him in the hip from six or seven
26         feet away.  He shot him in the hip.

27  Ex. B at 3508-09.

28
                                                    34

Here, counsel reasonably defended against counts 2 and 3 given the evidence that Miller had ample time to see his assailant, and adequate lighting to do so as well.  Ex. B at 2374-77, 2382, 2427-28, 2446, 2483-86.  Miller testified: "The kitchen—we went in the kitchen.  You're not going to forget the person that shoot you, I tell you that." Id. at 2485.  In interpreting Strickland, courts have repeatedly held that they will refuse to second-guess counsel's tactical decision to present a particular theory of defense when the decision was reasonable under the circumstances. Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001); United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990).

Accordingly, petitioner is not entitled to habeas relief on this claim.

### ii.  Miller's Mental Impairments and Addictions

Petitioner claims that counsel failed to investigate Miller's background and learn that "at the time of his testimony, Miller was undergoing treatment for brain damage, drug and alcohol addiction, and a history of psychiatric disorders, all of which severely impaired his ability to perceive, recollect, and testify credibly regarding the events of January 30."  Petition at 111.

The state court could have reasonably denied the claim as conclusory.  Gomez, 66 F.3d at 204-05.  The medical records petitioner cites in support of the present subclaim are from 1992. Ex. 80 to Ex. F.  The 1992 records do not establish that in October 1990, at the time of his testimony in this case, Miller suffered from any of the ailments or difficulties described by petitioner.  Petitioner fails to specify which, if any, of the facts described in the 1992 records were in existence at the time of trial and could have been discovered by counsel through reasonable diligence.  Further, although the medical records state that Miller was in a confused state after being brought by paramedics for hospital treatment on May 8, 1992, nothing in the 1992 medical records addresses Miller's ability to perceive, recollect, or testify.

As part of this second allegation of guilt-phase investigation ineffectiveness, petitioner complains that counsel did not investigate and discover Lonnie Eugene Nero, who would have testified that Miller was a long-time abuser of crack cocaine, heroin, and alcohol.  Petition at 112 (citing Ex. 56 to Ex. F).  Exhibit 56 is a declaration signed by Nero in 2003, in which he states that "after midnight" throughout January 1989, "Manzine was always messed up.  In addition to the

35

drugs he used, he also drank a lot, sometimes to the point where he would pass out.  Other times he would be so drunk and messed up that it didn't seem like he knew what was going on." Ex. 56 to Ex. F, ¶ 4.  Nero's declaration contains no statement that Manzine Miller was "messed up" to the point of passing out in the early morning hours of January 30, 1989, nor does Nero declare that he was available to petitioner's defense counsel in 1989 and 1990, and that he would have testified to the contents of his declaration.  These omissions are fatal to the present ineffectiveness claim. See Allen v. Woodford, 395 F.3d 979, 1002 n.2 (9th Cir. 2005); Dows, 211 F.3d at 486; Bragg, 242 F.3d at 1087; United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988).

Finally, the record shows that defense counsel Selvin and Meloling, as part of the defense presented on counts 2 and 3, went to great lengths to emphasize Miller's admission that he was "not exactly sober" during his encounter with petitioner, in a clear effort to have the jury draw the inference that Miller lied about petitioner robbing him.  Ex. B at 2400-01, 2416-18, 2443-44, 2476-79.  In light of this argument, the state court could have reasonably found that any additional impeachment evidence, even assuming it was reasonably discoverable, would not have changed the result of the proceeding.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### iii.  Miller's Psychiatric Illnesses

Petitioner next claims that defense counsel failed to investigate and discover that Miller "suffered from psychiatric illnesses which rendered his testimony inherently incredible."  Petition at 112-13.  According to petitioner, "Miller was diagnosed not only with polysubstance abuse, but also with a 'personality disorder' not otherwise specified . . . . [¶] The diagnosis continued that Miller's personality disorder demonstrated 'antisocial traits,' a reference to antisocial personality disorder," which has deceit and manipulation as central features.  Id.

The California Supreme Court reasonably rejected this ineffectiveness claim due to a lack of support.  Jones v. Gomez, 66 F.3d at 204-05; James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994). Petitioner again cites medical records for Miller from 1992, Petition at 112 (citing Ex. 79 to Ex. F), rather than any records in existence at the time of trial some two to three years earlier. Petitioner fails to show how any information contained in the medical file could have reasonably

been discovered by defense counsel.

Accordingly, petitioner is not entitled to habeas relief on this claim.

iv.   Miller's Conflicting Testimony

Petitioner's Exhibit 120 in the California Supreme Court is two pages of notes from Oakland Police officer Voznik regarding the interview he had with Miller in the emergency room of Highland Hospital on the morning of January 30, 1989.  Petitioner's Exhibit 81 in the California Supreme Court is the police report detailing the statement Miller gave at that time—a statement that was "not completed because Miller was rushed into surgery."  Ex. 81 to Ex. F at 2.  In his next allegation of guilt-phase investigation ineffectiveness, petitioner states that these two exhibits do not reflect Miller mentioning two matters he later testified to: (1) that he and his assailant went into Miller's kitchen together, and (2) that the assailant took a $20 rock of cocaine from him when they were in the swamp together and the assailant pulled the gun.  Petition at 113. Petitioner also notes that Miller told Officer Voznik that he (Miller) "did not see them" (petitioner and Jackson) "with a car," and that Miller contradicted this statement at trial.  Id.

Petitioner appears to claim that counsel should have impeached Miller with the contradiction and omissions from the police report and officer notes.  The California Supreme Court could have reasonably concluded that there exists no reasonable probability of a different result had counsel impeached Miller in the manner suggested.  Strickland, 466 U.S. at 694.  The jury likely would have understood that the omission from and contradictions between Miller's police statement and trial testimony resulted from the fact that he gave the police statement immediately after getting shot and as he was being rushed into surgery, and therefore his failure to include or correctly recount every detail regarding the shooting was understandable.

Accordingly, petitioner is not entitled to habeas relief on this claim.

v.   Other Witnesses Who Contradict Miller

Petitioner next claims that defense counsel failed to interview or develop information from Miller's uncle, Harvey Edwards, and Terry Rivers' girlfriend, Michelle Williams.  Petition at 114. According to petitioner, "Edwards told police that he and Michelle stayed in the kitchen for twenty minutes prior to the shooting and that Miller had come into the kitchen alone."  Id. (citing Ex. 116

United States District Court
Northern District of California

to Ex F).  "In her contemporaneous statement to the police, Michelle Williams also agreed that she was in the house with Edwards for 15 minutes prior to the shooting, but did not mention Miller or the shooter coming into the kitchen."  Id. at 114 (citing Ex. 125 to Ex. F).

The state court had a reasonable basis to deny this claim.  First, as noted above, petitioner only speculates that defense counsel failed to interview Edwards and Williams.  In any event, petitioner presented no declaration from either Edwards or Williams stating that they were available to defense counsel in preparation for trial and that they would have testified in the manner petitioner now claims.  Allen, 395 F.3d at 1002 n.2; Dows, 211 F.3d at 486.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### vi.  Miller's Identification of the Assailants

Petitioner claims defense counsel failed to investigate and develop evidence that Miller gave police descriptions of petitioner and of Patrick Jackson that "did not even begin to match" what petitioner and Jackson really looked like.  Petition at 114-15.  This claim fails because the California Supreme Court could have reasonably concluded that counsel reasonably decided to forgo a misidentification defense in favor of a defense on counts 1, 2, and 3 that placed petitioner and Jackson in the area, but had petitioner defending himself from Miller in the swamp (counts 2 and 3) and had Jackson killing Rivers (count 1).  Ex. B at 3500-09, 3513.  Richter, 131 S. Ct. at 789-90 (counsel had reason to question the truth of defendant's account of events, and pursuing forensic evidence could have exposed his story as an invention).  "To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."  Richter, 131 S. Ct. at 790.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### vii.  Reconstruction Expert

Manzine Miller initially testified that after petitioner shot him and left, five to ten minutes passed before he (Miller) heard the sound of the three additional gunshots—see Ex. B at 2387-88, 2467-68—the gunshots that the prosecution theorized petitioner fired to kill Terry Rivers (count 1).  However, on cross-examination Miller testified that he heard the shots three minutes later, and he then admitted that it could have been less than two minutes later, "or more."  Id. at 2468-69.

38

Miller continued: "Like I say, it could have been two to three minutes." Id. at 2497. "Two minutes." Id. at 2503. Finally, defense counsel asked Miller to reconstruct the time period between the shot which struck him and the three shots he heard coming from the street, slapping his thigh once for each gunshot. Id. at 2503-04. Defense counsel declared for the record that this reconstruction showed the passing of eight seconds between the time petitioner shot Miller to the time the first shot came from the street. Id. at 2504. Petitioner assumes that Manzine Miller's "eight second" testimony was the absolute truth, and thereon claims that counsel failed to "retain a criminalist, investigate the crime scene, or attempt a reconstruction of this incident for the jury to demonstrate that no person could have covered the distance in the amount of time allotted." Petition at 115-16.

The California Supreme Court could have reasonably rejected this claim on the ground that if Miller's "eight second" testimony reflected what the jury was going to accept as the truth, trial counsel did not need an expert to reconstruct the incident for the jury to demonstrate that no person could have covered the distance at issue in eight seconds. Richter, 131 S. Ct. at 789. As they did, counsel could reasonably use summation to stress this common-sense point to the jury:

> Now, question, can you connect [petitioner] with the Rivers shooting factually without the gun? And the answer is, no, you can't. You can't. Because from a time standpoint, and we went through this very carefully with Manzine Miller. Manzine Miller first said in response to a question by [the prosecutor] was five or ten minutes from the time he was shot until the time he heard the three shots up above.
>
> First he said [Petitioner] ran up the hill and then there were three shots. He crawled across 23rd Street and was taken over there by the paramedics and was taken to Highland Hospital and treated and so on. All right.
>
> On the witness stand he said first on direct examination two to three minutes. And you will recall this, I am sure, when it came right down to it, from the standpoint of sequence of events, I asked him very carefully. Mr. Miller, would you illustrate for us the time lapse between the time you were shot and the time that you heard the other shots. And he said there was—he said I was shot and then he paused and he went and he patted himself on the thighs. And I recorded eight seconds between the two. The judge recorded nine seconds. But in any event, the record reflects that eight seconds passed.
>
> Now, by the best evidence that the prosecution has established through one of the officers, I think it is Officer Bowden—I can be mistaken about his name, but I think it was Officer Bowden—was 125 to 150 feet from the point where Mr. Miller

was shot to the point in front of the house.

Mr. Miller says it is between five and six hundred feet.  You can look at the aerial photo and it will show the path that had to be traversed from the point down here at the tree.  This is the tree that is down right here.  Up the hill, up here, up the swamp, back over to the front of the house and shoot Terry Rivers after he shot Manzine Miller.

I submit to you that it is not factually possible based on the evidence you heard that you cannot conclude beyond a reasonable doubt that that happened that way.

Why isn't it just as reasonable to assume, if you will, that Patrick Jackson, standing in front of that house, who had been there watching the house, and who had been there watching the street, why can't you just reasonably, just as reasonably assume and find, if you will, that Patrick Jackson, who has been given immunity from that murder in order to testify, that he killed Terry Rivers.

Ex. B at 3511-12.[16]

No criminalist was needed.  In any event, petitioner provides no declaration from a criminalist showing what he or she could have said at trial.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### viii.  Petitioner's Ankles

Petitioner's next several claims of guilt-phase investigation ineffectiveness concern the failure of defense counsel to investigate and present the evidence that in the early morning hours of January 30, 1989, petitioner was still suffering from the severely sprained ankles he had first injured on January 2, 1989.  According to petitioner, this evidence would have shown that it was physically impossible for him to have committed the killing of Terry Rivers as he could not have covered the terrain necessary in the time allotted by Manzine Miller.  Petition at 115-19 (citing Exs. 18, 115, 128 to Ex. F).

The state court had reasonable basis to deny this claim.  First, the actions of counsel are

---

[16] Evidence, even conflicting evidence, is sufficient to sustain a verdict unless, in the view of the reviewing court, the evidence the jury relied on to convict was inherently improbable or physically impossible.  People v. Barnes, 42 Cal. 3d 284, 303-06 (1986).  Petitioner appears to argue that because Manzine Miller testified that the only way he could measure the time between the shot at him and the shots he later heard was to "give you an example," Ex. B at 2497, the testimonial "eight second" reconstruction had to be the only testimony from him on this point that the jury could accept.  This argument ignores the fact that the jury had Miller before them, and may have seen something in his demeanor or abilities (combined with other evidence in the case), which caused them to discredit his "eight-second reconstruction," and credit his direct evidence testimony of the estimated "minutes" between the shots at him and the shots he later heard.

often determined or influenced by the defendant's own statements or actions.  Strickland, 466 U.S. at 691.  Petitioner does not provide evidence that he ever told counsel about his ankles.  He thus fails to show that counsel was put on notice to investigate a "physical impossibility" defense.  See Hensley v. Crist, 67 F.3d 181, 186 (9th Cir. 1995) (rejecting ineffectiveness claim that counsel should have explored the possibility of an insanity defense because defendant fails to show that counsel was put on notice to explore an insanity defense).

Further, in light of Miller's conflicting testimony, the basis for this claim is itself speculative.  As discussed above, the state court could have reasonably concluded that the jury relied on Miller's "five minute" or "two-to-three minute" testimony in reconstructing the time lapse between the shots.  As such, it was unlikely that petitioner's ankle would prove "physical impossibility."

Finally, the documents petitioner submits to show the injury are jail records from 1989 and 1990 documenting ankle injuries (Ex. 18 to Ex. F), and Highland Hospital medical records from 1989 documenting the same (Ex 115 to Ex. F).  No doctor or medical expert expresses an opinion as to whether petitioner had the mobility to commit the offenses against Miller and Rivers in the manner described by the prosecution.

Accordingly, petitioner is not entitled to habeas relief on this claim.

ix.  Zorana Hodges

Sixteen-year-old Zorana Hodges was interviewed by police on the morning of January 30, 1989, regarding the shootings that had occurred on East 24th Street earlier that morning, and she said she saw a "hit man" in the neighborhood "before the shooting" and watched him enter the swamp with two other men. Ex. 126 to Ex. F at 11-13.  Petitioner assigns deficient investigation to defense counsel for making "no effort" to interview Hodges, for failing "to further investigate her story," for failing to "effectively cross-examine Miller on this matter," and for failing to "present this information to the jury."  Petition at 119-20.  Petitioner alleges that it is reasonably probable he would have received a more favorable verdict had counsel contacted Hodges and followed up on her police report:

United States District Court
Northern District of California

41

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

> Hodges would have testified that she and Mack were dealing crack cocaine out of a car on East 23rd Street on the night of the shooting.  [Citation.]  Miller himself was a regular customer of Hodges' and had purchased a $20 rock of crack cocaine from her earlier that evening.  Hodges would have testified that the area in which the shooting took place was the center of a turf dispute between a gang called "the Momos" and a newer gang which had only recently moved into the area and was drawing customers away from the Momos and cutting into their profits.  Hodges, who was affiliated with the Flames, had herself been warned by the Momos not to sell crack in the neighborhood.  Hodges would have also testified that fandangling, or selling fake crack cocaine, as Terry Rivers was doing, was considered so serious an offense in the community that a crack seller who did so would be unlikely to be alive 24 hours later.  Hodges would also have confirmed that she saw the tall "hit-man" in the neighborhood on the day of the shooting.  Hodges would also have severely undercut Manzine Miller's credibility.  She would have testified that when he came up to her reporting that he had just been shot, he referred to multiple perpetrators and made it sound as though he had been caught in a cross-fire.  [Citation.]  This would have contradicted Miller's testimony at trial that he had been robbed and shot by a single perpetrator, giving rise to the suspicion that Miller decided to lie about what happened in order to protect himself from retaliation by the Momos, the rival gang, or the hit-man and instead jumped at the chance to pin the crime on a single perpetrator from a different neighborhood.

Petition at 120 (citing Ex. 66 to Ex. F).

The state court had reasonable basis to deny this claim because it could have reasonably concluded that counsel would have not been able to secure Hodges's testimony.  Hodges does not state in her state high court declaration that she would have testified, which is fatal to the present ineffectiveness claim, Dows, 211 F.3d at 486, and in fact states in her declaration that after her police interview, "I left that neighborhood as soon as I could after that.  I did not want to be involved in that business and I never went back."  Ex. 66 to Ex. F, at 3, ¶ 11.

Zorana Hodges has also declared that she tried to tell the police "as little as possible."  Ex. 66 to Ex. F at 3, ¶ 9.  "Everything that I said to the police was true, but the whole time I was trying to say as little as possible because I knew that everything that I said could come back to haunt me."  Id.  "I have been shown a transcript of the statement I made to the police on the day of the crime and I was surprised to see that I said as much as I did, especially about the hit-man.  If anyone had found out, I would have been in big trouble."  Id. at 3, ¶ 10.  Based on these statements, the state court could have reasonably found that, even if counsel had found Hodges, she would not have been cooperative with them, or testified.

1          Although petitioner is correct that defense counsel, even without Hodges herself, could

2   have attempted to introduce Hodges's statement to the police, as discussed above, it was a

3   reasonable tactical decision to forgo a defense that completely exonerated petitioner in favor of a

4   defense that placed petitioner and Jackson in the area, but had petitioner defending himself from

5   Miller in the swamp and had Jackson killing Rivers.  Indeed, Miller's purported statement to

6   Hodges that "some guys had come up and just started shooting," id. at 2, ¶ 6, was not entirely

7   inconsistent with the prosecution's version of events placing both petitioner and Jackson at the

8   scene.

9          Accordingly, petitioner is not entitled to habeas relief on this claim.

10                        x.  Lonnie Eugene Nero

11         Petitioner claims that defense counsel did not investigate and discover Lonnie Eugene

12  Nero so that Nero could have testified that count 1 victim Terry Rivers sold a man named Kenny

13  McDaniel fake crack on January 27, 1989 on East 24th Street, and that on both the 28th and 29th

14  of January, McDaniel returned to the neighborhood, armed, looking to retaliate against Rivers.

15  Petition at 120-21 (citing Ex. 129 to Ex. F).  The California Supreme Court could have reasonably

16  rejected this ineffectiveness claim because petitioner has not provided a declaration from Nero

17  stating that he would have testified in the manner petitioner describes.  Allen v. Woodford, 395

18  U.S. at 1002 n.2; Dows v. Wood, 211 F.3d at 486.  Indeed, exhibit 129 to exhibit F is a barely

19  legible copy of a statement Nero presumably gave to police following the crime.  Nero makes no

20  mention of McDaniel in the declaration he submitted to the state court.  See Ex. 56.

21         Accordingly, petitioner is not entitled to habeas relief on this claim.

22                        xi.  Larry Galbert

23         Petitioner claims defense counsel failed to investigate and discover that in January 1989

24  petitioner "worked as a delivery and errand boy for Larry Galbert, one of East Oakland's largest

25  drug dealers," and thus "had no motive to rob a small-time crack dealer" like Manzine Miller "of

26  a single $20 rock. . . . If petitioner had wanted money or drugs, Galbert would have given it to

27  him. . . . Petitioner was also from a different part of East Oakland some 50 blocks away from the

28  scene of the East 24th Street incident.  There was no reason for petitioner to travel all the way

United States District Court
Northern District of California

43

1   across town in order to rob a total stranger of a single $20 rock of crack cocaine."  Petition at 121

2   (citing Exs. 53 and 54 to Ex. F).

3       The state court had a reasonable basis to deny this claim.  First, petitioner presents no

4   evidence that he put counsel on notice that he worked for Galbert.  See Hensley, 67 F.3d at 186.

5   Second, assuming counsel could have discovered such evidence through reasonable diligence,

6   petitioner suffered no prejudice because petitioner makes no showing counsel could have

7   presented the evidence.  Although Galbert declares that petitioner worked for him and that he

8   (Galbert) would have given petitioner money or drugs had petitioner asked, Ex. 54 to Ex. F,

9   Galbert's declaration does not state that he was available to counsel in 1989 and 1990 and would

10  have testified then, if asked, that he was a large-scale drug dealer who employed petitioner and

11  who would have given petitioner money or drugs.  Galbert declares only that he would have

12  testified "about [petitioner's] character and about what was going on in the neighborhood."  Ex. 54

13  to Ex. F at 4, ¶ 10.  See Allen v. Woodford, 395 U.S. at 1002 n.2; Dows v. Wood, 211 F.3d at 486.

14      Accordingly, petitioner is not entitled to habeas relief on this claim.

15              xii.  Other Interviews

16      Petitioner claims defense counsel failed to interview Patrick Jackson; Montrece Martin

17  Fields's adoptive brother, Darius Fields; and unnamed "others."  Petition at 121-22.  According to

18  petitioner, had counsel conducted these interviews and conducted a "complete investigation" into

19  Fields's background, counsel would have discovered that it was Fields and Jackson who were

20  together on East 24th Street on the morning of January 30, 1989, and Fields who perpetrated the

21  robbery and attempted murder of Manzine Miller.  Id.  The California Supreme Court reasonably

22  rejected this ineffectiveness claim due to a lack of support.  Jones v. Gomez, 66 F.3d at 204-05;

23  James v. Borg, 24 F.3d at 26.  Petitioner provides no declarations from Patrick Jackson, Darius

24  Fields, or the unnamed "others" stating that they were available to trial counsel and would have

25  testified in a manner that exculpated petitioner and inculpated Jackson and Montrece Fields on

26  counts 1, 2 and 3.

27      Accordingly, petitioner is not entitled to habeas relief on this claim.

28  //

United States District Court
Northern District of California

b.      Crimes Against Glen Frazier and Melva Fite

Petitioner alleges the following claims of alleged ineffective assistance of counsel in the investigation of the attempted robbery of Melva Fite (count 4) and the murder of Glen Frazier (count 5).

i. "Claim of Right" Defense

At trial, Patrick Jackson testified that moments before petitioner committed his crimes against Frazier and Fite, petitioner had been robbed, and Frazier was one of the robbers.  Ex. B at 2780, 2788, 2796.  Petitioner claims that defense counsel performed ineffectively by not accepting Patrick Jackson's testimony as true, and not developing other information through other witnesses to establish that Frazier and Fite's cousin Ricky Smith had indeed robbed petitioner.  Petition at 123.  From that evidence, petitioner continues, counsel should have argued that petitioner had "a 'claim of right' defense to the crimes of robbery or attempted robbery and would have eliminated any felony murder theory or special circumstance."  Id. (citing People v. Tufunga, 21 Cal. 4th 935, 950 (1999)).

The state court reasonably rejected this claim because defense counsel could have reasonably believed they had no evidentiary support for a claim-of-right defense on counts 4 and 5.  Under California law a claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he or she has a right or claim to property they take from another negates the felonious intent necessary for conviction of theft or robbery.  People v. Tufunga, 21 Cal. 4th at 938.  A California trial court is not required to instruct on a claim-of-right defense unless there is substantial evidence that the defendant acted with a subjective good faith belief he or she had a lawful claim on the taken property.  Id. at 944; see also People v. Barnett, 17 Cal. 4th 1044, 1145 (1998).  Here, petitioner presents no supporting documentation, nor is there anything in the record, establishing that petitioner had the requisite good faith belief that would entitle him to a claim-of-right defense.

Furthermore, as discussed above, counsel defended petitioner against counts 4 and 5 by vigorously attacking the credibility of Melva Fite, including her identification of petitioner. Counsel used that evidence, plus some of Fite's prior inconsistent statements regarding who had

45

approached her and Glen Frazier, to argue that it was Patrick Jackson who shot and killed Glen

Frazier, and that there existed reasonable doubt that a robbery of Fite even took place.  Ex. B at

3514-35.  Counsel could have reasonably decided not to present the alternative or contradictory

defense that petitioner committed the robbery but did so with a "claim of right."  See Correll v.

Stewart, 137 F.3d 1404, 1411 (9th Cir. 1998) (counsel's tactical decision to choose one reasonable

defense theory to the exclusion of a different, conflicting theory cannot support a claim of

ineffective assistance of counsel).

Accordingly, petitioner is not entitled to habeas relief on this claim.

### ii.  Intoxication Defense

Petitioner asserts he was "intoxicated on alcohol or drugs at the time of the incident"

comprising counts 4 and 5 and that "Patrick Jackson had so testified and others at the scene could

have done so as well."  Petition at 124.  Petitioner claims counsel's failure to investigate this

evidence "deprived petitioner of a theory of reduced culpability."  Id.

The state court had a reasonable basis to deny this claim.  Jackson testified only that

petitioner may have had a beer or two in the time period preceding the encounter with Fite and

Frazier.  Ex. B at 2829-31, 2860-61.  This alone does not establish intoxication, and there is

nothing else in the record showing petitioner was intoxicated.  Further, there is no evidence that

petitioner put his counsel on notice of this defense.  See Dyer v. Calderon, 122 F.3d 720, 733 (9th

Cir. 1997) (no ineffectiveness in failing to investigate whether defendant was high on PCP at the

time of the crime where defendant had not told counsel he had smoked PCP prior to the crime)

vacated on other grounds on reh'g en banc, 151 F.3d 970 (9th Cir. 1998).

Accordingly, petitioner is not entitled to habeas relief on this claim.

### iii.  Fite's Intoxication

Next petitioner alleges that victim Melva Fite had spent the entire evening of January 29,

1989, "drinking at the Apartment C bar on East 14th Street.  At the time of the incident, she was

under the influence of a combination of alcohol and crack cocaine, and had come to a notorious

crack cocaine hotspot to purchase more.  Thus, her ability to attend, perceive, and recollect the

events of that evening were severely impaired."  Petition at 124.  Petitioner claims counsel should

46

1   have investigated this information.  The California Supreme Court reasonably rejected this

2   ineffectiveness claim due to a lack of support.  Jones v. Gomez, 66 F.3d at 204-05; James v. Borg,

3   24 F.3d at 26.  Petitioner points to nothing in the record to support his allegations.

4          Accordingly, petitioner is not entitled to habeas relief on this claim.

5                        iv.  Impeachment Evidence Relating to Fite

6          Petitioner next claims that counsel failed to conduct sufficient investigation into Fite's

7   "lengthy background of criminal activity, deception and falsehoods, addictive behavior, and

8   psychiatric problems which reflected adversely upon her veracity and credibility."  Petition at 124.

9   Part of the evidence petitioner faults counsel for not discovering is the evidence petitioner

10  claims the prosecution withheld from the defense in violation of Brady: the July 1987 letter from

11  Fite's probation officer, discussed above in section III.B.5.b, supra, in which the officer states that

12  Fite had given the officer "much false information, especially with regard to data in the Social

13  Services files from Children's Protective Services.  She has a history of non-compliance and non-

14  cooperation as well as lying and dissembling to the Court, according to Social Services

15  information.  She has not cooperated properly during the presentence period and has failed to keep

16  one of her two scheduled appointments and submit information requested of her."  Id. at 124-25

17  (citing Ex. 87 to Ex. F at 15).  Petitioner also points out that a September 1987 probation

18  department memo to the court stating that Fite had become homeless and lost each of her six

19  children to foster care, and admitted "a recent problem with both alcohol and drug abuse."  Ex. 87

20  to Ex. F at 2-3.  The probation officer told the court that she had referred Fite "to a community

21  health problem for psychotherapy, in view of her painful childhood experiences of rejection and

22  abuse, about which she fantasizes and fabricates various accounts."  Id.

23          The Court first notes that petitioner fails to establish that the July 1987 letter was available

24  to defense counsel.  Not only does petitioner admit that this evidence was never turned over by the

25  prosecution, but a review of Exhibit 87 to Exhibit F reveals that the probation report was under

26  seal.  Even assuming that defense counsel somehow could have discovered the report and that it

27  constituted permissible impeachment evidence, petitioner suffered no prejudice from its absence at

28  trial.  Trial counsel extensively impeached Melva Fite and extensively argued to the jury in

United States District Court
Northern District of California

47

1    summation that her testimony lacked credibility.  Ex. B at 3514-18, 3521-24, 3526-30, 3534.  That

2    impeachment included evidence that Fite had a prior felony conviction for forgery, id. at 2744,

3    2754, and the evidence that while Fite had told the police she could identify Glen Frazier's killer in

4    person, at a physical lineup held on March 3, 1989, a lineup which included petitioner, she did not

5    identify anyone and only expressed uncertainty about someone other than petitioner, id. at 2657-

6    58, 2661-68, 2744-47, 2758, 3235-40.  The jury nevertheless believed Fite.  It is not reasonably

7    probable any additional impeachment evidence would have caused the jury to change its mind.

8    See Brown v. Uttecht, 530 F.3d 1031, 1036 (9th Cir. 2008) ("We give 'great deference' to

9    'counsel's decisions at trial'" regarding cross-examination of witnesses).[17]

10          Accordingly, petitioner is not entitled to habeas relief on this claim.

                             v.   Fite's Identification of Petitioner

12          At petitioner's guilt-phase trial, the prosecution presented evidence that Fite, at petitioner's

13   preliminary hearing, identified petitioner as her attempted robber and as the murderer of Glen

14   Frazier.  Ex. B at 2659, 2668-70.  At trial, Fite remained positive that petitioner was the assailant.

15   Id. at 2656, 2659, 2762.  Petitioner claims that defense counsel performed ineffectively in not

16   retaining an expert on eyewitness identification to establish that Fite suffered from many of the

17   biasing factors that taint identifications.  Petition at 126-27.

18          As discussed above, the record shows that on cross-examination of Fite during her

19   testimony in the prosecution's case-in-chief at the guilt phase, and also during the defense's guilt-

20   phase case, petitioner's attorneys established that on March 1, 1989, Fite viewed a photo lineup

21   which included a picture of petitioner.  She identified that picture as the assailant, but was not

22   absolutely sure.  Ex. B at 2656-57, 2659-61, 2751-52, 2757-58.  Although Fite told the police that

23   she could identify Frazier's killer in person, at a physical lineup held on March 3, 1989—a lineup

24   that included petitioner—she did not identify anyone, and only expressed uncertainty about

25   someone other than petitioner.  Id. at 2657-58, 2661-68, 2744-47, 2758, 3235-40.  As also

27   _____
     [17] The Court does not address petitioner's other claims that counsel failed to investigate evidence
28   relating to Fite as all the claims relate to information on Fite post-dating petitioner's trial.  See
     Petition at 126 n.33.

United States District Court
Northern District of California

discussed above, defense counsel also vigorously attacked Fite's credibility and identification in

guilt-phase summation:

> Melva Fite says oh, no, same guy.  I would recognize him if I saw him in a
> lineup.
>
> Well, she was shown a lineup on the Third of March.  She was shown a lineup
> at the Oakland Police Department.  The photographs are here.  You can look at them.
> It looks just like this man here.  He was not quite as heavy as he was now.  He has
> been consuming jail food for the last year and a half.  And he hasn't gotten much exercise,
> so he is heavier now.  But he looks exactly the same otherwise.  His face is
> exactly the same.  And she didn't pick him out.  As a matter of fact, she not only
> didn't pick him out, but she picked out somebody else, a filler as being the person by
> question mark, mind you, not with an "X," but a question mark.
>
> But she didn't even indicate to any degree that this man was responsible.
>
> Sure, when she got to Oakland Municipal Court in January of last year, after all
> he is sitting at the counsel table.  He is the only Black in front of the counsel rail.  He
> is sitting at the counsel table between [co-counsel] and myself and she says that is the
> man.
>
> Well, he is accused of these crimes.  Everybody knows who he is at that time
> and she knows who he is at that time.  So she is reinforcing her identification.  Yeah,
> that is him.  And in court she has no trouble.  That is him.  Well, God, if we had
> somebody else in here we were defending, we would be in the wrong courtroom.  It
> has to be [petitioner].  Who else are we defending in this case?

Ex. B at 3517-18.

On this record, the state court reasonably rejected this claim.  Trial counsel did not

demonstrate incompetence by deciding to address the accuracy of the identification made by

Melva Fite through argument, rather than through expert testimony.  Such testimony was not

guaranteed to be helpful to the defense, especially after it was subjected to cross-examination.  As

quoted above, during summation trial counsel devoted attention to Fite's eyewitness identification

of petitioner, and listed factors the jury could consider in determining the accuracy of the

identification evidence.  Apart from the portion of the argument quoted above, counsel continued

to vigorously attack Fite's credibility, relying on certain inconsistent statements and alleged

implausibilities in her account of the morning of January 30, 1989.  Ex. B at 3521-24, 3526-30,

3534.  A decision to appeal to the jury's common sense, rather than to attempt to impress them

with expert testimony, does not demonstrate incompetence, but is instead a rational tactical choice.

See e.g., Cantu v. Collins, 967 F.2d 1006, 1016 (5th Cir. 1992); Jones v. Smith, 772 F.2d 668, 674 (11th Cir. 1985).  In any event, petitioner again fails to establish what an identification expert would have said at trial.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### vi.   Where Bullet Entered Glen Frazier

Petitioner claims counsel "failed to adequately investigate, develop, and challenge the prosecution theory regarding the manner in which" Glen Frazier was killed.  Petition at 128. Petitioner notes that the pathologist testified that the bullet wound to Frazier was consistent with him having been shot from behind while down on his hands and knees.  Ex. B at 2621.  Because Melva Fite, Patrick Jackson, and Delores White all testified that the perpetrator was facing Frazier at the time he shot him, petitioner proffers that the sole explanation for this discrepancy "is that the perpetrator fired the shot downward, either at Frazier's legs or at the sidewalk itself, and the bullet caromed off the sidewalk and a short retaining wall behind the spot where Frazier was kneeling before striking Frazier in the back."  Petition at 128 (citing Ex. 108 to Ex. F).  According to petitioner,

> In spite of this discrepancy in the testimony and the obvious implications of the only logical explanation, counsel did not retain a criminalist, further investigate, develop, or present evidence, or cross-examine the prosecution's witnesses regarding this matter.  This evidence would have been crucial because it would have demonstrated that even if petitioner had been the perpetrator, the perpetrator did not intend to kill Frazier.

Id.

The California Supreme Court reasonably rejected this ineffectiveness claim.  Petitioner presents nothing to support his claim that the bullet which killed Glen Frazier entered his back after careening off the sidewalk and a retaining wall.  Presumably counsel recognized that even if they could somehow establish from the bullet trajectory that petitioner had no intent to kill Frazier when he shot him, petitioner was still guilty of first degree murder under the prosecution's felony-murder theory.[18]  Ex. B at 3479-81; Cal. Penal Code § 189.

Accordingly, petitioner is not entitled to habeas relief on this claim.

---

[18] The prosecution's felony-murder theory is discussed more at section III.B.7.f, ante.

vii.  <u>Investigation of Patrick Jackson</u>

As noted earlier, defense counsel argued to the jury in summation that based upon the evidence before the jurors there existed a reasonable doubt that any robbery of Melva Fite or Glen Frazier took place, and that the most reasonable inference from the evidence was that it was Patrick Jackson, and not petitioner, who shot and killed Glen Frazier.  Ex. B at 3514-35. Petitioner now alleges that "Patrick Jackson, not petitioner, killed Glen Frazier."  Petition at 129. Petitioner claims that "[c]ounsel could have discovered this information through interviews with Jackson himself and through a complete investigation into the incident."  <u>Id.</u>

The California Supreme Court reasonably rejected this allegation of guilt-phase investigation because petitioner does not offer the necessary declaration from Patrick Jackson or any other evidence suggesting Jackson would have confessed to killing Glen Frazier to petitioner's attorneys.  Nor does petitioner offer details as to what counsel should have done to conduct a more "complete investigation" that would have led to the discovery of admissible evidence conclusively proving that Jackson killed Frazier.  Petitioner does present the declaration of his mother, who avers that Patrick Jackson confessed to her in 2001 that he killed Frazier.  Ex. 62 to Ex. F.  There is no evidence that any such confession was available eleven years earlier, at the time of trial.

Accordingly, petitioner is not entitled to habeas relief on this claim.

c.  <u>Crimes Against Sylvester Davis, Luther Thomas, and Gerald Livingston</u>

Petitioner alleges the following claims of alleged ineffective assistance of counsel in the investigation of the attempted murder of Luther Thomas, the robbery of Gerald Livingston, and the murder of Sylvester Davis (counts 6, 7, and 8).

i.  <u>Investigation of Other Perpetrators</u>

The crimes comprising counts 6, 7, and 8 occurred at 2661 74th Avenue in Oakland on the morning of February 19, 1989.  Petitioner faults counsel for not discovering the exculpatory "evidence" that petitioner claims the prosecution withheld in violation of <u>Brady</u>: (1) that on December 14, 1988, "gunmen" entered 2661 74th Avenue, "robbed the house," and shot one of the occupants, Ex. 51 to Ex. F at 1, ¶ 4, and (2) that on February 17, 1989, at about 5:00 a.m., J.L. Batiste and Tyrice Ross were in 2661 74th Avenue when two masked men with guns entered.

Batiste declares: "The men wore black ski masks, but I could tell they were black men by their voices.  They were much taller and bigger than I was, but I cannot accurately estimate their height today.  One of them said 'Give me the money.  Give me the dope.'  He repeated this several times.  They also said, 'don't be looking at us,' and made us lie down on the floor.  I told them we didn't have any money or dope, and they warned us, 'Don't sell dope out of this place no more.'  They then left the house."  Ex. 51 to Ex. F at 2, ¶ 8; see also Ex. 64 to Ex. F at 2, ¶ 7.

According to petitioner, the above shows that on February 19, 1989:

. . . more than one perpetrator was present at the scene of the offense at the time the offense was committed; that the offense was committed by drug suppliers who were upset with JL Batiste, the operator of the crack house, for selling drugs purchased from other suppliers in their turf; that Batiste, not Davis, was the intended target of the perpetrators; that previous shootings and robberies had occurred at the crack house shortly before this incident; and that the perpetrators warned and threatened Batiste and others that they would return and kill Batiste if he continued to sell the wrong drugs there; and that the eyewitness identification testimony of Luther Thomas and Gerald Livingston was inherently unreliable.

Petition at 129, ¶ 292.

The California Supreme Court reasonably rejected this claim.  First, as petitioner himself conceded above, defense counsel was not aware of the earlier offenses occurring at 2661 74th Avenue, and, as discussed above, it appears that the February 17 incident was never reported to the police.  Defense counsel cannot be faulted for failing to interview the occupants of the house because they were likely hostile to the defense and unlikely to cooperate.

Further, there exists no reasonable probability—that is, no probability sufficient to undermine confidence in the outcome—that had counsel presented the jury with the evidence of other crimes at 2661 74th Avenue petitioner would have received a different result on counts 6, 7, and 8. Strickland, 466 U.S. at 692- 94.  Specifically, it is not reasonably probable that, had the jury learned that a robbery and shooting occurred at 2661 74th Avenue on December 14, 1988, by unidentified "gunmen," it would have had a reasonable doubt in the testimony of Luther Thomas and Gerald Livingston identifying petitioner as the perpetrator of the attempted murder, robbery, and murder which occurred at 2661 74th Avenue on February 19, 1989.  The same reasoning applies to what allegedly occurred on February 17, 1989.

52

United States District Court
Northern District of California

1   Accordingly, petitioner is not entitled to habeas relief on this claim.

2   ii.  Thomas and Livingston Identifications

3   Last, petitioner claims defense counsel should have hired an expert to demonstrate that the

4   identifications of petitioner by Thomas and Livingston were unreliable.  Petition at 130-31.  The

5   record shows the following: Livingston described his February 19, 1989 assailant as being about

6   six feet tall, and wearing a red shirt with a black waist-length "Members Only" jacket and a dark

7   knit Navy-style beanie.  Ex. B at 2891, 2894, 2914-17, 2920.  Thomas described his perpetrator as

8   being in his early twenties, between five feet six inches and five feet eight inches tall, about 155

9   pounds, and wearing a dark three-quarter length coat with a hood and a New York Yankees cap.

10   Ex. B at 2979, 3000-02.

11   Defense counsel stressed all of this in summation, arguing that because of the disparate

12   descriptions by Thomas and Livingston, and because of Thomas's statement to police that "they"

13   (not a he) had come to the front door of the residence, there existed evidence of multiple

14   perpetrators.  And, because there existed no direct evidence of who shot Sylvester Davis, there

15   existed reasonable doubt as to petitioner's guilt of that murder charge, especially considering that

16   the prosecution's theory was that petitioner was the direct perpetrator.  Ex. B at 3547-3600.

17   Counsel also stressed to the jury that they had reason to doubt the accuracy of Livingston's

18   identification given his cocaine ingestion on the evening in question, and given that while he

19   identified petitioner at the live lineup, he had failed to identify petitioner at the photo lineup.  Id.

20   at 3563-64, 3575-77.  "Ask yourself one question.  Five days later he goes and sees a lineup.  Is it

21   possible, perhaps, that the person he sees in the lineup is the person, one of the people he saw in

22   the photo?  Is that what activates him, his mind process, as opposed to being the person who he

23   saw at the time?"  Id. at 3576.

24   On this record, the state court reasonably rejected this claim.  As with the other

25   identifications discussed above, counsel did not demonstrate incompetence by deciding to address

26   the accuracy of the Thomas and Livingston identifications through argument, rather than expert

27   testimony.  Such testimony would have been subject to cross-examination and was not guaranteed

28   to help the defense.  Petitioner again fails to establish what an identification expert would have

1 said at trial.

2        Accordingly, petitioner is not entitled to habeas relief on this claim.

3            d.        Cumulative Error

4        Petitioner's cumulative error argument is also without merit.  In some cases, although no

5 single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors

6 may still prejudice a defendant so much that his conviction must be overturned.  Alcala v. Woodford,

7 334 F.3d 862, 893-95 (9th Cir. 2003).  Cumulative error is more likely to be found prejudicial when

8 the government's case is weak.  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  In this

9 instance, as discussed above, many of petitioner's ineffective assistance of counsel claims are

10 based upon conclusory and unsupported allegations.  In every other case, the Court has found that

11 counsel's performance did not fall below an objective standard of reasonableness.  Where there is

12 no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.

13 Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011); Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir.

14 2002).

15        Accordingly, petitioner is not entitled to habeas relief on this claim.

16        7.        Ineffective Assistance of Counsel – Guilt Phase Performance

17        Petitioner asserts multiple claims of ineffective assistance of his trial counsel, all of which

18 variously allege that counsel provided prejudicially deficient "guilt-phase performance."  Petition

19 at 132-53.  Petitioner presented this claim only on state habeas to the California Supreme Court,

20 which summarily denied it on the merits.

21            a.        Petitioner's Alias

22        Petitioner's first claim of guilt-phase performance ineffectiveness concerns an alleged

23 "alias," i.e., "Robert Carter."  Petition at 133-36.  Specifically, petitioner claims that counsel not

24 only failed to consistently use his true name, "Robert Young," but also failed to object to the use

25 of the "a.k.a. Robert Carter" in the Information; failed to move for an order prohibiting reference

26 to the "a.k.a." before the jury; failed to object when the prosecutor and witnesses referred to

27 petitioner as "Robert Carter " in front of the jury; and repeatedly referred to petitioner  as "Robert

28 Carter."  Id.  Petitioner argues that counsel's reference to petitioner by an alias was

prejudicial not only because it suggested that petitioner was a member of the supposed "criminal class," but also because it provided non-evidentiary support for the prosecutor's baseless argument that petitioner was "a gangster, an out and out gangster," and "a street gangster." Id. at 135-36 (citing Ex. B at 4044, 4050).

The record confirms that witnesses referred to petitioner as "Robert Carter" and that at times both the prosecutor and defense counsel referred to petitioner as "Robert Carter" (as well as "Robert Young"). See e.g., Ex. B at 2332, 2767, 2926, 3116, 3121, 3127, 3137, 3141, 3143, 3144, 3211, 3240, 3748, 3762, 3772, 3779.  However, the California Supreme Court reasonably rejected this claim of guilt-phase performance ineffectiveness.  No reason for the existence or use of "Carter" was ever elicited or otherwise given to the jury.  In other words, no evidence was ever presented explaining why petitioner had the last name "Carter" in addition to "Young," and no evidence was ever presented as to the significance of the "Carter" name.  The trial court instructed the jury that it could decide the issues in this case based only on the evidence presented.  Ex. B at 3653.  Because there existed no evidence regarding the significance of why petitioner was known as "Robert Carter," the alias had no probative value and could not have been prejudicial.  The prosecutor never made any argument that petitioner's use of a second last name inculpated him. For the jury to have reached any conclusions about petitioner having the name "Carter" in addition to "Young," the jury would have had to engage in speculation, contrary to the instructions given them.  See Richardson v. Marsh, 481 U.S. 200, 206 (1987) (jury is presumed to have followed the trial court's instructions).  Even assuming that the jury did draw unsupported conclusions from the alias, the evidence against petitioner was strong enough that it cannot be said that the alias tilted the balance against petitioner.

Accordingly, petitioner is not entitled to habeas relief on this claim.

b.     Ballistics Expert

Petitioner's next several allegations of guilt-phase performance ineffectiveness concern the prosecution's ballistics evidence.  Petition at 136-40.  More specifically, petitioner alleges that because the ballistics and tool-mark evidence was so crucial, defense counsel Selvin and Meloling were "obliged, at a minimum," to retain their own ballistics expert; have that expert examine the

bullets in evidence to either confirm or dispute the conclusions of the prosecutor's ballistics expert, criminalist Chester Young; have the expert assist in cross-examination of Young; and have the expert testify. Petition at 136-37, ¶ 302, 304. Petitioner also claims that counsel "deficiently" addressed the prosecution's ballistics evidence, in that counsel did not challenge "the scientific validity of bullet matching" in part through a "Kelly/Frye" motion. Id. at 136, 140, ¶¶ 302, 311.[19] Petitioner claims counsel should have used a ballistics expert of their own to emphasize through testimony that Young was offering only opinions—and ones based on "questionable assumptions" at that. Petition at 137-38, ¶ 305-06. Petitioner faults counsel for not cross-examining Young "with respect to his demonstrable bias," and particularly faults counsel for acknowledging the expertise of Young by agreeing to stipulate to his qualification as an expert. Id. at 139-40, ¶¶ 309-10. According to petitioner "there was no conceivable reason for the defense to actually endorse the expertise of this prosecution witness and enhance his credibility in the eyes of the jurors." Id.

The California Supreme Court reasonably rejected these allegations of guilt-phase performance ineffectiveness. Trial counsel could have reasonably believed that they could gain credibility with the jury by endorsing the qualifications of Chester Young and his ballistics opinions in this case. Indeed, Young was so well-respected as a firearms identification expert that the trial court remarked that if the defense would not stipulate to his expertise, the court "would take judicial notice of it." Ex. B at 3032.

In any event, the record makes clear defense counsels' strategy with respect to Young and the ballistics evidence. The defense wanted to emphasize Young's expertise and experience because, as counsel explored with Young during cross-examination, a determination of whether fired bullets match by examining their striations, "depends on the experience of the examiner." Ex. B at 3095. And, as defense counsel also probed with Young, a very experienced examiner like himself could classify only two of the bullets as positively matching (the Miller mantel bullet and the Rivers body bullet—two bullets counsel urged Patrick Jackson fired), notwithstanding Young's

---

[19] The California Supreme Court in People v. Kelly, 17 Cal. 3d 24 (1976), held that when faced with a novel method of proof, there must be a "preliminary showing of general acceptance of the new technique in the scientific community." Id. at 30; see Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

United States District Court
Northern District of California

"strong suspicion" or belief in the likelihood that the same gun had fired all six bullets at issue in this case:

> Q. Well, as an expert Mr. Young, you were looking at these bullets to determine whether or not, in fact, they were fired from the same gun; isn't that true?
>
> A. Well, it is not all black and white. There is a gray area in between. And this falls in the gray area closer to one end than the other end.
>
> Q. It is in a gray area?
>
> A. It is in a gray end closer to the match than not match.
>
> Q. But is still not a match?
>
> A. Correct.
>
> Q. Because you are not satisfied that it is a match?
>
> A. Correct.
>
> Q. And you are the expert, right?
>
> A. Yes.

Ex. B at 3100.  In summation, defense counsel vigorously argued that the "gray area" referred to by Chester Young could not equal proof beyond a reasonable doubt that petitioner committed all the shootings in this case.  Ex. B at 3535-40.  Thus, petitioner's current criticisms establish nothing but hindsight disagreement with an unsuccessful trial tactic, which is insufficient to sustain an ineffectiveness finding.  See Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984) (tactical decisions do not constitute ineffective assistance simply because, in retrospect, better tactics are known to have been available).

Furthermore, the California Supreme Court could have reasonably concluded that no relief was warranted because petitioner failed to present evidence demonstrating that a defense ballistics expert would have yielded a more favorable result.  The Court does not read petitioner's only supporting evidence, the 2002 Criminal Law Bulletin article, see Ex. 1 to Ex. F, as containing information that would have led counsel to information in 1989 that would have sustained a successful Kelly/Frye motion precluding Young from offering his opinions.  And petitioner

57

provides no declaration from any expert stating he or she would have so testified at trial, which is fatal to his claim. See Allen, 395 F.3d at 1002 n.2; Dows, 211 F.3d at 486; Grisby, 130 F.3d at 373 (noting "[s]peculation about what an expert could have said is not enough to establish prejudice").

Finally, although petitioner maintains trial counsel could have asked cross-examination questions to explore Chester Young's "demonstrable bias" as a former employee of the Oakland Police Department and should not have stipulated to criminalist Young's expert qualifications as they did, the California Supreme Court could have reasonably found that it was not reasonably probable such further questioning or challenge to his qualifications would have led the jury to reject Young's opinions.

Accordingly, petitioner is not entitled to habeas relief on this claim.

        c.    Competency Proceedings

Petitioner next claims that by the end of the guilt phase counsel were aware of substantial evidence that petitioner was incapable, because of mental disease or defect, of understanding the nature of the proceedings against him or of assisting in his defense, such that counsel should have moved for a competency hearing. Petition at 140-41. Petitioner states the following as evidence of his incompetence to stand trial:

> On October 6, 1990, three days before the defense rested its case, Dr. Robert Kaufman, a neuropsychologist who had examined petitioner for the defense, completed a report of his findings. In that report, Kaufman concluded that petitioner had a total IQ score of only 75, placing petitioner in what Kaufman stated was the borderline range of intelligence, at just the fifth percentile among adults nationwide. However, Kaufman found that petitioner's verbal IQ of 73 placed him in only the fourth percentile for his age group. His subtests in this area were "uniformly poor" and "especially impaired" in the areas of acquired general knowledge and comprehension. Petitioner could not correctly state the number of weeks in a year or name recent presidents of the United States. He was unable to define simple words and had only a "marginal vocabulary." His standard scores were the equivalent of those of a fourth-grader. Kaufman found that petitioner demonstrated "compromise in higher-level reasoning skills" and "compromised brain functioning."

Petition at 140-41, ¶ 312 (citing Ex. 98 to Ex. F).

The California Supreme Court reasonably rejected this claim. Dr. Kaufman never expressed an opinion that petitioner was not competent to stand trial. To the contrary, Dr.

58

Kaufman's report specifically states:

> [Petitioner] appeared to be well-oriented to time, person, and place and displayed no signs of impairment in logical thought processes.  He was able to communicate his thoughts and appear to understand all instructions and questions posed to him.… [Petitioner's] thought processes appeared to be logical and sequential, though he had some difficulty remembering some dates regarding his past.

Ex. 98 to Ex. F.

Indeed, the California Supreme Court, on direct appeal, specifically rejected a penalty phase claim that counsel rendered ineffective assistance by failing to request a competency hearing.  People v. Young, 34 Cal. 4th at 1214-18.  Significantly, the state court noted that Dr. Kaufman made no diagnosis that petitioner suffered from a developmental disability and specifically testified that petitioner was not suffering from a thought disorder.  See id.  The Court has reviewed the state court's analysis and finds that its basis for denying relief was objectively reasonable.

Accordingly, petitioner is not entitled to habeas relief on this claim.

d.      Crimes Against Manzine Miller and Terry Rivers

With respect to the Manzine Miller assault and robbery (counts 2 and 3) and Terry Rivers homicide (count 1), petitioner claims that "counsel failed to competently investigate evidence demonstrating that petitioner was not present at the scene of the incident, evidence undermining the credibility of Manzine Miller, or substantial evidence of third party culpability."  Petition at 141.  This claim repeats several of petitioner's allegations of guilt-phase investigation ineffectiveness.  It fails here for the same reasons discussed above.  See discussion at III.B.6.a, supra.

Accordingly, petitioner is not entitled to habeas relief on this claim.

e.      Physical Impossibility Defense

Petitioner next claims that trial counsel failed to "develop and present" the "physical impossibility" evidence, i.e., the medical records showing that petitioner had badly sprained both ankles on January 2, 1989.  Petition at 142.  For the reasons this claim failed as an allegation of guilt-phase investigation ineffectiveness it fails as an allegation of guilt-phase performance ineffectiveness.  See discussion at III.B.6.a.viii, supra.

United States District Court
Northern District of California

1    Accordingly, petitioner is not entitled to habeas relief on this claim.

2            f.        Failure to Argue Against Felony Murder Instruction

3    The trial court instructed the jury on robbery, in part, as follows:

4    The commission of the crime of robbery is not confined to a fixed place or a
     limited period of time.

5

6    A robbery is still in progress after the original taking of physical possession of
     the stolen property while the perpetrator is in possession of the stolen property and
     fleeing in an attempt to escape.  Likewise, it is still in progress so long as the
7    immediate pursuers are attempting to capture the perpetrator or regain the stolen
     property.
8

9    A robbery is complete when the perpetrator has alluded [sic] any pursuers, has
     reached a place of temporary safety, and is in unchallenged possession of the stolen
10   property after having affected [sic] an escape with such property.

11   Ex. B at 3686.

12       The jury convicted petitioner on count 1 of the first degree murder of Terry Rivers, either

13   under a premeditation-deliberation theory or a felony-murder (robbery) theory.  Ex. B at 3480,

14   3670-73, 3719.  The jury also found true the special circumstance allegation that petitioner killed

15   Rivers during the commission of a robbery.  Id. at 3719-20.

16       Petitioner claims that even if there was sufficient evidence that he shot Manzine Miller

17   and shot and killed Terry Rivers, there was insufficient evidence that he committed the crimes

18   during the commission of a robbery, and trial counsel Selvin and Meloling performed ineffectively

19   in not making such an argument.  Petition at 142-45.  More specifically, according to petitioner,

20   there was no evidence that his leaving the scene of the Miller robbery and walking to the front of

21   Miller's home was a flight or an escape from that robbery.  "Here there was nothing to 'escape'

22   from.  The Miller shooting occurred in an unlighted area in an overgrown vacant lot shielded from

23   view from the street, and there were no other witnesses, real or apparent.  Miller himself was

24   unarmed, had been shot, and would certainly not have attempted to follow petitioner, nor was it

25   likely that anyone else would [have] come walking through the area until the following day.  Thus,

26   it is difficult to characterize petitioner's actions following the Miller shooting as 'flight.'"  Id. at

27   144, ¶ 319.  And, petitioner continues: "Certainly by the time he arrived at the sidewalk in front of

28   Miller's house, if not sooner, petitioner had reached a place of temporary safety.  Since petitioner

United States District Court
Northern District of California

60

must have reached this location before the fatal shot was fired at Terry Rivers, the Rivers killing cannot have occurred during the flight after the Miller robbery."  Id. at 145, ¶ 321.

The California Supreme Court reasonably concluded that defense counsel were not ineffective in failing to make the above arguments in guilt-phase summation.  The record reflects that defense counsel had a different theory.  They argued to the jury that the most reasonable interpretation of the evidence was that petitioner went into the swamp with Manzine Miller, but he did not rob Miller and shot him only because he thought Miller was about to shoot first.  Ex. B at 3500-09, 3513.  As stated earlier, trial counsel have great latitude to present a particular theory of defense and present it via summation.  See Richter, 131 S. Ct. at 790 ("There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'").

Second, the California Supreme Court reasonably rejected petitioner's claim that counsel should have argued that there existed insufficient evidence to support the theory that he killed Terry Rivers during the commission of the Manzine Miller robbery because, as the state high court held on direct appeal, petitioner's view of the evidence is incorrect:

> Defendant contends . . . that even if there existed sufficient evidence that he killed Rivers, the evidence is insufficient to establish the murder occurred during the commission of the Miller robbery.

> We disagree.  First, the evidence demonstrates overwhelmingly that defendant robbed Miller—that is, defendant took property from Miller by means of force or fear with the specific intent to permanently deprive him of that property.  ([Cal. Penal Code] § 211.)  Second, a rational trier of fact could have found the Miller robbery was not complete when defendant shot and killed Rivers.

> A robbery is not complete until the perpetrator reaches a place of temporary safety (*People v. Salas* (1972) 7 Cal.3d 812, 822), and the jury here was so instructed. [] Miller testified Rivers had been "fandangling," i.e., selling fake drugs, in front of the house and may have been outside at the time he left with defendant and headed towards the "swamp" to buy some cocaine from one of his suppliers.  The jury thus could have reasonably inferred that defendant killed Rivers in order to eliminate a potential witness against him in a prosecution for the robbery and attempted murder of Miller.  (See *People v. Fields* (1983) 35 Cal.3d 329, 365-368.)  In addition, because "[t]he scene of a robbery is not a place of temporary safety . . ." (*People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1375), the jury reasonably could have found that the robbery was not yet complete at the front of Miller's house at 2:30 a.m., approximately 120 to 150 feet from the "swamp" where defendant had robbed

United States District Court
Northern District of California

Miller moments before.

> Accordingly, the record contains sufficient evidence that defendant shot and killed Rivers during the commission of a robbery, and thus committed first degree murder under the theory of robbery felony murder.

Young, 34 Cal. 4th at 1175-77.  For all the reasons explicated in this analysis, defense counsel could have reasonably decided that arguing against a felony-murder finding, in relation to the Terry Rivers murder, would be futile.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### g.    Admitting Petitioner's Presence

As noted above, defense counsel defended petitioner against the count 2 and count 3 charges that he attempted to murder and robbed Manzine Miller by tacitly acknowledging that petitioner went into the swamp with Miller, but arguing that petitioner did not rob Miller and shot him only because he (petitioner) credibly felt that Miller was about to rob him.  Ex. B at 3500-09, 3513.  Petitioner contends that this constituted prejudicial deficient performance.  Petition at 145-46.  Petitioner elaborates: "There was no conceivable tactical reason for counsel to have made these admissions.  Not only did they contradict what their client had told them, they also contradicted the medical evidence which counsel had in their files showing that petitioner could not have been the person who shot Miller.  Counsel's improper concessions and admissions placed petitioner in a false light and greatly prejudiced his case."  Id. at 146, ¶ 324.

The California Supreme Court could have reasonably rejected this claim as an improper conclusory allegation of ineffectiveness.  Harrington v. Richter, 131 S. Ct. at 789; Jones v. Gomez, 66 F.3d at 204-05; James v. Borg, 24 F.3d at 26.  Petitioner offers no declaration or other evidence in support of his claim that he told counsel he did not shoot Miller.  Dows v. Wood, 211 F.3d at 486; Tinsley v. Million, 399 F.3d 796, 808 (6th Cir. 2005) (no ineffectiveness absent affidavits from the omitted witnesses to show what favorable information they had); Allen v. Woodford, 395 F.3d at 1002 n.2.  Petitioner also fails to offer support for the claim that medical evidence existed in counsel's files "showing that petitioner could not have been the person who shot Miller."  To the extent he is referring to his ankle injury, the claim has been discussed and rejected above.

United States District Court
Northern District of California

Accordingly, petitioner is not entitled to habeas relief on this claim.

        h.      Failure to Make "Claim of Right" Defense

Petitioner next contends that defense counsel "performed deficiently with regard to the Frazier homicide in failing to present evidence of the robbery of petitioner, argue a claim-of-right defense, or request an instruction on this theory." Petition at 146, ¶ 325. According to petitioner, "Had counsel argued this theory and requested appropriate instructions on it, counsel would have eliminated the first-degree felony murder verdict and the robbery special circumstance, and petitioner's conviction with respect to this count would have been for an offense no greater than second-degree murder." Id. at 147, ¶ 326. For the reasons this claim failed as an allegation of guilt-phase investigation ineffectiveness, it fails as an allegation of guilt-phase performance ineffectiveness. See discussion at III.B.6.b.i, supra.

Accordingly, petitioner is not entitled to habeas relief on this claim.

        i.      Impeachment of Melva Fite

Petitioner next claims that counsel performed with unconstitutional ineffectiveness "in failing to impeach Melva Fite with evidence of her cocaine addiction, mental health problems, and other evidence of her lack of credibility." Petition at 147, ¶ 327. For the reasons this claim failed as an allegation of guilt-phase investigation ineffectiveness, it fails as an allegation of guilt-phase performance ineffectiveness. See discussion at III.B.6.b.iii-iv, supra.

Accordingly, petitioner is not entitled to habeas relief on this claim.

        j.      Identification Expert

Petitioner claims. "Counsel also failed to impeach the credibility of the prosecution's supposed eyewitnesses—Melva Fite, Gerald Livingston, Manzine Miller, and Luther Thomas—by retaining and presenting an expert witness regarding the unreliability of eyewitness testimony." Petition at 147-48, ¶ 328. For all of the reasons this claim failed when petitioner presented it as a multi-pronged claim of guilt-phase investigation ineffectiveness, it fails here. See discussion at III.B.6.a.i, III.B.6.b.v, and III.B.6.c.ii, supra.

Accordingly, petitioner is not entitled to habeas relief on this claim.

//

United States District Court
Northern District of California

1

             **k.**       <u>Failure to Object to Prosecution's Closing Argument</u>

2

       Petitioner claims trial counsel rendered ineffective assistance by failing to object to all of

3

the instances of misconduct committed by the prosecutor during his guilt-phase summation as

4

alleged above.  <u>See</u> discussion at III.B.3, <u>supra</u>.  Petition at 148-49, ¶¶ 329-30.  According to

5

petitioner, "Although the prosecutor's argument to the jury—particularly his rebuttal argument at

6

the guilt phase—was replete with abusive misconduct, counsel let much of this misconduct pass

7

by without objection or comment."  <u>Id.</u> at 148, ¶ 329.

8

       The California Supreme Court had reasonable basis to deny this claim on state habeas

9

because on direct appeal the state high court had already addressed each of the allegations of

10

prosecutorial misconduct in summation on the merits, and concluded that some of the allegations

11

were without merit, and others that were meritorious, either singly or cumulatively, were harmless.

12

<u>See</u> <u>People v. Young</u>, 34 Cal. 4th at 1188-98.  Petitioner (1) has not identified any unobjected-to

13

allegation of prosecutorial misconduct in summation that the California Supreme Court did not

14

address on the merits on direct appeal; and (2) has not shown that such an allegation was

15

meritorious and prejudicial.  <u>See also</u> <u>Garcia v. Bunnell</u>, 33 F.3d 1193, 1200 (9th Cir. 1994)

16

("'many trial lawyers refrain from objecting during closing argument to all but the most

17

egregious misstatements by opposing counsel on the theory that the jury may construe their

18

objections to be a sign of desperation or hyper-technicality'"); <u>United States v. Necoechea</u>, 986

19

F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening

20

statement and closing argument, absent egregious misstatements, the failure to object during

21

closing argument and opening statement is within the 'wide range' of permissible professional

22

legal conduct.").

23

       Accordingly, petitioner is not entitled to habeas relief on this claim.

24

             **l.**     <u>Failure to Object to Other Instances of Prosecutorial Misconduct</u>

25

       Petitioner claims that defense counsel performed deficiently in four more respects in

26

failing to object to prosecutorial misconduct:

27

       Counsel also failed to move in limine to prevent the prosecutor from referring
to the "Valente" bullet, which was not related to this case, but which the prosecutor

28

introduced into his questioning of Chester Young to insinuate that police suspected

United States District Court
Northern District of California

petitioner of a fourth killing. ([Exh. B at] 3049-3051.) Counsel also performed deficiently in failing to request a jury admonition and mistrial when the prosecutor questioned his expert on this subject. Counsel also performed deficiently in failing to request a jury admonition and mistrial when the prosecutor committed egregious misconduct in asking Patrick Jackson whether petitioner had admitted other killings, in spite of the fact that the prosecutor had no good faith basis for this question. ([Exh. B at] 2838-2841.) Counsel was also deficient in failing to object on explicit prosecutorial misconduct grounds when Manzine Miller gratitously testified that petitioner had "no remorse" for shooting him. ([Exh. B at] 2502.)

Petition at 149-50, ¶ 331.

The California Supreme Court reasonably rejected this claim on state habeas because on direct appeal the state high court had already held that: (1) "the prosecutor's question about other killings was not improper"; (2) any prosecutorial misconduct with respect to the "Valente" bullet "was harmless given the stipulation that the Valente bullet had nothing to do with [petitioner]'s case"; and (3) the prosecutor did not commit misconduct in questioning Manzine Miller in the way that led to Miller's "no remorse" response. See People v. Young, 34 Cal. 4th at 1185-88.

Accordingly, petitioner is not entitled to habeas relief on this claim.

m.    .32 Caliber Weapon

When the police arrested petitioner on March 1, 1989, they searched his home pursuant to a warrant. They found a .32 caliber pistol in his bedroom, and a red and black jacket. Ex. B at 3033, 3135-36. Petitioner alleges that defense counsel performed ineffectively by not objecting on relevance and undue prejudice grounds to the admission of the evidence of the .32 caliber weapon. Petition at 150, ¶ 332. Petitioner argues that because all of the fired bullets at the three crime scenes in this case were either of .38 caliber or .357 magnum character, "the .32 caliber gun found under the bed of a room which petitioner shared with his younger brother, Terrence, could not have been the weapon which fired these bullets." Id.

The California Supreme Court did not unreasonably reject this allegation of ineffective assistance. Even assuming that counsel should have objected and that the objection would have been sustained, given all of the other properly admitted evidence of petitioner's guilt of the charged crimes in this case, it is not reasonably probable that petitioner would have received a more favorable verdict had counsel succeeded in preventing the jury from learning of the .32 caliber weapon found in his bedroom. Strickland v. Washington, 466 U.S. at 692-94.

1      Accordingly, petitioner is not entitled to habeas relief on this claim.

2              n.      Jury Instructions Regarding Aiding and Abetting

3      Petitioner claims that counsel "performed deficiently in failing to object or request

4  clarification regarding the confusing jury instruction restricting consideration of aiding and

5  abetting to 'the following four instructions.' (CALJIC No. 3.00; [Ex. A at] 918; [Ex. B at] 3675.)"

6  Petition at 150, ¶ 333.  Because this is the entirety of petitioner's present claim, the California

7  Supreme Court could have reasonably rejected it as an improper conclusory claim that also made

8  no attempt to establish prejudice from any deficient performance.  Jones v. Gomez, 66 F.3d at

9  204-05; James v. Borg, 24 F.3d at 26.

10     Additionally, the California Supreme Court could have reasonably concluded that the

11 allegedly "confusing" jury instructions were not in fact confusing and therefore counsel did not

12 perform deficiently in failing to object to the instructions or request clarification.  Indeed, the state

13 court, on direct appeal, specifically denied petitioner's claim that the instructions were confusing:

14     Prior to instructing on aiding and abetting, the trial court stated: "The following four
       instructions should be considered by you only as they apply to counts four [attempted
15     robbery of Fite] and five [Frazier murder]," followed by the relevant instructions.[13]
       Immediately thereafter, the court instructed as to second degree murder pursuant to
16     CALJIC No. 8.30.

17
           Fn 13: Specifically, the trial court read the following four instructions: (1) CALJIC
18         No. 3.00 (Principals—Defined); (2) CALJIC No. 3.01 (Aiding and Abetting—
           Defined); (3) CALJIC No. 3.02 (Principals—Liability for Natural and Probable
19         Consequences); and (4) CALJIC No. 8.27 (First Degree Felony Murder—Aider
           and Abettor).
20

21     Defendant contends that based on the above instructions, the trial court misinformed the
       jury that it could consider the instruction defining second degree murder only with regard
22     to the Frazier murder, because the jury would have erroneously believed CALJIC No. 8.30
       was one of the "following four instructions" to be considered only as it applied to count 4
23     (attempted robbery of Fite) and count 5 (Frazier murder).[20] We reject the contention.

24     . . .

25

26  ────────────────────
    [20] CALJIC 8.30 states: "Murder of the second degree is [also] the unlawful killing of a human
27  being with malice aforethought when the perpetrator intended unlawfully to kill a human being
    but the evidence is insufficient to prove deliberation and premeditation."
28

United States District Court
Northern District of California

The record contains no inquiries from the jury regarding the application of these instructions.  We agree with respondent that if the instructions were susceptible of the interpretation defendant now asserts, counsel likely would have objected at trial on this basis.  Such an omission suggests that " 'the potential for [confusion] argued now was not apparent to one on the spot.' " (*People v. Keenan* (1988) 46 Cal.3d 478, 535, 250 Cal.Rptr. 550, 758 P.2d 1081 [failure to object to trial court's remarks about potential jury investigation suggested the potential for coercion was not discernible], quoting *Lowenfield v. Phelps* (1988) 484 U.S. 231, 240, 108 S.Ct. 546, 98 L.Ed.2d 568.)  Counsel's arguments, moreover, informed the jury that it could consider second degree murder as to the Rivers, Frazier, and Davis murders.  Therefore, we find no basis to conclude the jury misinterpreted the above instructions or was confused in any manner as to the applicability of the second degree murder instruction to all of the charged murders.  Accordingly, we conclude the trial court did not erroneously limit the second degree murder instructions to the Frazier murder charge.

People v. Young, 34 Cal. 4th at 1202-03.

Because the state court reasonably rejected the merits of petitioner's position on direct appeal that the instructions were confusing, it necessarily, and reasonably, rejected petitioner's habeas claim that counsel was ineffective in not objecting to the instructions and requesting clarification.  "[T]rial counsel cannot have been ineffective for failing to raise a meritless objection."  Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005).  Although the state court supported its finding in part on the very fact that counsel did not object, it also noted that the jury never asked for clarification and that counsel's arguments would have clarified any confusion.

Accordingly, petitioner is not entitled to habeas relief on this claim.

o.    Instruction Regarding Patrick Jackson's Immunity

Petitioner claims that defense counsel "performed deficiently in failing to request a jury instruction informing the jury that the grant of immunity from prosecution to Patrick Jackson could be considered as reflecting negatively on his credibility."  Petition at 150, ¶ 333.  Petitioner argues that Jackson's testimony was the principal reason he was convicted on counts 1 through 5, and because three juror declarations show "confusion among the jurors with respect to why Jackson's immunity agreement was significant," "counsel's failure to request proper instructions . . . was prejudicial and contributed directly to petitioner's conviction. . . ."  Id. at 150-51, ¶ 333.[21]

---

[21] Declarations about jurors' "mental processes concerning the verdict or indictment" are generally inadmissible. Fed. R. Evid. 606(b).  In any event, only one of the three juror declarations mentions Jackson and merely states, "[T]here was so much other evidence [sic] witnesses that

67

The California Supreme Court reasonably rejected this allegation of ineffective performance by counsel.  The record shows that the trial court instructed the jury with the then-standard instruction on witness credibility, CALJIC No. 2.20, which informed the jurors that they could, in determining a witness's believability, consider, among other things, "the existence or nonexistence of a bias, interest, or other motive."  Ex. B at 3659-60.  On four occasions during closing argument defense counsel alluded to the fact that Patrick Jackson had testified for the prosecution under a grant of immunity for murder, and suggested that the jury should consider that fact as reflecting negatively on Jackson's credibility.  Ex. B at 3499, 3512, 3514, 3518.  The trial court also instructed the jury that if petitioner proved by a preponderance of the evidence that Patrick Jackson was an accomplice to counts 1 through 5, the jury ought to view his testimony with distrust.  Ex. B at 3667-69.

Considering what counsel did to attack Patrick Jackson's credibility in summation, and considering the instructions the trial court gave on Jackson's credibility, petitioner's claim that counsel should have requested a more specific instruction (which petitioner does not set forth) informing the jury that the grant of immunity to Jackson could be considered as reflecting negatively on his credibility, is unpersuasive.  Where the jury instructions that are given are not improper and qualify as an accurate statement of the law, the failure of a defense attorney to object or request additional instructions is not objectively unreasonable under Strickland. Aparicio v. Artuz, 269 F.3d 78, 100 (2d Cir. 2001).

Accordingly, petitioner is not entitled to habeas relief on this claim.

        p.    Failure to Pursue Writ Proceedings

Petitioner claims counsel failed to engage in interlocutory writ proceedings after the magistrate presiding over the preliminary hearing denied the defense motion to dismiss under section 995 of the California Penal Code.  Petition at 151, ¶ 334.  At petitioner's preliminary hearing in this case, Patrick Jackson, after answering a preliminary question about whether he knew petitioner, refused to answer any further questions.  Ex. A at 429-31.  The magistrate

picked him out of a line.  And his very own cousin turning him in."  Ex. 145 to Ex. F at ¶ 5.

1    informed Jackson that each time he refused to answer a question, after being ordered to do so by

2    the court, he would be found in contempt and sentenced to five days in the county jail. Id. at 431.

3    After talking to his attorney Jackson still refused to testify. Ex. A at 432. The magistrate

4    proceeded to inform Jackson that he was going to begin contempt proceedings and then sentence

5    him for his refusal to obey a lawful court order. Id. The magistrate added: "Well, I guess Mr.

6    Jackson's ready to serve a long, long time because that's exactly what we're going to do to Mr.

7    Jackson." Id. After Jackson's counsel asked for and received a five-minute recess to discuss

8    matters further with Jackson, counsel announced that Jackson would testify. Id. at 432-33.

9    However, the crux of Jackson's subsequent testimony was that he did not remember much about

10   the events of January 30, 1989. The prosecution then played a taped statement for Jackson in an

11   attempt to refresh his recollection—a statement in which he inculpated petitioner in the attempted

12   robbery of Melva Fite and murder of Glen Frazier. Id. at 434-49, 475-82, 587-605. The

13   magistrate ultimately ruled that Jackson's "I can't remember" answers were "contrived

14   and I think that the entire tape is admissible as his prior inconsistent statement under the existing

15   case law." Id. at 440, 475-82.

16   After the preliminary hearing and the magistrate's holding of petitioner to answer, defense

17   counsel filed a motion under section 995 of the California Penal Code, asking the superior court to

18   dismiss the Information, specifically counts 1, 4, and 5 (the murder of Terry Rivers, the attempted

19   robbery of Melva Fite and Glen Frazier, and the murder of Frazier, respectively). Ex. A at 563-

20   605. Counsel argued that petitioner had been denied a substantial right at the preliminary hearing

21   because the magistrate had coerced testimony out of Patrick Jackson ("creating the vehicle

22   whereby the prosecution could introduce the witness' prior inconsistent statement") as if the

23   magistrate were a second prosecutor. When that testimony and taped statement were removed

24   from the case, defense counsel argued, there remained only evidence insufficient to support counts

25   1, 4, and 5. Id. Defense counsel further argued that the coercion occurred when the magistrate

26   erroneously threatened Jackson with contempt punishment the law does not permit. In In re

27   Keller, 49 Cal. App. 3d 663, 670-71 (1975), the state appellate court held that a witness who

28   makes it clear he or she will answer no questions regarding an incident can be punished for only

United States District Court
Northern District of California

69

one contempt (with a maximum punishment of five days' imprisonment or a fine or both, see Cal. Civ. Proc. Code § 1218), and not for each refusal to answer a particular question relating to the incident.  The magistrate can also jail the witness while the hearing is in process, id., or request that the witness be prosecuted for a violation of section 166(a)(6) of the California Penal Code.  In re Keller, 49 Cal. App. 3d at 670.

The superior court denied the section 995 dismissal motion, Ex. A at 612, and petitioner now claims that counsel "performed deficiently in failing to engage in interlocutory writ proceedings" challenging the superior court's denial of the section 995 dismissal motion.  Petition at 151, ¶ 334.  According to petitioner, the magistrate's actions at the preliminary hearing were "clearly in excess" of his "jurisdiction and abusive," and therefore the dismissal motion "was meritorious and should have been pursued."  Id.  Petitioner further claims that by failing to bring writ proceedings following the superior court's denial of the dismissal motion, trial counsel "waived the issue for appeal."  Id. (citing People v. Pompa-Ortiz, 27 Cal. 3d 519, 529 (1980)).

The California Supreme Court reasonably rejected this claim of ineffectiveness.  First, failure to pursue writ proceedings from the denial of the section 995 motion did not waive the issue on appeal as petitioner now claims.  Where the defendant is denied a substantial right at the preliminary hearing, such a denial would support the setting aside of the information.  But it is the defendant's failure to make a section 995 motion at all that waives the issue on appeal.  See People v. Anderson, 43 Cal. 3d 1104, 1148 (1987) (failure to raise logical impossibility of special circumstance allegation), superseded by statute, Cal. Penal Code § 190.2 (c), (d), as stated in People v. Mil, 53 Cal. 4th 400, 408 (2012).  In Pompa-Ortiz, the case cited by petitioner, the California Supreme Court discarded a per se reversal rule in the context of pretrial error correctable by pretrial writ.  The court overruled previous cases which assumed that preliminary hearing error could not be cured by a fair trial and adopted the requirement that prejudice must be shown when a defendant raises the erroneous denial of a section 995 motion on appeal from the resulting conviction.  No prejudice need be shown if a pretrial writ seeks review of the denial of the section 995 motion.

Second, defense counsel may have reasonably believed that a writ proceeding would be

United States District Court
Northern District of California

unsuccessful and opted not to use their limited time and resources to pursue a writ.  Under

California law, on review by appeal or writ, the reviewing court in effect ignores the superior

court's ruling on the section 995 motion, and directly reviews the determination of the magistrate

holding the defendant to answer.  People v. Laiwa, 34 Cal. 3d 711, 718 (1983).  An appellate court

affirms the denial of a section 995 motion even if the magistrate considered inadmissible evidence,

if the remaining admissible evidence was such that it could have sufficiently led the magistrate to

conclude that probable cause existed.  Rogers v. Superior Court, 46 Cal. 2d 3, 8 (1955).  Here,

there existed evidence apart from Jackson's taped statement sufficient to sustain the holding order

as to counts 4 and 5.  Victim Melva Fite identified petitioner as the perpetrator of those crimes in

court at his preliminary hearing.  Ex. A at 338-39.  And, once sufficient cause existed to believe

petitioner in fact shot Glen Frazier (count 5), that circumstantially provided the probable cause

that he was responsible for the Rivers murder (count 1), given the ballistics evidence that

positively matched the bullet taken from Frazier with one of the bullets fired at Rivers, and given

the evidence that petitioner was present at the Rivers murder scene (moments earlier he had shot

Manzine Miller).  Ex. A at 193-209, 297-99.

If a defense attorney does not perform in violation of Strickland when he or she does not

make an objection that has no merit, Juan H v. Allen, 408 F.3d at 1273, then counsel may

reasonably refrain from pursuing writ proceedings of dubious merit.

Accordingly, petitioner is not entitled to habeas relief on this claim.

q.     Jury Selection

Petitioner claims counsel performed deficiently during jury voir dire and jury selection

proceedings because while counsel "made a Batson motion to challenge the prosecutor's removal

of all the African-American women from the jury," counsel "failed to make an adequate record

regarding the composition of the jury," and failed to make an adequate record regarding "the

prosecutor's purported investigation of prospective juror [D.D.]."  Petition at 151, ¶ 335.

The state court reasonably rejected these two claims of ineffective assistance.  First, they

are conclusory and unsupported by any specifics.  Jones v. Gomez, 66 F.3d at 204-05; James v.

Borg, 24 F.3d at 26.  Further, the California Supreme Court reasonably held on direct appeal that

71

1   the trial court properly denied the defense's <u>Batson/Wheeler</u> motion.  <u>People v. Young</u>, 34 Cal. 4th

2   at 1170-74.  Petitioner has not only wholly failed to establish on habeas corpus how counsel

3   "failed to make an adequate record regarding the composition of the jury," but he has failed to

4   demonstrate that there is a reasonable probability that the trial court would have granted the

5   <u>Wheeler</u> motion had counsel made the unidentified "adequate" record regarding the composition

6   of the jury.  <u>Strickland v. Washington</u>, 466 U.S. at 692-94.  This same conclusion applies to

7   petitioner's claim that counsel failed to make an adequate record regarding the prosecutor's

8   purported investigation of prospective juror D.D.[22]

9          Accordingly, petitioner is not entitled to habeas relief on this claim.

10               r.     <u>Deficiency in Closing Argument</u>

11          Petitioner claims trial counsel provided ineffective assistance in presenting a closing

12   argument that was wanting in three ways: (1) counsel failed "to argue persuasively" that the man

13   who shot from the southwest bedroom of the house on 74th Avenue could not have shot Sylvester

14   Davis because his view of Davis would have been entirely blocked by the camellia bush next to

15   that window; (2) counsel "failed to argue that petitioner had a nonviolent record and no record of

16   firearm use and that the prosecutor's theory that he would suddenly kill three people for no reason

17   within the space of three weeks was therefore inherently implausible";  and (3) counsel

18   "performed deficiently in failing to present and argue evidence that petitioner did not use crack

19   cocaine and therefore did not have a drug-related motive to commit these killings."  Petition at

20   152-53, ¶ 336.

21          The state court had a reasonable basis to reject these claims.  First, petitioner points to

22   nothing in the record regarding the location of the purported camellia bush.  In any event, trial

23   counsel gave a lengthy argument expressing the defense position as to why petitioner was not

24   

_____

25   [22] Petitioner also alleges that counsel failed to conduct an adequate voir dire of the jurors
with respect to a number of penalty-phase issues, including (1) whether the jury truly understood
26   that a sentence of life without parole actually meant that petitioner would die in prison, and
(2) whether the jury truly understood that the life- or death-sentence decision resided with them,
27   and that a death verdict was not required under any circumstance.  Petition at 151-52, ¶ 335.
Petitioner also faults counsel for not peremptorily challenging Juror A.M., "based upon his view
28   on the death penalty."  <u>Id.</u>  The Court does not address these allegations, given that petitioner
has already received penalty-phase relief in state court.

United States District Court
Northern District of California

1    guilty of the Davis homicide.  Ex. B at 3547-3600.  The jury rejected this position.  Given the

2    strong evidence of petitioner's guilt, there exists no reasonable probability the jury would have

3    returned a not-guilty verdict had counsel focused on the presence of the camellia bush in

4    argument.  Strickland v. Washington, 466 U.S. at 692-94.

5         Second, it is improper for lawyers to argue in summation "facts" that were not presented as

6    evidence.  Thus, counsel did not perform ineffectively at the guilt phase in not arguing that

7    petitioner had a nonviolent record and no record of firearm use because there was no evidence in

8    the guilt-phase record concerning his past.  Nor would such an argument have affected the

9    outcome.  Strickland v. Washington, 466 U.S. at 692-94.

10        Third, concerning petitioner's claim that defense counsel performed deficiently in failing to

11   present and argue evidence that petitioner did not use crack cocaine and therefore did not have a

12   drug-related motive to commit these killings, that claim fails as conclusory.  Petitioner does not

13   substantiate his premise that he did not use crack cocaine by pointing to the admissible evidence

14   counsel could have used to prove that fact.  Presumably counsel knew from Dr. Kaufman what

15   petitioner had told him: That beginning at age 18, petitioner began using alcohol and drugs

16   almost continuously.  Ex. B at 3911.

17        Accordingly, petitioner is not entitled to habeas relief on this claim.

18             s.    Failure to Request Funding

19        Petitioner next claims: "To the extent that counsel's failure to conduct adequate

20   investigation or perform competently with respect to any of the enumerated instances of deficient

21   performance can be attributed to a lack of funding or resources, counsel performed below the

22   Sixth Amendment standard in unreasonably failing to request the necessary funds."  Petition at

23   153, § 337.  The state court reasonably rejected this claim as hypothetical given the lack of

24   information in the record pertaining to defense funding.

25        Accordingly, petitioner is not entitled to habeas relief on this claim.

26             t.    Cronic Error

27        Petitioner's final claim of guilt-phase performance ineffectiveness is that the failings of

28   counsel were, taken together, "so obviously below" the Strickland standard of care as to amount to

73

1    a failure to subject the prosecution's case to meaningful adversarial testing and merit habeas relief

2    without a showing of prejudice.  Petition at 153, ¶ 338 (citing United States v. Cronic, 466 U.S.

3    648 (1984)).

4         In Cronic, the United States Supreme Court held that where counsel's conduct is

5    egregiously prejudicial, no showing that there is a reasonable probability that the outcome would

6    have been different is required, and prejudice and ineffective assistance are presumed.  Cronic,

7    466 U.S. at 658-62.  These will be those rare cases where counsel "entirely fail[ed] to subject the

8    prosecution's case to meaningful adversarial testing."  Id. at 659.

9         The state court had a reasonable basis to reject this claim.  No fair reading of the record

10   leads to the conclusion that this was a Cronic case—that counsel Selvin and Meloling performed

11   in such a way that a complete breakdown in the adversarial process occurred, resulting in the

12   constructive absence of counsel.

13        Accordingly, petitioner is not entitled to habeas relief on this claim.

14             u.    Cumulative Error

15        Petitioner's cumulative error argument is also without merit.  As discussed above the Court

16   has found that in every instance of alleged ineffective performance, petitioner's claims are

17   unsupported or counsel's performance did not fall below an objective standard of reasonableness.

18   The one exception was counsel's failure to object to the admission of the evidence of the .32

19   caliber weapon found in petitioner's bedroom.  Based on this record, the Court concludes that

20   petitioner is not entitled to habeas relief on a claim that he suffered cumulative prejudice from trial

21   counsel's alleged various instances of ineffective assistance in guilt-phase performance.

22        Accordingly, petitioner is not entitled to habeas relief on this claim.

23        8.    Ineffective Assistance of Counsel – Mental Health Evidence

24        Petitioner claims trial counsel performed ineffectively by failing to competently investigate

25   and present mental health evidence in his defense.  Petition at 153-62.  Petitioner presented this

26   claim only on state habeas to the California Supreme Court, which summarily denied it on the

27   merits.

28        The record reflects that at petitioner's penalty-phase trial the defense presented extensive

United States District Court
Northern District of California

evidence regarding petitioner's mental health, including the evidence of the results of the testing done on petitioner by defense neuropsychologist Dr. Robert Kaufman.  That testing led Dr. Kaufman to conclude that petitioner had an overall or full-scale I.Q. of 75, which fell in the fifth percentile, a so-called "borderline" region.  Ex. B at 3920.  The "borderline" region, according to Dr. Kaufman, is "just above what qualifies for mental retardation," although persons in that range can hold jobs and live independently.  Id. at 3920-21, 3930-31.  Based on petitioner's performance on a range of tests, Dr. Kaufman's ultimate mental status determination of petitioner was "probable organic mental disorder not otherwise specified."  Ex. B at 3913, 3960.  In layman's terms, this meant petitioner had "borderline level intelligence" and "clear deficits" in his "executive functioning," i.e., problems in his ability to accurately perceive social situations and develop strategies to solve problems.  Id. at 3960-63.  Petitioner was generally logical, however, and his behavior generally appropriate.  Id. at 3966.

Petitioner faults counsel for not hiring Dr. Kaufman until August 1990, when jury selection was already underway.  Petition at 157.  Petitioner contends that had counsel hired Dr. Kaufman earlier, they could have made more effective use of his testing.  Id. at 158.  According to petitioner, "an accurate and timely assessment of petitioner's mental condition would have shown that petitioner was not competent to stand trial [and] did not actually form the mental states required for first degree murder."  Id. at 161, ¶ 352.

The state court had a reasonable basis to deny this claim.  First, as discussed above, Dr. Kaufman never expressed an opinion that petitioner was not competent to stand trial, and the California Supreme Court, on direct appeal, specifically rejected a penalty-phase claim that counsel rendered ineffective assistance by failing to request a competency hearing.  Regarding petitioner's mental defense argument, the presentation of mental health evidence in California criminal trials is controlled in part by sections 25, 28, and 29 of the California Penal Code.  These statutes provide in relevant part:

> The defense of diminished capacity is hereby abolished.  In a criminal action, as well as any juvenile court proceeding, evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged.

75

Cal. Penal Code § 25(a).

> Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.  Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.

Cal. Penal Code § 28(a).

> In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged.  The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact.

Cal. Penal Code § 29.

Here, while petitioner claims that the mental health evidence counsel failed to competently investigate and present would have shown that he "lacked the capacity to form, and therefore did not actually form, the mental states required for first degree murder," Petition at 161, ¶ 352, petitioner makes that argument in conclusory fashion only.  And the above-cited statutes show no reasonable probability that had the jury been aware of the mental health evidence he identifies, it would have concluded he did not have the required mental states for conviction when he acted as charged on January 30 and February 19, 1989.

Accordingly, petitioner is not entitled to habeas relief on this claim.

9.      Trial Court Error in Admitting Rebuttal Testimony

Petitioner claims that the trial court erred when it permitted the prosecution to present an "improper rebuttal" case in the testimony of one Delores White.  Petition at 162-71.  Petitioner made the same claim on direct appeal in the California Supreme Court.  The state court summarized and rejected the claim as follows:

> Prosecution witness Melva Fite testified on direct examination that defendant, holding a gun, had exited the driver's side of the vehicle before he approached Fite and Frazier on 90th Avenue and shot Frazier.  On cross-examination, Fite acknowledged she had provided oral and written statements to police that the passenger exited the vehicle and did the shooting on 89th Avenue and 90th Avenue and that the driver never exited the vehicle.

During the defense case, Officers Derrick Norfleet and Brian Thiem both confirmed that Fite had stated the shooter exited the passenger side of the vehicle on 89th Avenue and 90th Avenue.  In rebuttal, the prosecution sought to call Delores White to rehabilitate Fite's credibility by testifying that she (White) observed the man who shot Frazier on 90th Avenue exit the driver's side of the vehicle and that another man was in the passenger seat.  Defendant objected to the rebuttal as improper because the defense impeached Fite's credibility on cross-examination and because White had been available to the prosecution during its case-in-chief.  The prosecutor replied the proffered testimony was proper to rebut evidence presented by the defense in its own case-in-chief that corroborated its impeachment of Fite.

Pursuant to *People v. Carter* (1957) 48 Cal.2d 737, 753–754, 312 P.2d 665, the court ruled White's testimony admissible and more probative than prejudicial.  On appeal, defendant contends that the trial court erred.  We disagree.

The decision to admit rebuttal evidence rests largely within the discretion of the trial court and will not be disturbed on appeal in the absence of demonstrated abuse of that discretion. (§ 1093, subd. (d); *People v. DeSantis* (1992) 2 Cal.4th 1198, 1232, 9 Cal.Rptr.2d 628, 831 P.2d 1210.) In *People v. Carter*, *supra*, 48 Cal.2d at pages 753–754, 312 P.2d 665, we stated "proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime.  It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt." Restrictions are imposed on rebuttal evidence (1) to ensure the presentation of evidence is orderly and avoids confusion of the jury; (2) to prevent the prosecution from unduly emphasizing the importance of certain evidence by introducing it at the end of the trial; and (3) to avoid "unfair surprise" to the defendant from confrontation with crucial evidence late in the trial.  (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1211, 249 Cal.Rptr. 71, 756 P.2d 795; *Carter*, at pp. 753–754, 312 P.2d 665.)

Here, White's testimony corroborated the portion of Fite's testimony that had been impeached by defense witnesses Norfleet and Thiem.  The substance of White's testimony, therefore, had already been conveyed to the jury during the prosecution's case-in-chief.  Testimony that repeats or fortifies a part of the prosecution's case that has been impeached by defense evidence may properly be admitted in rebuttal.  (See, e.g., *People v. Carrera* (1989) 49 Cal.3d 291, 322, 261 Cal.Rptr. 348, 777 P.2d 121; *People v. Graham* (1978) 83 Cal.App.3d 736, 741, 149 Cal.Rptr. 6, disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 569, 76 Cal.Rptr.2d 239, 957 P.2d 928.)  Further, as the trial court determined, the introduction of White's testimony in rebuttal did not implicate the concerns addressed in *Carter*.  On this record, we find no abuse of discretion in permitting the rebuttal testimony.

Defendant additionally contends the trial court's error in admitting the rebuttal testimony violated his Fifth, Sixth, and Fourteenth Amendment rights under the federal Constitution to due process of law and a fair trial and also violated section 1093 (order of trial proceedings), thereby impairing his Fourteenth Amendment liberty interest under *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175.  Assuming these claims were properly preserved for review (see *Yeoman*, supra, 31 Cal.4th at pp. 117, 133, 2 Cal.Rptr.3d 186, 72 P.3d 1166), they are without merit because we have concluded that

United States District Court
Northern District of California

the trial court did not err in admitting the rebuttal testimony.  For the same reason, his contention that the prosecutor engaged in misconduct by reserving White's testimony for rebuttal is also meritless.

People v. Young, 34 Cal. 4th at 1198-1200.

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).  Due process is violated only if there are "no permissible inferences the jury may draw from the evidence."  Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  Even if an evidentiary error is of constitutional dimension, the court must consider whether the error had a substantial and injurious effect on the verdict.  Brecht, 507 U.S. at 638;  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

Here, petitioner has not shown that a specific constitutional guarantee was violated or that he was denied a fair trial.  The state court determined that White's testimony essentially fortified the prosecution's case-in-chief, making it proper rebuttal evidence under California case law.  Because the jury could have drawn the "permissible inference" that White had no motive to lie about what she observed as well as the "permissible inference" that her observations connected petitioner to the Frazier murder, petitioner's constitutional rights were not violated.  See Jammal, 926 F.2d at 920.

Finally, a review of the record demonstrates that the prosecutor's case against petitioner was strong, so that even if the admission of White's testimony in rebuttal constituted error, there was no due process violation.  As discussed above, not only did Fite and the ballistics evidence inculpate petitioner as the perpetrator of the offenses against Fite and Frazier, but so did the testimony of petitioner's cousin, Patrick Jackson.

Accordingly, petitioner is not entitled to habeas relief on this claim.

//

10.    Insufficient Evidence – Terry Rivers Murder

Petitioner claims that there existed insufficient evidence to support the count 1 conviction

for first degree murder of Terry Rivers.  Petition at 171-91.  More specifically, petitioner contends

insufficient evidence existed that he was the perpetrator at all.  Petitioner alternatively contends

that even if the evidence sufficiently proved beyond a reasonable doubt that he killed Terry Rivers,

"the evidence was still insufficient to establish that the crime was first degree murder" under either

of the first degree theories presented to the jury: premeditation-deliberation, and felony murder

(robbery).  Petition at 173, 184, ¶¶ 386, 409.  Petitioner lastly contends that because there was

insufficient evidence that he killed Terry Rivers during the commission of a robbery, he is due

habeas relief striking the robbery murder special circumstance.  Petition at 173, 184, 191, ¶¶ 386,

409, 427.

Petitioner made the same claim on direct appeal in the California Supreme Court.  The

state court summarized and rejected the claim as follows:

> Defendant was convicted of the first degree murder of Terry Rivers.  The jury was
> instructed it could convict defendant of first degree murder based on the theory of robbery
> felony murder or of premeditated and deliberate murder.  Because the jury found true the
> special circumstance that defendant killed Rivers during the commission of a robbery, it
> necessarily sustained at least the felony-murder theory.  Defendant contends, in substance,
> the evidence is insufficient under the due process clause of the Fourteenth Amendment to
> the federal Constitution to support his conviction for the first degree murder of Terry
> Rivers under either theory.

> "In reviewing the sufficiency of evidence under the due process clause of the Fourteenth
> Amendment to the United States Constitution, the question we ask is 'whether, after
> viewing the evidence in the light most favorable to the prosecution, any rational trier of
> fact could have found the essential elements of the crime beyond a reasonable doubt.' "
> (*Rowland*, *supra*, 4 Cal.4th at p. 269, 14 Cal.Rptr.2d 377, 841 P.2d 897, quoting *Jackson v.
> Virginia* (1979) 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.)  We apply an identical
> standard under the California Constitution.  (Ibid.)  "In determining whether a reasonable
> trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate
> court 'must view the evidence in a light most favorable to respondent and presume in
> support of the judgment the existence of every fact the trier could reasonably deduce from
> the evidence.' "  (*People v. Johnson* (1980) 26 Cal.3d 557, 576, 162 Cal.Rptr. 431, 606
> P.2d 738.)  The same standard also applies in cases in which the prosecution relies
> primarily on circumstantial evidence.  (*People v. Maury* (2003) 30 Cal.4th 342, 396, 133
> Cal.Rptr.2d 561, 68 P.3d 1.)

> "In California, the first degree felony-murder rule 'is a creature of statute.' [Citation.]
> When the prosecution establishes that a defendant killed while committing one of the

79

felonies section 189 lists [including robbery], 'by operation of the statute the killing is deemed to be first degree murder as a matter of law.' " (*People v. Mendoza* (2000) 23 Cal.4th 896, 908, 98 Cal.Rptr.2d 431, 4 P.3d 265.)  Under the felony-murder rule, a strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the felony and murder were part of one continuous transaction.  (*People v. Cavitt* (2004) 33 Cal.4th 187, 207, 14 Cal.Rptr.3d 281, 91 P.3d 222.)  This transaction may include a defendant's flight after the felony to a place of temporary safety.  (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1015–1016, 248 Cal.Rptr. 568, 755 P.2d 1017; People v. Portillo (2003) 107 Cal.App.4th 834, 846, 132 Cal.Rptr.2d 435.)

Defendant contends the evidence is insufficient to support his first degree murder conviction of Rivers under a robbery-felony-murder theory because it fails to establish he killed Rivers during the commission of the Miller robbery.  Under the foregoing standard, and viewing the evidence in the light most favorable to the judgment, a rational trier of fact could have concluded that defendant robbed and shot Miller and then killed Rivers before completing the Miller robbery.

Miller testified defendant robbed and then shot him around 2:30 a.m. on January 30, 1989.  Defense counsel conceded during summation that defendant shot Miller and, on appeal, defendant concedes the evidence is sufficient to prove he shot Miller.

Miller testified that after defendant shot him, defendant walked back towards Miller's house.  Miller heard three additional shots fired, from several seconds to 10 minutes later.  He then began crawling towards East 23rd Street to get help.

Police discovered Rivers's body lying on the front porch of Miller's house, across the front entryway.  Rivers was killed by a single .38–caliber bullet to the back of his head.  A dozen small white rocks were found next to Rivers's body.  A second .38–caliber bullet was removed from a living room wall in Miller's house.  Police did not find a third bullet that had penetrated a door to the front porch.  A police evidence technician estimated the distance between Miller's house and the area where defendant shot Miller to be 120 to 150 feet.

From these circumstances, a trier of fact could reasonably infer that defendant shot and killed Rivers.  The ballistics evidence solidified this conclusion.  The prosecution's ballistics expert opined that, based on the presence of one or two rare "pseudo land impressions" on each of the bullets he examined, including the one taken from Miller's body, the one taken from Rivers's body, and the one taken from Miller's living room wall, all of the bullets were fired from the same gun.

Defendant contends further that even if there existed sufficient evidence that he killed Rivers, the evidence is insufficient to establish the murder occurred during the commission of the Miller robbery.

We disagree.  First, the evidence demonstrates overwhelmingly that defendant robbed Miller—that is, defendant took property from Miller by means of force or fear with the specific intent to permanently deprive him of that property.  (§ 211.)  Second, a rational trier of fact could have found the Miller robbery was not complete when defendant shot

80

and killed Rivers.

A robbery is not complete until the perpetrator reaches a place of temporary safety (*People v. Salas* (1972) 7 Cal.3d 812, 822, 103 Cal.Rptr. 431, 500 P.2d 7), and the jury here was so instructed.  Miller testified Rivers had been "fandangling," i.e., selling fake drugs, in front of the house and may have been outside at the time he left with defendant and headed towards the "swamp" to buy some cocaine from one of his suppliers.  The jury thus could have reasonably inferred that defendant killed Rivers in order to eliminate a potential witness against him in a prosecution for the robbery and attempted murder of Miller.  (See *People v. Fields* (1983) 35 Cal.3d 329, 365–368, 197 Cal.Rptr. 803, 673 P.2d 680.)  In addition, because "[t]he scene of a robbery is not a place of temporary safety" (*People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1375, 46 Cal.Rptr.2d 530), the jury reasonably could have found that the robbery was not yet complete at the front of Miller's house at 2:30 a.m., approximately 120 to 150 feet from the "swamp" where defendant had robbed Miller moments before.

Accordingly, the record contains sufficient evidence that defendant shot and killed Rivers during the commission of a robbery, and thus committed first degree murder under the theory of robbery felony murder.

Defendant additionally claims the lack of sufficient evidence to support his conviction for first degree murder based on a theory of felony murder also violated his right to a reliable penalty determination under the Eighth Amendment to the United States Constitution.  The point is without merit, given we have concluded there was substantial evidence to support his conviction on a felony-murder theory.

Finally, defendant contends that, even if the evidence was sufficient to identify him as the shooter, it nevertheless was insufficient to support his conviction for the first degree murder of Rivers based on a theory of premeditation and deliberation.   But because we have concluded defendant's first degree murder conviction is adequately supported under the theory of robbery felony murder and the jury found true the robbery-murder special circumstance, we need not address this point.  (*People v. Berryman* (1993) 6 Cal.4th 1048, 1086, 25 Cal.Rptr.2d 867, 864 P.2d 40 (*Berryman* ), overruled on another point by *People v. Hill* (1998) 17 Cal.4th 800, 823, 72 Cal.Rptr.2d 656, 952 P.2d 673, fn. 1 (*Hill* ).)

People v. Young, 34 Cal. 4th at 1175-78.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  Consequently, where a state prisoner alleges the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt, such petitioner states a constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, id. at 324.  For purposes of determining such claim, the relevant inquiry is

1   whether, "after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational

2   trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u>

3   at 319.  Where the record supports conflicting inferences, a federal habeas court must presume the

4   trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

5   resolution.  <u>Id.</u> at 326.  Only if no rational trier of fact could have found proof of guilt beyond a

6   reasonable doubt, may the writ be granted.  <u>Id.</u> at 324.

7           Based on an independent review of the record, the state court's denial of this claim was

8   objectively reasonable.  The evidence adduced at trial shows: (1) petitioner took property from

9   Miller and shot Miller in the "swamp," after which petitioner began to walk back toward Rivers

10  (<u>People v. Young</u>, 34 Cal. 4th at 1166); (2) Miller heard three additional shots fired, from several

11  seconds to 10 minutes later (Ex. B at 2387-88, 2467-69, 2497, 2503-04); (3) ballistics expert

12  Chester Young examined the pseudo land impressions on the bullets from Miller's body, River's

13  body, and from Miller's living room wall and opined that the same gun fired all the shots (Ex. B at

14  3058-59, 3062-63, 3087-92, 3099); and (4) Jackson admitted to Oakland police investigators that

15  he had been with petitioner in a car at 2:30 a.m. on January 30 and that they had parked a block

16  away from Miller's house (Ex. B at 3128).  Viewing the evidence in the light most favorable to the

17  prosecution, a rational trier of fact could find that:  (1) petitioner shot and killed Rivers; and (2)

18  the Miller robbery was not yet complete when he did so.  Petitioner makes much of the fact that

19  Miller's courtroom reconstruction showed that only eight or nine seconds passed between the time

20  petitioner shot Miller and the time Miller heard more shots, presumably those fired at Rivers.  As

21  discussed above, however, the jury could have reasonably relied on Miller's "five to ten minute" or

22  "two to three minute" testimony in reconstructing the time lapse between the shootings.  <u>See</u>

23  discussion at III.B.6.a.vii-viii, <u>supra</u>.  And this Court must presume the trier of fact resolved any

24  conflicting inferences in favor of the prosecution.  <u>Jackson v. Virginia</u>, 443 U.S. at 326.  <u>See also</u>

25  <u>McDaniel v. Brown</u>, 558 U.S. 120, 133-34 (2010) (finding the Ninth Circuit erred by failing to

26  consider all of the evidence in the light most favorable to the prosecution when it resolved

27  inconsistencies in testimony in favor of the state prisoner).

28          Accordingly, petitioner is not entitled to habeas relief on this claim.

United States District Court
Northern District of California

1      11.    Insufficient Evidence – Sylvester Davis Murder

2      Petitioner claims that there existed insufficient evidence to support the count 5 conviction

3  for the murder of Sylvester Davis or to support the finding that the killing was premeditated and

4  deliberate murder.  Petition at 191-203.  Petitioner made the same claim on direct appeal in the

5  California Supreme Court.  The state court summarized and rejected the claim as follows:

6          The jury found that defendant personally used a handgun during the commission of the
           offense, but did not find true the robbery-felony-murder or burglary-felony-murder special-
7          circumstance allegations, thus implicitly finding that the Davis killing was premeditated
           and deliberate first degree murder.  Defendant contends that the evidence is insufficient to
8          support his conviction on this theory.

9          In order to address defendant's contention, we must set forth the facts at some length.  In
10         early 1989, Thomas lived in a room that he rented from Joseph Batiste at the 74th Avenue
           house in Oakland.  The house was a single-story structure with a living room and garage in
11         the front, a kitchen to one side, and a central hallway that led to two bedrooms in the rear.
           A small concrete porch extended from the front door to the large living room window.
12         Crack cocaine was regularly bought, sold, and used at the house, characterized by one
13         regular visitor as a "smoke house."

14         On February 19, 1989, shortly after 2:00 a.m., Thomas was in the living room watching
           television.  Batiste, Livingston, Davis, Hackett, and Robinson were also in the house:
15         Livingston and Davis in the northwest bedroom smoking cocaine, Batiste and Robinson in
           the southwest bedroom, and Hackett in the kitchen.
16

17         Steve Ross, who lived next door, came over to the house and briefly visited with Batiste.
           After Ross left, Thomas watched through a crack in the open front door and saw Ross
18         speaking with defendant, who had just walked up the street.  As Ross and defendant talked,
           Ross pointed to the house, and defendant looked over his shoulder in Thomas's direction.
19         After Ross and defendant started walking up the street, Thomas shut the door and
           continued to watch them through the peephole in the door.  When Thomas saw Ross
20         walking towards the house next door, he resumed watching television.

21         Moments later, defendant knocked on the front door of the 74th Avenue house.  Because
22         Thomas did not recognize the name defendant gave, he looked out the peephole.  Thomas
           saw defendant and asked again for defendant's name.  When he still failed to recognize the
23         name, Thomas called for Batiste and again looked out the peephole.  Defendant had put his
           own eye up to the peephole and looked in.  He then rattled the doorknob, took a half-step
24         backwards, and walked towards the living room window.

25         Thomas stepped back from the door and heard a loud crash in the living room.  He turned
26         and ran towards the kitchen.  As he did so, he saw the top of defendant's Yankees baseball
           cap and an arm with a pistol in the hand come through the window.  Defendant shot
27         Thomas through his right forearm as he ran.  Thomas continued to run and eventually
           escaped the house through the garage door.
28

In the northwest bedroom, Davis and Livingston heard loud banging and then two gunshots.  Upon hearing the shots, Davis ran out of the bedroom and into the southwest bedroom where he jumped out of the window. Robinson, who was hiding in the closet, followed.

Livingston, meanwhile, had remained in the northwest bedroom.  Defendant suddenly kicked open the bedroom door, brandishing a long-barreled black revolver with a brown handle.  Defendant told Livingston to "give me your damn money."  Livingston reached into his wallet and handed him two $20 bills.  Defendant took the money and walked into the southwest bedroom. Livingston then heard the sound of a window breaking and three gunshots.  After the shooting stopped, Livingston stayed in the northwest bedroom for two or three minutes. Defendant returned, looked at Livingston, and walked out of the house through the front door.

Outside the southwest bedroom window, Robinson had crawled to the south side of the house toward the front.  Davis had run to the north side. Robinson heard Davis say, "Oh, they going to kill me," and then another gunshot.

About a minute after defendant left the house, Livingston walked to the front door and looked outside.  Livingston heard Davis "hollering" as if he were "in a lot of pain." Livingston retreated into the house as a dark four-door car pulled in front.

After Robinson had crawled past three or four houses, she was assaulted by someone matching defendant's description who hit her in the head with his gun.  The man told Robinson not to return to the 74th Avenue house "because it was his turf."

Police discovered Davis's body lying in the front yard of the house next door. A trail of blood led from the intersection of the fences at the rear of the house and along the side to where Davis's body was found.  The bullet that struck Thomas was found lodged in the refrigerator and was either a .38–caliber or .357–magnum lead bullet.  A second shot, a .38–caliber lead bullet, was found in the hallway. A .32–caliber cartridge was found on a dresser in the southwest bedroom.  The bullet that struck and killed Davis was never recovered.

Thomas described the man who spoke with Ross and later knocked on the front door as being in his early 20's, between five feet six inches and five feet eight inches tall, and approximately 155 pounds.  He wore a dark three-quarter-length coat with a hood and a New York Yankees cap.  Livingston described the man who robbed him as about six feet tall and wearing a dark knit navy watch cap, black waist-length "Members Only" jacket, and red shirt.  Robinson described the man who assaulted her as African American, five feet nine inches tall, between 26 and 29 years old, and wearing a black leather coat and a baseball cap.

As stated, in reviewing a challenge to the sufficiency of the evidence, the relevant inquiry is whether, on review of the entire record in the light most favorable to the judgment, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. (*Rowland*, *supra*, 4 Cal.4th at p. 269, 14 Cal.Rptr.2d 377, 841 P.2d 897; see also *Jackson v. Virginia*, *supra*, 443 U.S. at pp. 317–320, 99 S.Ct. 2781.)

Applying this standard, we conclude the above evidence constituted sufficient proof that defendant shot and killed Davis.  The jury reasonably could have found that defendant (1) broke into the 74th Avenue house, (2) shot Thomas as he fled to the kitchen, then (3) robbed Livingston in the northwest bedroom, and (4) pursued and shot Davis after he jumped through the southwest bedroom window.

The testimony of the prosecution's ballistics expert bolsters this conclusion.  The expert testified that the bullet taken from Frazier—whom the evidence overwhelmingly proved defendant shot and killed on January 30, 1989—and the bullet taken from the hallway at the 74th Avenue house were "likely" fired from the same gun.  The expert also formed the "very, very strong" opinion that the Frazier bullet and the bullet recovered from the refrigerator at the same house were fired from the same gun.  Thus, the expert's ballistics testimony strongly suggests that the gun used to kill Frazier was used to shoot Thomas at the 74th Avenue house.  Because the evidence proved overwhelmingly that defendant had shot and killed Frazier approximately three weeks before, the jury could reasonably conclude that Thomas's identification of defendant as his assailant was reliable.  It follows that, given the jury also found defendant shot at Thomas and attempted to murder him, it reasonably could conclude that defendant also shot and killed Davis.

Defendant asserts the jury could not reasonably believe that he shot Davis because Livingston and Thomas described different assailants.  He acknowledges that both identified defendant at trial but argues nonetheless that their conflicting descriptions and other evidence suggest that at least two gunmen were in the house that night.

In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts.  (*People v. Maury*, *supra*, 30 Cal.4th at p. 403, 133 Cal.Rptr.2d 561, 68 P.3d 1.)  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  (*Ibid.*)  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.  (*People v. Allen* (1985) 165 Cal.App.3d 616, 623, 211 Cal.Rptr. 837.)

No inherent improbability appears in the identification testimony of either Livingston or Thomas, and nothing about the evidence shows the Davis murder would have been physically impossible for defendant to perpetrate.  The jury, as the sole judge of the credibility of witnesses, could reasonably have rejected defendant's theory of two gunmen storming the house and instead accepted the prosecutor's argument that Livingston's description of the perpetrator's height and clothing was simply inaccurate.  In addition, given the chaos prevailing at the 74th Avenue house in the early morning hours on February 19, 1989, conflicting descriptions would not be particularly surprising.  Importantly, though, both witnesses identified defendant at trial as their assailant and identified the jacket worn by defendant on the day of his arrest as similar to the one the perpetrator wore.

* * *

Defendant contends that even if the evidence is sufficient to prove beyond a reasonable doubt that defendant killed Davis, there is no evidence to establish the killing was

premeditated and deliberate and thus, first degree murder.  We disagree.

 "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.... 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance.  [Citations.] 'The process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." [Citations.]' "  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080, 119 Cal.Rptr.2d 859, 46 P.3d 335 (*Koontz*).)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27, 73 Cal.Rptr. 550, 447 P.2d 942 (*Anderson* ), this court surveyed prior cases and developed  guidelines to aid reviewing courts in assessing the sufficiency of the evidence to sustain findings of premeditation and deliberation.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1125, 9 Cal.Rptr.2d 577, 831 P.2d 1159.)  The court identified three categories of evidence pertinent to this analysis: planning, motive, and manner of killing.  (*Ibid.*, citing *Anderson*, at p. 27, 73 Cal.Rptr. 550, 447 P.2d 942.)  With respect to these categories, the *Anderson* court stated: " 'Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing].' " (*Perez*, at p. 1117, 9 Cal.Rptr.2d 577, 831 P.2d 1159, quoting Anderson, at p. 27, 73 Cal.Rptr. 550, 447 P.2d 942.)

The *Anderson* guidelines are "descriptive, not normative," and reflect the court's attempt "to do no more than catalog common factors that had occurred in prior cases."  (*People v. Perez, supra,* 2 Cal.4th at p. 1125, 9 Cal.Rptr.2d 577, 831 P.2d 1159.)  In developing these guidelines, the court did not redefine the requirements for proving premeditation and deliberation.  (*People v. Welch* (1999) 20 Cal.4th 701, 758, 85 Cal.Rptr.2d 203, 976 P.2d 754 (*Welch*).)  The categories of evidence identified in *Anderson*, moreover, do not represent an exhaustive list of evidence that could sustain a finding of premeditation and deliberation, and the reviewing court need not accord them any particular weight.  (*Perez*, at p. 1125, 9 Cal.Rptr.2d 577, 831 P.2d 1159; *People v. Sanchez* (1995) 12 Cal.4th 1, 33, 47 Cal.Rptr.2d 843, 906 P.2d 1129.)

Applying these guidelines, we find substantial evidence supports the jury's finding that defendant premeditated and deliberated the Davis murder.  Shortly before it occurred, defendant was talking with Ross in front of the 74th Avenue house.  As they talked, Ross pointed to the house, and defendant looked in the direction of Thomas, who was standing in the front doorway.  A short time later, defendant knocked on the front door of the house. When asked for his name, defendant gave a name that Thomas did not recognize. Defendant then put his eye up to the peephole and rattled the door handle.  He stepped back and walked along the porch towards the living room window.  Moments later, defendant crashed through the living room window armed with a pistol.  Thus, as defendant concedes, the evidence established defendant planned his entry into the house.

Defendant contends the mere fact of a planned entry, standing alone, is inconsequential because it does not establish premeditation and deliberation of a murder committed outside the home.  Defendant, however, executed his planned entry into the house with a loaded

gun in his hand.  Hence, the jury could infer that defendant "considered the possibility of murder in advance" and intended to kill.  (*People v. Miller* (1990) 50 Cal.3d 954, 993, 269 Cal.Rptr. 492, 790 P.2d 1289; *People v. Miranda* (1987) 44 Cal.3d 57, 87, 241 Cal.Rptr. 594, 744 P.2d 1127.)

The jury could further infer from the evidence defendant's motive and a premeditated and deliberate manner of killing.  The jury could reasonably conclude that defendant's killings over this period showed a distinct pattern.  He accosted Miller, Rivers, Frazier, Fite, and Smith while in possession of a loaded gun.  He killed Rivers and Frazier and wounded Miller.  He demanded money or contraband, but the point of this rampage seemed to be to intimidate his victims and to convince the survivors of his seriousness.  The Davis murder fit the same pattern.  Defendant went to the crack house armed with a gun.  When the door remained barred, he smashed a window to get inside.  He shot Thomas and took money from Livingston at gunpoint.  He tracked Davis down when he made a desperate attempt to escape and cold-bloodedly executed him.  Someone matching defendant's description pointed a gun at Robinson's back and told her not to go near the crack house again because "it was his turf."  The jury could reasonably infer that this was defendant's motive and that, like the other incidents, it showed a premeditated and deliberate killing—even if the specific victim was selected more or less at random.

In sum, substantial evidence supports the jury's verdict that defendant committed the premeditated and deliberate first degree murder of Davis.

Defendant further contends the insufficiency of evidence to support his conviction for first degree murder based on a theory of premeditation and deliberation violated his right to a reliable sentence under the Eighth Amendment to the United States Constitution. Because we have concluded substantial evidence supported his conviction on such a theory, the point is without merit.

People v. Young, 34 Cal. 4th at 1178-84 (footnote omitted).

Applying the legal principles on sufficiency of the evidence outlined above to petitioner's current claim, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 12.    Juror Misconduct

Petitioner claims that jury members engaged in misconduct.  Petition at 203-12. Specifically, petitioner contends that: (1) two jurors concealed important information on voir dire, which would have resulted in their dismissal from the jury by defense challenge; (2) one juror harbored and concealed deep-seated racial bias which led him to reject the presumption of innocence and to prejudge the case, deciding guilt on the basis of race and other improper factors; (3) one juror introduced extrinsic evidence into jury deliberations; (4) jurors inferred guilt from the

1   fact that petitioner did not testify; and (5) jurors discussed the case and deliberated prior to the

2   conclusion of the presentation of evidence and also deliberated in the presence of an alternate

3   juror.  Id.[23]  In support of this claim, petitioner submits the declarations of jurors S.W. and A.M.,

4   as well as alternate juror S.L.  Petitioner presented this claim to the California Supreme Court only

5   in his state habeas petition, which was summarily denied on the merits.

6          The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of

7   impartial jurors.  U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961); Green v.

8   White, 232 F.3d 671, 676 (9th Cir. 2000).  Due process requires that the defendant be tried by "a

9   jury capable and willing to decide the case solely on the evidence before it."  Smith v. Phillips,

10  455 U.S. 209, 217 (1982).  See also United States v. Plache, 913 F.2d 1375, 1377-78 (9th Cir.

11  1990).  Jurors are objectionable if they have formed such deep and strong impressions that they

12  will not listen to testimony with an open mind.  Irvin, 366 U.S. at 722 n.3.  A defendant is denied

13  the right to an impartial jury if even one juror is biased or prejudiced.  Fields v. Woodford, 309

14  F.3d 1095, 1103 (9th Cir.), amended, 315 F.3d 1062 (9th Cir. 2002); Dyer v. Calderon, 151 F.3d

15  970, 973 (9th Cir. 1998) (en banc). Where a juror's actions or misconduct create "destructive

16  uncertainties" about the indifference of a juror, bias should be presumed.  Green, 232 F.3d at 677.

17                    a.      Misstatements During Voir Dire

18         The Ninth Circuit has identified three theories of juror bias based on a misstatement by a

19  juror during voir dire: (1) McDonough-style bias (i.e., juror fails to answer honestly and, had he

20  answered correctly, the information would have provided a basis for a challenge for cause, see

21  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548 (1984)), (2) "actual bias, which

22  stems from a preset disposition not to decide an issue impartially," and (3) "implied (or

23  presumptive) bias, which may exist in exceptional circumstances where, for example, a

24  prospective juror has a relationship to the crime itself or to someone involved in a trial, or has

25  repeatedly lied about a material fact to get on the jury."  Fields v. Brown, 503 F.3d 755, 766 (9th

26  Cir. 2007) (en banc).  A petitioner may obtain a new trial because a juror failed to answer a voir

27

28  [23] Petitioner also inadvertently presented juror misconduct claims relating to the sentencing phase, which he withdraws in his Traverse.  See Traverse at 82.

United States District Court
Northern District of California

dire question correctly by showing: (1) that the juror failed to honestly answer a voir dire question, and (2) that this undermined the impartiality of the petitioner's jury. See Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc).

i.    Juror S.W.

Petitioner claims that S.W. concealed important information on voir dire that, if disclosed, would have prompted the defense to excuse him by challenge.  In support, petitioner submitted to the California Supreme Court, on state habeas, a declaration from S.W. signed in 2003 and stating in relevant part:

2. To me, this case was about thugs and drug deals.  I know that neighborhood in Oakland, where all the murders took place.  My uncle built houses there.  I even know specific floor plans of houses in that neighborhood.  I used to work on Fruitvale, where I was robbed at gun point in the late 1970's.[24]  I know what people in those neighborhoods are like.  Those neighborhoods are filled with thugs.  I grew up in San Leandro, which [was] mostly white in those days.  San Leandro is right next door to Oakland so I knew Oakland well.  Oakland used to be a really nice, neighborhoody place, not at all like it is now.  It used to be made up mostly of whites and Portuguese. It felt very safe and comfortable.  Now it is mostly Mexican, Black and Asian.

3. My experiences with these neighborhoods in Oakland and my experience being robbed at gun point have made me street-wise.  My street smarts have gotten me to the point where I can look at someone and know whether they are good or bad. I knew this guy was bad.  All the evidence of guilt was there.  My street smarts gave me an earthier picture of what really goes on in these kinds of situations, a grittier feel of the neighborhood.  When I worked in Oakland, there were always helicopters flying above me, trying to get to all the thugs causing trouble.

4. Most of the witnesses that we heard testify were little drug addicts.  They were too high to remember or even care who shot at their friends.  One of them was a hooker.  It was really obvious what she did for a living, even if it wasn't established in court.  It was so transparent who all those people were.  We heard a person testify that had been shot by Robert Young and survived, and he seemed like he couldn't have cared less.  He was too much of a junkie to even realize how close he came to death.

5. Most of the people in that neighborhood don't take the time or make the effort to care about what goes on around them.  I once bought a car from a Chrysler dealership near the neighborhood where the murders happened.  The guy I bought my car from told me about all the black guys that would come into their dealership with a whole stack of cash and buy their cars flat out.  The dealership just didn't care

---

[24] Fruitvale Avenue in Oakland is approximately one-half mile from Highland Avenue and East 24th Street, where the crimes against Miller and Rivers took place.

because, to them, money was money and they didn't care where that money came
from.

Ex. 144 to Ex. F at 1-2, ¶¶ 2-5.

Petitioner alleges that this portion of Juror S.W.'s declaration directly contradicts answers

he gave on voir dire.  Specifically, in an answer to the jury questionnaire inquiry, "Are you

familiar with any of the locations where the offenses occurred?,"  S.W. responded negatively.  Ex.

136 to Ex. F at 3.  Then, on individual voir dire questioning, S.W. and the court had the following

exchange:

> Q. We will ask you a few more questions that are not related to the death
> penalty just to follow up on your questionnaire.
>
> You indicated that you were not familiar with the locations where the crimes
> took place?
>
> A. No.  Well, my parents lived in there on Delaware some place in the '40's
> before I was even born, so I heard of some of these street names, but as far as being
> there, ever being there, never.

Ex. B at 1019-20.

Also in his jury questionnaire Juror S.W. stated, in response to an inquiry regarding

membership in any special interest groups, that he did not belong to the National Rifle

Association.  Ex. 136 to Ex. F at 10.  In another portion of the questionnaire, in explaining that

he owned weapons (three), and why ("pistol for personal peace of mind, shotgun and rifle for

hunting"), S.W. stated that he did not belong "to any groups that advocate the right to own

weapons."  Ex. 136 to Ex. F at 16.

Yet, in the declaration from Juror S.W. that petitioner presented to the California Supreme

Court, S.W. stated:

> 9. I am a member of the NRA.  I've been a member of the NRA since I was 13
> or 14.  I grew up in a hunting family.  My sister and I went through our NRA training
> when we were kids so that we were educated about the guns that were always around
> us.  We always had beagles in our back yard that we were never allowed to play with
> since they were hunting dogs.

Ex. 144 to Ex. F at 2, ¶ 9.

Petitioner has also submitted a declaration from defense counsel Alexander Selvin stating

that he and co-counsel were of the opinion that members of the National Rifle Association "are

more likely that the average jurors to favor law enforcement over the defense and are also more likely than most jurors to impose the death penalty."  Ex. 140 to Ex. F at 3, ¶ 8.  Selvin further states that "if we had known that a juror was a member of the National Rifle Association, we would have exercised a peremptory challenge to remove him."  Id.

On this record, petitioner has established that juror S.W. failed to answer honestly during voir dire and, had he answered correctly, the information would have provided a basis for a challenge.  McDonough, 464 U.S. at 556.  Although defense counsel Selvin states in his declaration that he would have exercised a peremptory challenge to strike S.W., S.W.'s answers—had he answered honestly during jury selection—provided a basis for a challenge "for cause,"  see McDonough, 464 U.S. at 556, particularly had he answered truthfully that he knew the area where the crimes occurred and had even been robbed at gunpoint there in the 1970's.[25]  To disqualify a juror for cause requires a showing of either actual or implied bias, "'that is . . . bias in fact or bias conclusively presumed as a matter of law.'"  United States v. Gonzalez, 214 F.3d 1109, 1111-12 (9th Cir. 2000) (quoting 47 Am. Jur. 2d Jury § 266 (1995)).  Applying this standard, courts have found implied bias in cases where the juror in question has had some personal experience that is similar or identical to the fact pattern at issue.  See Gonzalez, 214 F.3d at 1112-13 & n.4.

Accordingly, petitioner is entitled to relief on this claim.

ii.    Juror A.M.

Petitioner also submitted to the California Supreme Court, on state habeas, a declaration from juror A.M. stating in relevant part:

> 2. I made my decision for death based on premeditated murder.  Robert chased that couple down and murdered that man.  That's premeditated.  Nothing else held any water with me.  Nothing else moved me.
>
> 4. I told the court I believed in an eye for an eye.  There was so much evidence of his guilt.  It was clear.  So he deserved the death penalty.  If there was evidence that led to reasonable doubt I would have been open to it and another sentence.  But

---

[25] Although S.W. did report in his jury questionnaire that he had been the victim of a robbery, he did not indicate the location.  His description, in total, reads: "Robbery alone in store when individual came in with gun forced to back of store and took the till a whole $65."  Ex. 136 to Ex. F at 12.

91

> there wasn't.  Robert committed murder so he got death.  There was nothing mitigating that could have changed my verdict.  If Robert had contested his guilt, then maybe things would have been different.  But since he didn't my mind was already made up.

Ex. 142 to Ex. F at 1, ¶¶ 2, 4.

Petitioner claims that this testimony shows that A.M. concealed the fact that he would not have an open mind.  The Court disagrees.  First, the statements relate entirely to A.M.'s penalty-phase determinations in that he states that his decision to vote for a death sentence was based on the evidence of guilt.[26]  As discussed above, petitioner's penalty-phase contentions are now moot.  Further, A.M.'s post-conviction statements that the crimes warranted the death penalty do not indicate that he lied on voir dire when he indicated that he would keep an open mind to the possibility of voting for life-without-parole and would not automatically vote for the death penalty.  Ex. B at 2099-2101.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### b.   Racial Bias and Prejudgment

Petitioner claims that S.W. was biased against black people and that such racial bias "led him to prejudge the case and to view petitioner as guilty from the beginning before deliberations had ever begun at either phase of petitioner's trial."  Petition at 208, ¶ 474.

As noted above, S.W.'s declaration includes statements such as that the neighborhoods comprising the crime scenes in this case "are filled with thugs."  Ex. 144 to Ex. F at 1, ¶ 2.[27]  "I know what people in those neighborhoods are like."  Id.  "Most of the people in that neighborhood don't take the time or make the effort to care about what goes on around them.  I once bought a car from a Chrysler dealership near the neighborhood where the murders happened.  The guy I bought my car from told me about all the black guys that would come into their dealership with a whole stack of cash and buy their cars flat out.  The dealership just didn't care because, to them, money

---

[26] Indeed, later in his declaration, A.M. states:  "Maybe it would have been different if the penalty phase came first."  Ex. 142 to Ex. F at 1, ¶ 8.

[27] The Merriam-Webster Dictionary defines "thug" as "a brutal ruffian or assassin. "  See Merriam-Webster Online Dictionary, retrieved Sept. 8, 2015, from http://www.merriam-webster.com/dictionary/thug.

United States District Court
Northern District of California

was money and they didn't care where that money came from." Id. at 2, ¶ 5 (emphasis added).

S.W. states he "knew those neighborhoods and those people, and I knew the stuff they do." Id. at

2, ¶ 6. "I grew up in San Leandro, which was mostly white in those days.  San Leandro is right

next door to Oakland so I knew Oakland well.  Oakland used to be a really nice, neighborly place,

not at all like it is now.  It used to be made up mostly of whites and Portuguese.  It felt very safe

and comfortable.  Now it is mostly Mexican, Black, and Asian." Id. at 1, ¶ 2 (emphasis added).

"My experiences with these neighborhoods in Oakland and my experiences being robbed at gun

point have made me street-wise.  My street smarts have gotten me to the point where I can look at

someone and know whether they are good or bad.  I knew this guy was bad." Id. at 1, ¶ 3

(emphasis added).  "My street smarts gave me an earthier picture of what really goes on in these

kinds of situations, a grittier feel of the neighborhood.  When I worked in Oakland, there were

always helicopters flying above me, trying to get all the thugs causing trouble. " Id.  In addition to

the above comments, S.W. states:

> 10. In the court room there was a lot of intimidation stuff going on.  We had to go up and
> down in the elevator with the witnesses a bunch of times, and they used to try to intimidate
> us.  Most of them were underage, and they knew they were within protection of the law, so
> they came in with those cocky attitudes.  It didn't bother me, though.  They could have
> brought as many little black punks into the courtroom as they wanted, but they weren't
> going to scare me.

> 11. The bottom line was that Robert Young was an opportunistic bully.  He knew that
> nobody in his neighborhood really cared about what happened to their community or even
> themselves.  He took advantage of that.  Robert Young's lawyers dressed him well, and
> made him look preppy.  But I could still tell he was a thug, and he never did anything to
> convince me otherwise.

Id. at 2, ¶ 10 (emphasis added).

These statements exhibit an alarming level of racism and prejudgment of the community in

the crime areas, which seriously undermine S.W.'s impartiality as a juror.  Respondent argues that

Federal Rule of Evidence 606(b) prohibits a juror from testifying about his or her mental processes

concerning a verdict.  Rule 606 provides:

> (a) At the Trial. A juror may not testify as a witness before the other jurors at the trial.  If a
> juror is called to testify, the court must give a party an opportunity to object outside the
> jury's presence.  [¶] (b) During an Inquiry into the Validity of a Verdict or Indictment. [¶]
> (1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a
> verdict or indictment, a juror may not testify about any statement made or incident that

United States District Court
Northern District of California

occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters. [¶] (2) Exceptions. A juror may testify about whether: [¶] (A) extraneous prejudicial information was improperly brought to the jury's attention; [¶] (B) an outside influence was improperly brought to bear on any juror; or [¶] (C) a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606.

The Court finds that a juror's pre-existing racial bias is not the kind of "mental process[] concerning the verdict" that Rule 606(b) was intended to protect.  As the advisory notes to Rule 606(b) make clear, "the central focus has been upon insulation of the manner in which the jury reached its verdict, and this protection extends to each of the components of deliberation, including arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process."  Fed. R. Evid. 606(b) advisory committee's note.  "The policy does not, however, foreclose testimony by jurors as to prejudicial extraneous information or influences injected into or brought to bear upon the deliberative process."  Id.  Here, the evidence submitted in S.W.'s declaration—i.e. testimony as to his own pre-existing views of petitioner and the areas where the crimes occurred—does not relate to any "component" of the jury's deliberation.  Rather, it is more analogous to the latter category—prejudicial extraneous information or influence— which Rule 606(b) explicitly does not foreclose.  Respondent's reading of the rule would essentially make it impossible to introduce evidence of a juror's pre-existing bias, thereby hindering the Sixth Amendment right to an impartial jury in federal post-conviction proceedings.  See United States v. Booker, 480 F.2d 1310, 1311 (7th Cir. 1973) (where an offer of proof showed that there was a substantial likelihood that a criminal defendant was prejudiced by the influence of racial bias in the jury room, to ignore the evidence might very well offend fundamental fairness).

Here, petitioner has established "actual bias, which stems from a preset disposition not to decide an issue impartially."  Fields v. Brown, 503 F.3d at 766.

Accordingly, petitioner is entitled to relief on this claim.

> c.   Extrinsic Evidence

Petitioner claims that juror A.M. "also introduced extrinsic evidence into the jury deliberations, familiarizing the other jurors with the neighborhoods in which the crimes occurred."

1    Petition at 209, ¶ 478.  Specifically, in his declaration submitted to the California Supreme Court,

2    on state habeas, A.M. states that he "was a phone repairman and worked a lot in the areas where

3    the crimes happened and [he] described those areas to the other jurors.  [He] gave them a verbal

4    tour of that part of Oakland."  Ex. 142 to Ex. F at ¶ 9.

5         The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on

6    the evidence presented at trial.  See Turner v. Louisiana, 379 U.S. 466, 472-73 (1965); Jeffries v.

7    Wood, 114 F.3d 1484, 1490 (9th Cir. 1997) (en banc), overruled on other grounds by Gonzalez v.

8    Arizona, 677 F.3d 383, 389, n.4 (9th Cir. 2012).  Evidence not presented at trial is deemed

9    "extrinsic."  See Marino v. Vasquez, 812 F.2d 499, 504 (9th Cir. 1987).  Jury exposure to extrinsic

10   evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of

11   counsel embodied in the Sixth Amendment.  See Lawson v. Borg, 60 F.3d 608, 612 (9th Cir.

12   1995).  That the extrinsic evidence comes from a juror rather than a court official or other party

13   does not diminish the scope of a defendant's rights under the Sixth Amendment.  See Jeffries, 114

14   F.3d at 1490.

15        However, not every incident of juror misconduct requires a new trial.  United States v.

16   Klee, 494 F.2d 394, 396 (9th Cir. 1974).  Rather, "[t]he test is whether or not the misconduct has

17   prejudiced the defendant to the extent that he has not received a fair trial."  Id.  A petitioner is

18   entitled to habeas relief only if it can be established that the exposure to extrinsic evidence had

19   "'substantial and injurious effect or influence in determining the jury's verdict.'"  Sassounian v.

20   Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623

21   (1993)); see Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (same).  In other words, the

22   error must result in "actual prejudice."  See Brecht, 507 U.S. at 637; see also Estrada, 512 F.3d at

23   1235 (noting that Brecht provides the standard of review for harmless error in cases involving

24   unconstitutional juror misconduct).

25        Respondent fails to address petitioner's claim of juror misconduct based on introduction of

26   extrinsic evidence.  Petitioner, however, has made no showing that A.M.'s discussion of the areas

27   where the crimes happened had any effect on the jurors.  The state court could have reasonably

28   rejected this claim on the ground that petitioner was not prejudiced by any misconduct.

United States District Court
Northern District of California

1    Accordingly, petitioner is not entitled to habeas relief on this claim.

2          d.      Petitioner's Failure to Testify

3    Petitioner claims that jurors S.W. and A.M. "held petitioner's exercise of his Fifth

4    Amendment rights against him." Petition at 209, ¶ 477.  Petitioner points to the following

5    statements made by S.W. and A.M. in their respective declarations to the California Supreme

6    Court, on state habeas:

7          The bottom line was that Robert Young was an opportunistic bully.  He knew
           that nobody in his neighborhood really cared about what happened to their
8          community or even themselves.  He took advantage of that.  Robert Young's lawyers
           dressed him well, and made him look preppy.  But I could still tell he was a thug, and
9          he never did anything to convince me otherwise.  For that reason I thought it was
10         strange that he never testified.

11   Ex. 144 to Ex. F at 2-3, ¶ 11 (emphasis added).

12         Robert spoke through his lawyers and they never once said he didn't do it.
           They were really grasping at straws.  They had Robert's brother say a jacket was his,
13         but when he put it on you could see it was way too big.  That was ridiculous.  They
           were obligated to do a job, but didn't have much to work with.
14
     Ex. 142 to Ex. F at 1, ¶ 5 (emphasis added).
15
16   The trial court instructed the jury that petitioner had "a constitutional right not to be

17   compelled to testify.  You must not draw any inference from the fact that a defendant does not

18   testify.  Further, you must neither discuss this matter nor permit it to enter into your deliberations

19   in any way."  Ex. B at 3662-63.  The Ninth Circuit has held that Federal Rule of Evidence 606(b)

20   bars consideration of jurors' statements that they ignored the court's instructions and discussed a

21   defendant's failure to testify during deliberations.  Raley v. Ylst, 470 F.3d 792, 803 (9th Cir.

22   2006); United States v. Rutherford, 371 F.3d 634, 640 (9th Cir. 2004).

23   Accordingly, petitioner is not entitled to habeas relief on this claim.

24         e.      Premature Deliberations

25   The record shows that the trial court admonished the jury not to discuss the case with

26   anyone or form or express any opinion regarding the case until asked to do so.  See e.g., Ex. B at

27   218, 2458.  Petitioner claims that, notwithstanding the admonition, the jury not only discussed the

28   case prior to commencement of formal deliberations but did so in the presence of an alternate

United States District Court
Northern District of California

juror.  Petition at 210, ¶ 482.  Petitioner supports this claim with the following portion of the declaration of alternate juror S.L., which was submitted to the California Supreme Court on state habeas:

> I sat through the full trial and was involved in jury deliberations right up until the end. . . . [¶] . . . What we as a jury always discussed with each other was the whole idea of "beyond a shadow of a doubt."  I kept on having to remind myself that my decision was according to the law and nothing else.  Not my personal feelings, not Robert Young's family's personal feelings, but the law itself.  The murder weapon thing seemed really important to this concept.  We were always kicking around the question, could we really know what happened if there was never a murder weapon found?  But, just like the judge pointed out, there was so much other evidence, witnesses that picked him out of a line.  And his very own cousin turning him in.  Everything pointed to him being the shooter, such that I felt I was beyond a shadow of any doubt. . . . [¶] . . . I was involved in discussions with the rest of the jury right up until the point when the guilty verdict was decided upon.  At the beginning of the trial, half the people thought he was guilty, and the other half were undecided.  But as the trial went on, and more and more evidence built up, pretty much everyone realized he was guilty.  [¶] Among the jurors there were some leaders and some followers.  I was definitely a follower.  I had never sat on a jury before and I just wanted to listen to what everyone else had to say.  There was one head juror, who was in charge of moderating all the discussions.  These conversations all took place in one big room, sitting around that big table.  I felt kind of left out at the end of the trial, on the outside of everything that had been going on.  I had been there everyday, and I had been a part of all the discussions up to that point, so it felt weird to sit and wait out in the court room as everybody else came to their decisions.

Ex 145 to Ex. F, ¶¶ 2, 5, 7-8.

The state court could have had a reasonable basis to deny this claim.  Assuming that this declaration is not foreclosed by Rule 606(b), as with the claim above, petitioner has failed to show that he was prejudiced by any misconduct arising out of premature deliberations.  Indeed, here, the conversations described by S.L. involved discussion of a legal point favorable to petitioner, i.e., the requirement that the prosecution prove its case "beyond a shadow of a doubt."  Further, premature deliberations are not as serious as private communication, contact, or tampering.  Davis v. Woodford, 384 F.3d 628, 653 (9th Cir. 2004).  "What is crucial is 'not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury.'"  Id. at 653 (quoting United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974)).

Accordingly, petitioner is not entitled to habeas relief on this claim.

13.   Instructional Error – Limitation of Instructions

Petitioner claims that the trial court deprived him of his right to due process of law, and other rights guaranteed under the Fifth , Sixth, Eighth, and Fourteenth Amendments, because the trial court limited the aiding and abetting, and intentional second degree murder instructions, to the count 5 charge for the murder of Glen Frazier.  Petition at 212-26, ¶¶ 485-519.  Petitioner made the same claim on direct appeal in the California Supreme Court.  The state court summarized and rejected the claim as follows:

*a) Aiding and Abetting Instruction*

Defendant requested that the jury be instructed on an aider and abettor theory of liability, as relevant to the Davis murder, on the basis that there was substantial evidence on which the jury could find he was not the actual perpetrator, but merely an aider and abettor.  The trial court denied defendant's request.  Defendant claims this was error.

Even absent a request, the trial court must instruct on the general principles of law applicable to the case.  (*Koontz, supra*, 27 Cal.4th at p. 1085, 119 Cal.Rptr.2d 859, 46 P.3d 335.)  The general principles of law governing a case are those that are commonly connected with the facts adduced at trial and that are necessary for the jury's understanding of the case.  (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047, 31 Cal.Rptr.2d 128, 874 P.2d 903.)  The trial court must give instructions on every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case.  (*Ibid.*)  Evidence is "substantial" only if a reasonable jury could find it persuasive.  (*People v. Hagen* (1998) 19 Cal.4th 652, 672, 80 Cal.Rptr.2d 24, 967 P.2d 563.)  The trial court's determination of whether an instruction should be given must be made without reference to the credibility of the evidence.  (*People v. Tufunga* (1999) 21 Cal.4th 935, 944, 90 Cal.Rptr.2d 143, 987 P.2d 168.)  The trial court need not give instructions based solely on conjecture and speculation.  (*People v. Day* (1981) 117 Cal.App.3d 932, 936, 173 Cal.Rptr. 9.)

Instructions on aiding and abetting are not required where "[t]he defendant was not tried as an aider and abettor, [and] there was no evidence to support such a theory."  (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 404, 226 Cal.Rptr. 880.)  In this case, we conclude the trial court did not err in denying defendant's request for instructions on aiding and abetting as to the Davis murder.

According to defendant, the evidence in the record establishes that at least two gunmen were in the house because: (1) Thomas and Livingston provided the police with different descriptions of the assailant; (2) the police found a .32–caliber cartridge in the southwest bedroom and recovered a .38–caliber bullet from the kitchen and another from the hallway; (3) Robinson heard Davis say, "Oh, they going to kill me"; (4) as Livingston observed the man in the knit watch cap in front of the house, Robinson was being accosted by the man in the baseball cap down the street; and (5) the presence of the dark four-door car in front of the house suggests that a "getaway driver" was used and that defendant did not act

United States District Court
Northern District of California

alone.  Under defendant's theory, a reasonable jury could have found that he shot Thomas with a .38–caliber gun and a second gunman shot and killed Davis with a .32–caliber gun as defendant accosted Robinson down the street.

Defendant overlooks the fact that both Thomas and Livingston positively identified him at trial as their assailant.  These identifications were corroborated by their independent identifications of the jacket taken from defendant on the day of his arrest as "similar" to the one worn by their assailant on February 19, 1989.  To find defendant guilty on a theory of aiding and abetting rather than as the actual shooter, the jury would have had to disbelieve either Thomas or Livingston and speculate, based on the descriptions Thomas and Livingston provided to investigators, that defendant and another gunman were in the house.  The jury would have had to then speculate that (1) the other gunman shot and killed Davis; (2) defendant shot Thomas and accosted Robinson; and (3) in doing so, defendant acted with the intent of aiding and abetting the second gunman in killing Davis.  Such speculation does not mandate instruction on an aiding and abetting theory.  (*People v. Perry* (1972) 7 Cal.3d 756, 785, 103 Cal.Rptr. 161, 499 P.2d 129, overruled on another ground in *People v. Green*, *supra*, 27 Cal.3d at pp. 27–34, 164 Cal.Rptr. 1, 609 P.2d 468; see also *People v. Day*, *supra*, 117 Cal.App.3d at p. 936, 173 Cal.Rptr. 9.)  Accordingly, the trial court did not err in denying defendant's request for aiding and abetting instructions as to the Davis murder.

Defendant further contends that the trial court's erroneous denial of his request for instructions on an aiding and abetting theory as to the Davis murder deprived him of an impartial jury, a reliable penalty determination, and due process under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, respectively.  Assuming these claims were properly preserved for review (see *Yeoman*, *supra*, 31 Cal.4th at pp. 117, 133, 2 Cal.Rptr.3d 186, 72 P.3d 1166), his point is without merit because we conclude that the trial court did not err in declining the requested instructions.

*b) Second Degree Murder Instructions*

Prior to instructing on aiding and abetting, the trial court stated: "The following four instructions should be considered by you only as they apply to counts four [attempted robbery of Fite] and five [Frazier murder]," followed by the relevant instructions.  Immediately thereafter, the court instructed as to second degree murder pursuant to CALJIC No. 8.30.

Defendant contends that based on the above instructions, the trial court misinformed the jury that it could consider the instruction defining second degree murder only with regard to the Frazier murder, because the jury would have erroneously believed CALJIC No. 8.30 was one of the "following four instructions" to be considered only as it applied to count 4 (attempted robbery of Fite) and count 5 (Frazier murder).  We reject the contention.

 "If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction."  (*People v. Smithey* (1999) 20 Cal.4th 936, 963, 86 Cal.Rptr.2d 243, 978 P.2d 1171; *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4, 112 S.Ct. 475, 116 L.Ed.2d 385.) " ' " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " ' " (*Smithey*, at p. 963, 86 Cal.Rptr.2d 243,

United States District Court
Northern District of California

978 P.2d 1171, quoting *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248, 74 Cal.Rptr.2d 212, 954 P.2d 475.)  The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury. (See *People v. Garceau* (1993) 6 Cal.4th 140, 189, 24 Cal.Rptr.2d 664, 862 P.2d 664 [any possibility of confusion about conspiracy instruction was diminished by the parties' closing arguments], disapproved on another ground in *People v. Yeoman*, *supra*, 31 Cal.4th at pp. 117–118, 2 Cal.Rptr.3d 186, 72 P.3d 1166; *People v. McPeters* (1992) 2 Cal.4th 1148, 1191, 9 Cal.Rptr.2d 834, 832 P.2d 146 [correct view of the law regarding mitigating factors in penalty phase trial was reinforced by the parties' closing arguments].)

As a preliminary matter, a defendant's failure to request a clarification instruction forfeits that claim on appeal.  (*People v. Marks* (2003) 31 Cal.4th 197, 237, 2 Cal.Rptr.3d 252, 72 P.3d 1222.)  Here, however, portions of the record regarding the parties' discussion of the jury instructions before the trial court are missing.  Thus, because it cannot be ascertained whether defense counsel specifically requested clarification, we shall give defendant the benefit of the doubt and find the issue preserved for appeal.  Nonetheless, defendant's claim is without merit.

The record contains no inquiries from the jury regarding the application of these instructions.  We agree with respondent that if the instructions were susceptible of the interpretation defendant now asserts, counsel likely would have objected at trial on this basis.  Such an omission suggests that " 'the potential for [confusion] argued now was not apparent to one on the spot.' "  (*People v. Keenan* (1988) 46 Cal.3d 478, 535, 250 Cal.Rptr. 550, 758 P.2d 1081 [failure to object to trial court's remarks about potential jury investigation suggested the potential for coercion was not discernible], quoting *Lowenfield v. Phelps* (1988) 484 U.S. 231, 240, 108 S.Ct. 546, 98 L.Ed.2d 568.)  Counsel's arguments, moreover, informed the jury that it could consider second degree murder as to the Rivers, Frazier, and Davis murders.  Therefore, we find no basis to conclude the jury misinterpreted the above instructions or was confused in any manner as to the applicability of the second degree murder instruction to all of the charged murders.  Accordingly, we conclude the trial court did not erroneously limit the second degree murder instructions to the Frazier murder charge.

Defendant additionally contends that the trial court's error in this regard violated his rights to an impartial jury under the Sixth Amendment, to a reliable penalty determination under the Eighth Amendment, and to due process of law under the Fourteenth Amendment of the United States Constitution.  Assuming these claims were properly preserved for review (*see Yeoman*, supra, 31 Cal.4th at pp. 117, 133, 2 Cal.Rptr.3d 186, 72 P.3d 1166), they are meritless given we conclude that the trial court did not err.

People v. Young, 34 Cal. 4th at 1200-03 (footnotes omitted).

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

1   process.'"  Id. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  The instruction may

2   not be judged in artificial isolation, but must be considered in the context of the instructions as a

3   whole and the trial record.  Id.  Petitioner also must show actual prejudice from the error, i.e., that

4   the error had a substantial and injurious effect or influence in determining the jury's verdict, before

5   the court may grant federal habeas relief.  Calderon v. Coleman, 525 U.S. 141, 146 (1998) (citing

6   Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

7         A defendant is entitled to an instruction on a theory of defense only "if the theory is legally

8   cognizable and there is evidence upon which the jury could rationally find for the defendant."

9   United States v. Boulware, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotation marks omitted).

10  Due process does not require an instruction be given unless the evidence supports it.  See Hopper

11  v. Evans, 456 U.S. 605, 611 (1982) (holding instruction on lesser-included offense required only

12  "when the evidence warrants such an instruction").  Moreover, "[a] state trial court's refusal to give

13  [a requested] instruction does not alone raise a ground cognizable in a federal habeas corpus

14  proceeding."  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988) (internal quotation marks

15  omitted).  "The error must so infect the entire trial" that the petitioner was deprived of the fair trial

16  guaranteed by the Fourteenth Amendment.  Id.  "Whether a constitutional violation has occurred

17  will depend upon the evidence in the case and the overall instructions given to the jury."  Duckett

18  v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995).  The omission of an instruction is less likely to be

19  prejudicial than a misstatement of the law.  Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir.

20  1987).  A habeas petitioner whose claim involves a failure to give a particular instruction, as

21  opposed to a claim that involves a misstatement of the law in an instruction, bears an "'especially

22  heavy burden.'"  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v.

23  Kibbe, 431 U.S. 145, 155 (1977)).

24        This Court, having reviewed the record, agrees with the California Supreme Court's

25  findings that:  (1) it is not reasonably probable that the jury could have found that petitioner was a

26  mere aider and abettor to the Davis homicide; and (2) the trial court did not limit the second

27  degree murder instruction to the Frazier murder charge.  Consequently, it cannot be said that

28  petitioner's preferred instructions would have resulted in a different verdict.  See Calderon, 525

United States District Court
Northern District of California

U.S. at 146.

Accordingly, petitioner is not entitled to habeas relief on this claim.

14.     Instructional Error – CALJIC 8.80

The jury found true the robbery-murder special-circumstance allegations attendant to the first degree murder convictions: count 1 (Rivers) and count 5 (Frazier).  Petitioner claims that CALJIC No. 8.80, the instruction the court gave the jury regarding the robbery-murder special circumstance, Cal. Penal Code § 190.2(a)(17)(i), violated his due process rights, as well as the Eighth Amendment, because it permitted a true finding on the special-circumstance allegation without requiring a finding that petitioner intended to kill.  Petition at 226-28.

Petitioner made the same claim on direct appeal in the California Supreme Court.  The state court summarized and rejected the claim as follows:

*c) CALJIC No. 8.80*

Defendant was found death eligible based in part on the robbery-felony-murder special circumstances the jury found  true with respect to the Rivers and Frazier murders.  The robbery-felony-murder special circumstance applies when "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, or attempted commission of, or the immediate flight after committing, or attempting to commit ... [r]obbery ...." (§ 190.2, subd. (a)(17)(A).)  Here, the trial court instructed the jury pursuant to CALJIC No. 8.80 [Pre–June 6, 1990 Special Circumstances— Introductory] that if it found "beyond a reasonable doubt that defendant was the actual killer in the Terry Rivers killing in Count One, [and] the Glen Frazier killing in Count Five, ... you need not find that the defendant intended to kill a human being in order to find the special circumstances to be true."  Citing *Tison v. Arizona* (1987) 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127, and *Enmund v. Florida* (1982) 458 U.S. 782, 787, 102 S.Ct. 3368, 73 L.Ed.2d 1140, defendant asserts that CALJIC No. 8.80 is constitutionally defective under the Eighth and Fourteenth Amendments because it permits a finding of death eligibility in the absence of a jury finding that the defendant either intended to kill the victim or, as a major participant in the underlying felony, exhibited a reckless indifference to human life.

 "The United States Supreme Court has made clear that felony murderers who personally killed may properly be subject to the death penalty in conformance with the Eighth Amendment—after proper consideration of aggravating and mitigating circumstances— even where no intent to kill is shown.  (*Cabana v. Bullock* (1986) 474 U.S. 376, 386–387 [106 S.Ct. 689, 88 L.Ed.2d 704]; see *Tison v. Arizona* (1987) 481 U.S. 137, 152 [107 S.Ct. 1676, 95 L.Ed.2d 127].)  Subsequently, '[i]n *People v. Anderson* [ ( 1987) 43 Cal.3d 1104, 1147, 240 Cal.Rptr. 585, 742 P.2d 1306], we held that with respect to the actual killer, the court need not instruct on intent to kill in connection with felony-murder special circumstances. Such an instruction is required only when there is evidence from which the

United States District Court
Northern District of California

jury could find that the defendant was an accomplice rather than the actual killer.'  (*People v. Gates* (1987) 43 Cal.3d 1168, 1193 [240 Cal.Rptr. 666, 743 P.2d 301].)" (*People v. Belmontes* (1988) 45 Cal.3d 744, 794, 248 Cal.Rptr. 126, 755 P.2d 310, italics omitted.) Defendant asks that we reconsider our decision in Anderson, but he offers no persuasive reason to do so.

Defendant further asserts that as to the Rivers and Frazier murders, the evidence was insufficient to establish he was the actual killer and intended to kill.  "Evidence that the defendant is the actual killer and guilty of felony murder ... establishes 'a degree of culpability sufficient under the Eighth Amendment to permit defendant's execution.' " (*People v. Smithey*, *supra*, 20 Cal.4th at p. 1016, 86 Cal.Rptr.2d 243, 978 P.2d 1171; *People v. Hayes* (1990) 52 Cal.3d 577, 632, 276 Cal.Rptr. 874, 802 P.2d 376 (*Hayes*).)  Moreover, a jury's guilty verdict satisfies the requirements under *Enmund*, even though the trial court's instructions did not explicitly require it to find the *Enmund* factors, when "the theory on which the case was tried and the evidence received leave no doubt that the jury's verdict rested on a finding that the defendant killed or intended to kill."  (*Cabana v. Bullock*, *supra*, 474 U.S. at p. 391, fn. 6, 106 S.Ct. 689.)

We conclude that the record and theories presented in this case leave no doubt that as to the Rivers and Frazier murders, defendant was the actual killer and intended to kill.

With respect to the Rivers murder, the prosecution proceeded against defendant solely on the theory that he actually shot and killed Rivers before he completed his robbery of Miller.  As demonstrated above (see *ante*, 24 Cal.Rptr.3d at pp. 129–131, 105 P.3d at pp. 501–503), substantial evidence supports defendant's conviction for the first degree murder of Rivers based on a theory of robbery felony murder.

The jury's true finding on the allegation that defendant personally used a handgun during the commission of the Rivers murder is further evidence that the jury concluded he actually killed Rivers.  Defendant argues, however, that because a weapon is used, if it is merely displayed in a menacing manner and never fired (see *People v. Wims* (1995) 10 Cal.4th 293, 302, 41 Cal.Rptr.2d 241, 895 P.2d 77) the gun-use true finding does not necessarily establish that he is the actual killer.  Although "[t]he finding of personal use ... would not in itself prove defendant was the actual killer" (*People v. Jones* (2003) 30 Cal.4th 1084, 1120, 135 Cal.Rptr.2d 370, 70 P.3d 359), here the evidence shows that only one gun was used to commit the crimes at the Miller residence.  The prosecution's ballistics expert testified that the bullets removed from the bodies of Miller and Rivers were fired from the same gun.  The defense, moreover, presented no evidence that anyone else who may have been present at the Miller residence displayed in a menacing manner, or otherwise used, a gun.  Thus, all evidence points to defendant as the one who actually shot and killed Rivers.

We conclude the jury necessarily found defendant to be the actual killer of Rivers, "thereby establishing a degree of culpability sufficient under the Eighth Amendment to permit defendant's execution."  (*Hayes*, *supra*, 52 Cal.3d at p. 632, 276 Cal.Rptr. 874, 802 P.2d 376.)

With respect to the Frazier murder, the prosecution's case against defendant was similarly based upon the theory that defendant actually shot and killed Frazier during a robbery. This theory was supported by evidence that just before the Frazier murder, defendant and

his cousin, Patrick Jackson, approached Fite and Frazier as they stood on the sidewalk near the corner of 90th Avenue and Cherry Street in Oakland. Defendant exited the driver's side of the car, approached Fite and Frazier, pointed a dark gun at them, and demanded their money. Fite and Frazier begged for their lives. Moments later, after defendant told Fite to run, Fite heard two shots and then saw Frazier slump to the ground.

Patrick Jackson, defendant's cousin, testified under a grant of immunity that defendant was driving a black-over-green Ford LTD on the night in question and pulled into a driveway near 89th Avenue and Cherry Street. According to Jackson, defendant possessed a dark revolver with a brown handle when he initially got into the car. Jackson heard at least one shot and saw Fite run down Cherry Street. After defendant returned to the car, he drove Jackson to an apartment on 76th Avenue. Along the way, defendant told Jackson that the man he shot had robbed him earlier. At the apartment, defendant parked his car, and Jackson got his own car. Defendant and Jackson then went to a motel room that Jackson had rented during the afternoon of the 29th and spent the rest of the night watching television and sleeping.

The defense argued it was Jackson who exited the driver's side and shot Frazier and that, at most, defendant was guilty of aiding and abetting. But no evidence indicated that someone other than the actual killer possessed a gun. Thus, in finding defendant guilty of the first degree murder of Frazier and sustaining the allegation that he personally used a gun during commission of the murder, the jury necessarily rejected this defense and found defendant to be the actual killer. We therefore conclude that defendant's culpability was sufficiently established under the Eighth Amendment to permit his execution. (*Hayes*, *supra*, 52 Cal.3d at p. 632, 276 Cal.Rptr. 874, 802 P.2d 376.)

Accordingly, we need not address defendant's contention that, because the jury was also instructed on an aiding and abetting theory as to the Frazier murder, the trial court erred by failing to instruct the jury that it must find defendant was a major participant in the underlying felony (robbery) and acted with reckless indifference to human life before it could find him death eligible pursuant to the robbery-felony-murder special circumstance (section 190.2, subdivision (a)(17)(A)). Any instructional error was harmless beyond a reasonable doubt. (*People v. Jones*, *supra*, 30 Cal.4th at p. 1120, 135 Cal.Rptr.2d 370, 70 P.3d 359; *Chapman v. California* (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.)

People v. Young, 34 Cal. 4th at 1203-06.

Applying the legal principles on instructional-error claims outlined above to petitioner's current claim, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Accordingly, petitioner is not entitled to habeas relief on this claim.

15.      Ballistics Evidence

A trial, the prosecution presented the detailed expert testimony of retired Oakland Police Department firearms examiner, Chester Young. Ex. B at 3030-100. In summary, Young

1    testified that because the six bullets recovered in the case all shared "pseudo land impressions,"

2    which is a very rare occurrence, he strongly suspected that the same gun fired all six bullets, even

3    though he could declare only two of the bullets—the bullet taken from the body of Glen Frazier

4    and the one found in the wall at Manzine Miller's home—were a positive match. Id. at 3056-59,

5    3062-63, 3087-88, 3092, 3099.

6        Petitioner claims that this evidence, though presented as "hard science," was actually

7    "subjective, unreliable, and erroneous." Petition at 228-41. As a result, petitioner claims that the

8    presentation of this evidence amounted to prosecutorial misconduct, in violation of Napue v.

9    Illinois, 360 U.S. 264, 269 (1959). Petition at 229, ¶ 528. Petitioner presented this claim to the

10   California Supreme Court only in his state habeas petition, which was summarily denied on the

11   merits.

12       A conviction obtained through the use of testimony which the prosecutor knows or should

13   know is perjured must be set aside if there is any reasonable likelihood that the testimony could

14   have affected the judgment of the jury. See United States v. Agurs, 427 U.S. 97, 103 (1976). The

15   result is the same when the prosecutor, although not soliciting false evidence, allows it to go

16   uncorrected when it appears. See Napue v. Illinois, 360 U.S. 264, 269 (1959). To prevail on a

17   claim based on Agurs/Napue, the petitioner must show that (1) the testimony (or evidence) was

18   actually false, (2) the prosecution knew or should have known that the testimony was actually

19   false, and (3) the false testimony was material. See United States v. Zuno-Arce, 339 F.3d 886,

20   889 (9th Cir. 2003). In evaluating allegations of prosecutorial misconduct, this court considers

21   whether the prosecution's actions "so infected the trial with unfairness as to make the resulting

22   conviction a denial of due process." See Hein v. Sullivan, 601 F.3d 897, 912 (9th Cir. 2010)

23   (quotation marks omitted).

24       The claim fails at the first step, as petitioner fails to establish that Young's testimony was

25   "actually false." Young explained to the jury that in examining a fired bullet, "rifling marks" or

26   "land groove impressions" are observed. Ex. B at 3038-41, 3048-49, 3058-59. They are produced

27   by grooves that are cut into the bore of the barrel of the gun by the gun's manufacturer. Id. at

28   3040-41, 3058. These grooves are cut along the length of the barrel's interior and are curved or

"twisted" slightly in one direction or the other in order to cause the bullet to spin for accuracy as it leaves the barrel.  Id. at 3040.  Because different manufacturers cut a different number of grooves in the interior of their gun barrels, the number of rifling marks these grooves leave on the bullet's surface aids ballistics experts in determining whether a single gun fired two or more different bullets.  Id. at 3063-64.  The raised areas in the gun's barrel between the grooves are called "lands," and these raised areas score corresponding grooves, called "land impressions" on the bullets.  Id. at 3040, 3048-49, 3058-59.  The division between the land and the groove in the barrel is called the "shoulder."  Id. at 3048-49.

> When I am comparing two bullets to see if they were fired by the same gun, there are different things I look at.  First of all, I insure that the right flank characteristics are the same.
>
> Basically that means if it is eight right rifling, I will not compare that with something that is six right because there is no sense in doing it.  It is different, fired by different guns.
>
> But if it is eight right versus eight right, then after that I will look for striations or scratches on the bullet to see whether or not they were made by the same gun, because the striations are unique if the pattern is unique. . . [¶] Indexing. . . . [¶] Basically if I have a known bullet or a standard bullet, I will look for something that is unique on one side, on one bullet.  And it could be anything.  A pattern might be unique.  If it is two double and a wide groove for example, and I focus on that on one side, and on the other side—one side meaning under one microscope.  I look at one bullet first.
>
> And then on the other bullet, I rotate the bullet until I find something that looks similar to my index that I have chosen, which is just a unique feature.
>
> Once I find that, then they could be the same or they could not be the same.  But if I find that, then I rotate both the bullets the same degree away from me or either way to see if there are other markings that match.
>
> Basically the index is a certain distance from a fixed shoulder.  The shoulder has to line up first, and then I see if the index marking that I am looking at is the same distance from the shoulder.  If it is not the same distance from the shoulder, it could not have been made by the same defect in the gun.
>
> So basically it is a starting point for comparison, the index is.

Ex. B at 3063-65.

Young examined six bullets in this case: the three bullets recovered from each of the

106

bodies of Manzine Miller, Terry Rivers, and Glen Frazier; the bullet recovered from the wall of Miller's living room at 2215 East 24th Street; and the two bullets recovered from the crime scene at 2661 74th Avenue.  Ex. B at 3030-3100.  All six bullets shared one or two "pseudo land impressions," "a defect possibly from the accumulation of metal in one of the grooves so now the groove has what looks like a land in it."  Ex. B at 3058.  Pseudo land impressions are a very rare occurrence and possibly attributable to a defect in the gun.  This led Young to strongly suspect that, while not all the bullets were identical, the same gun had fired them all.  Ex. B at 3058-59, 3062-63, 3087-88, 3092, 3099.

Petitioner has not presented any expert to contradict Young's conclusions, and even if he did, he would still not be entitled to habeas relief because experts often disagree.  See Harris v. Vasquez, 949 F.2d 1497, 1524 (9th Cir. 1991) (conflicting psychiatric opinions did not show that testimony of prosecution's expert was false).  On this record, the California Supreme Court could have reasonably concluded that Chester Young's testimony was in no sense "false."

Even assuming arguendo that there was something false in Young's testimony, nothing in the record even suggests that the prosecution knew or should have known.  To the contrary, the record shows that Young, "took over the firearms cases for the City of Oakland" in 1977, meaning, in his words, "every time a gun was fired in Oakland the case came to me."  Ex. B at 3032.  He testified as a ballistics expert in Alameda County almost "three hundred times," including as an expert in "evidence slug comparison."  Id. at 3031-32.  Young was so well-respected that the trial court remarked that if the defense would not stipulate to his expertise, the court "would take judicial notice of it."  Id. at 3032.

Petitioner also claims that, because the ballistics evidence was inherently unreliable, its admission at trial violated Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court case addressing qualifying expert witnesses in federal court.  Petition at 229-230, ¶ 528.  Daubert is based on a federal rule of evidence, not the Constitution.  Daubert, 509 U.S. at 594-95; Moses v. Payne, 555 F.3d 742, 757-58 (9th Cir. 2009) (Supreme Court has not ruled on whether state evidentiary rules governing qualifications of experts implicate federal due process).  For that reason, California courts are not required to apply it, and in fact do not.  See People v.

107

United States District Court
Northern District of California

1   Leahy, 8 Cal. 4th 587, 594 (1994).  Therefore, petitioner's claim, to the extent it is based on the

2   assertion that his due process rights were violated by Young's qualifying as an expert, also fails

3   because no Supreme Court case addresses whether a state court's decision to qualify a person as an

4   expert can violate a defendant's due process rights.  Thus, the state court's denial of this claim was

5   not contrary to or an unreasonable application of established federal authority.

6          Accordingly, petitioner is not entitled to habeas relief on this claim.

7          16.    Actual Innocence

8          Petitioner claims that, through the exercise of reasonable diligence, he has discovered

9   exonerating evidence that could not have been discovered at the time of his trial.  According to

10  petitioner, the evidence points to his actual innocence of the Rivers murder, the Miller attempted

11  murder and robbery, the Frazier murder, and the Davis murder.  Petition at 241-95.  Petitioner

12  presented this claim to the California Supreme Court only in his state habeas petition, which was

13  summarily denied on the merits.

14         "Claims of actual innocence based on newly discovered evidence have never been held to

15  state a ground for federal habeas relief absent an independent constitutional violation occurring in

16  the underlying state criminal proceeding."  Herrera v. Collins, 506 U.S. 390, 400 (1993).  "This

17  rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not

18  imprisoned in violation of the Constitution—not to correct errors of fact."  Id.; see also House v.

19  Bell, 547 U.S. 518, 555 (2006); Dist. Atty's Office for Third Jud. Dist. v. Osborne, 557 U.S. 52, 71

20  (2009) ("Whether such a federal right [to be released upon proof of actual innocence] exists is an

21  open question. We have struggled with it over the years, in some cases assuming, arguendo, that it

22  exists while also noting the difficult questions such a right would pose and the high standard any

23  claimant would have to meet.").  Consequently, the California Supreme Court's denial of this

24  claim cannot be unreasonable under AEDPA as there is no United States Supreme Court authority

25  establishing a free-standing actual innocence right.  Carey v. Musladin, 549 U.S. at 74-77

26  (denying habeas relief in absence of clearly established federal law).

27         A petitioner may attempt to establish factual innocence in order to show that a

28  fundamental miscarriage of justice would result from application of a procedural default.  See

Schlup v. Delo, 513 U.S. 298, 314-15 (1995).  Under this exception, a petitioner may establish a procedural "gateway" permitting review of defaulted claims if he demonstrates "actual innocence." Schlup, 513 U.S. at 316 & n.32.

> [I]f a petitioner . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

Id. at 316.  The required evidence must create a colorable claim of actual innocence, i.e., that the petitioner is innocent of the charge for which he is incarcerated, as opposed to legal innocence as a result of legal error.  Id. at 321.  It is not enough that the evidence show the existence of reasonable doubt.  Petitioner must show "that it is more likely than not that no 'reasonable juror' would have convicted him."  Id. at 329.  As the Ninth Circuit has put it, "the test is whether, with the new evidence, it is more likely than not that no reasonable juror would have found [p]etitioner guilty."  Van Buskirk v. Baldwin, 265 F.3d 1080, 1084 (9th Cir. 2001).  See, e.g., Carriger v. Stewart, 132 F.3d 463, 478 (9th Cir. 1997) (en banc) (petition qualified for gateway on a showing principally that the chief prosecution witness had confessed to the crime under oath in the postconviction court and that prosecution had failed to produce file disclosing that witness was a known liar).

Here petitioner does not assert actual innocence as a Schlup procedural gateway.  Rather, he presented a free-standing actual innocence claim, which, as explained above, is not cognizable. The Court has nonetheless reviewed the evidence submitted in support of petitioner's actual innocence claims.  Petitioner's proffered evidence does not come close to establishing his actual innocence; at best, it represents an attempt to raise reasonable doubt, which is insufficient.  Indeed, much of petitioner's "newly discovered evidence" has no support in the record.

Accordingly, petitioner is not entitled to habeas relief on this claim.

17.    Missing Components of Record

Petitioner claims that the trial court failed to create or provide him with a complete record on appeal.  Petition at 33-46.  The California Supreme Court, on direct appeal, summarized and rejected this claim as follows:

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The appellate record in this case does not include the reporter's transcripts of the following proceedings or conferences: defendant's arraignment in the Alameda County Superior Court; a portion of the jury selection proceedings; a conference between the trial court and counsel during which the trial court excused Prospective Juror Heather H. by stipulation; two conferences between the trial court and counsel during which the parties agreed to excuse additional jurors by stipulation; a bench conference immediately preceding the testimony of prosecution witness Patrick Jackson; several conferences regarding jury instructions, penalty phase scheduling, and the readback of testimony; and a conversation between the trial court and the jury foreperson.  The trial court conducted hearings to settle the record, but the parties were unable to fully reconstruct all of the unreported proceedings.  Defendant claims the omission of these proceedings renders the record on appeal inadequate to permit meaningful appellate review.  A criminal defendant is entitled under the Eighth and Fourteenth Amendments to an appellate record that is adequate to permit meaningful review.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 196, fn. 8, 58 Cal.Rptr.2d 385, 926 P.2d 365; *People v. Howard* (1992) 1 Cal.4th 1132, 1166, 5 Cal.Rptr.2d 268, 824 P.2d 1315 (*Howard*).)  An appellate record is inadequate "only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal." (*Alvarez*, at p. 196, fn. 8, 58 Cal.Rptr.2d 385, 926 P.2d 365.)  The defendant bears the burden of demonstrating that the record is not adequate to permit meaningful appellate review.  (*People v. Samayoa* (1997) 15 Cal.4th 795, 820, 64 Cal.Rptr.2d 400, 938 P.2d 2.) Inconsequential inaccuracies or omissions are insufficient to demonstrate prejudice. (*Howard*, at p. 1165, 5 Cal.Rptr.2d 268, 824 P.2d 1315.)  If the record can be reconstructed with other methods, such as "settled statement" procedures (see Cal. Rules of Court, rules 7, 32.3), the defendant must employ such methods to obtain appellate review (*People v. Hawthorne* (1992) 4 Cal.4th 43, 66, 14 Cal.Rptr.2d 133, 841 P.2d 118 (*Hawthorne*)). Defendant fails to demonstrate prejudice.  He argues the omissions from the record are prejudicial because legal discussions may have occurred during these proceedings and because reversible errors may have occurred that are forever shielded from appellate review.  He adds that transcripts of these unreported proceedings are also crucial to determine whether trial counsel performed competently.  In essence, defendant argues that merely showing that the missing material may have contained matter that demonstrated error or reflected a constitutional violation satisfies his burden of establishing prejudice. But this amounts to nothing more than speculation, which is insufficient.  (*People v. Pinholster* (1992) 1 Cal.4th 865, 923, 4 Cal.Rptr.2d 765, 824 P.2d 571 (*Pinholster* ).) Because we find the appellate record adequate for us to reach the merits of defendant's claims, defendant was not prejudiced by the omission of portions of the record.  (*People v. Frye* (1998) 18 Cal.4th 894, 941, 77 Cal.Rptr.2d 25, 959 P.2d 183 (*Frye* ).)  For this reason, his constitutional claims must fail.  (*Pinholster*, supra, 1 Cal.4th at pp. 919–923, 4 Cal.Rptr.2d 765, 824 P.2d 571; *Howard*, *supra*, 1 Cal.4th at pp. 1165–1166, 5 Cal.Rptr.2d 268, 824 P.2d 1315.)

People v. Young, 34 Cal. 4th at 1169-70.

"The Federal Constitution imposes on the States no obligation to provide appellate review of criminal convictions."  Halbert v. Michigan, 545 U.S. 605, 610 (2005).  However, when a state chooses to provide for appellate review, the state must provide a defendant with "a record of sufficient completeness to permit proper consideration of (his) claims" in order to satisfy the

110

constitutional guarantees of due process and equal protection.  Mayer v. City of Chicago, 404 U.S.

189, 193-94 (1971) (citation and internal quotation marks omitted); see Britt v. North Carolina,

404 U.S. 226, 227 (1971) ("there can be no doubt that the State must provide an indigent

defendant with a transcript of prior proceedings when that transcript is needed for an effective

defense or appeal").  "A 'record of sufficient completeness' does not translate automatically into a

complete verbatim transcript."  Mayer, 404 U.S. at 194.  Rather,

> [a]lternative methods of reporting trial proceedings are permissible if they place before the
> appellate court an equivalent report of the events at trial from which the appellant's
> contentions arise.  A statement of facts agreed to by both sides, a full narrative statement
> based perhaps on the trial judge's minutes taken during trial or on the court reporter's
> untranscribed notes, or a bystander's bill of exceptions might all be adequate substitutes,
> equally as good as a transcript.

Draper v. Washington, 372 U.S. 487, 495 (1963); see Mayer, 404 U.S. at 194 (quoting id.).

Whether a transcript is needed for an effective defense or appeal depends on: "(1) the value of the

transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the

availability of alternative devices that would fulfill the same functions as the transcript."  Britt,

404 U.S. at 433-34.

The Ninth Circuit has held that the Britt criteria apply in evaluating a habeas petitioner's

claim that the reconstruction of unrecorded portions of state trial court proceedings was inadequate

for him to make an effective appeal.  See Madera v. Risley, 885 F.2d 646, 648 (9th Cir. 1989)

(adopting Britt standard while noting, "There is no Supreme Court or Ninth Circuit authority on

the due process implications of a state court's failure to record portions of a criminal trial.").

Petitioner has the burden of establishing prejudice from the lack of a complete transcript in light of

the alleged value of the transcript and the availability of alternatives that would fulfill the same

functions.  Id. at 648-49 (finding that the petitioner was not entitled to habeas relief because he

had not shown prejudice by the absence of a complete transcript); see Scott v. Elo, 302 F.3d 598,

604 (6th Cir. 2002) ("federal habeas relief based on a missing transcript will only be granted

where the petitioner can show prejudice"); White v. State of Florida, Department of Corrections,

939 F.2d 912, 914 (11th Cir. 1991) ("in a federal habeas corpus case brought by a state prisoner,

the absence of a perfect transcript does not violate due process absent a showing of specific

1   prejudice").

2          The Court finds, for reasons similar to the California Supreme Court, that petitioner does

3   not allege the necessary prejudice from any missing transcripts.  Petitioner does not explain the

4   value of such transcripts to his conviction.  Nor does he identify anything that might appear in the

5   transcripts that would have assisted him in advancing his claims or in formulating new ones.

6          The Court is compelled to agree with petitioner, however, that a large number of

7   proceedings are missing from the record.  Petitioner has identified fifteen separate proceedings

8   that went unrecorded.[28]  Further, the record before the Court is undeveloped as to how much was

9   accomplished during the trial court's reconstruction proceedings to settle the record.  Petitioner

10  states that record correction proceedings were held in Alameda County Superior Court on

11  February 19, 1999 and March 19, 1999.  Petition at 35, ¶ 118.  He also states the superior court

12  issued its order correcting the record on July 14, 1999 and that two court reporters filed

13  declarations attesting to proceedings that were not recorded.  Petition at 35, ¶ 119.  It appears that

14  this Court has not received transcripts of the record correction proceedings nor the above-

15  mentioned order and declarations.

16         The Court is unable to rule on this claim without additional information on the unrecorded

17  proceedings.  Rather than order further briefing, however, the Court declines to rule on this claim,

18  given that petitioner is already entitled to relief on his juror misconduct claim.

19         18.    Cumulative Error

20         Petitioner claims he was prejudiced by the cumulative effect of the foregoing asserted

21  errors.  Petition at 295-98.  As discussed above, in some cases, although no single trial error is

22  sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a

23  defendant so much that his conviction must be overturned.  Alcala v. Woodford, 334 F.3d 862, 893-95

24  (9th Cir. 2003).  Cumulative error is more likely to be found prejudicial when the government's case is

25  weak.  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  Where there is no single

26  constitutional error existing, nothing can accumulate to the level of a constitutional violation.  Hayes v.

27

28  ───────────────
    [28] One of these proceedings, however, pertained to penalty-phase instructions, making the issue
    now moot.  See Petition at 34, ¶ 115.

United States District Court
Northern District of California

112

1   Ayers, 632 F.3d 500, 524 (9th Cir. 2011); Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

2          Because petitioner is entitled to relief on his juror misconduct claim, the Court declines to rule

3   on this claim.

4   C.      Evidentiary Hearing

5          Following oral argument in this matter, respondent filed a motion for an evidentiary

6   hearing on petitioner's juror misconduct claim.  Docket No. 28.  Specifically, respondent asserts

7   that a hearing is needed to determine whether Juror S.W. was telling the truth in his 2003

8   declaration submitted in support of petitioner's state habeas petition.  Although S.W. signed his

9   2003 declaration under penalty of perjury, respondent argues that this is not evidence that S.W.

10  was telling the truth because he also swore to the truth of his conflicting statements during voir

11  dire in 1990.[29]

12         The Court finds that an evidentiary hearing is no longer possible at this point.  The parties

13  stipulate that Juror S.W. is now deceased, having passed away in 2010.  See Docket No. 27.

14  Consequently, to the extent disputes remain about S.W.'s credibility, a hearing would not resolve

15  them.

16         Respondent specifically requests an evidentiary hearing to resolve the following factual

17  questions:

18         Did juror S.W. tell the truth in his 2003 declaration when he states that he had personal
           knowledge of the crime scenes and had been a lifelong NRA member?  Or did he tell the
19         truth in his 1990 questionnaire and jury voir dire testimony when he stated that he did not
           have knowledge of the crime scenes and was not a member of the NRA?  Did S.W. have
20         racist beliefs that prompted him to prejudge the case?

21  Docket No. 28 at 5.

22         Regarding the first two questions, it is conceivable that evidence of petitioner's NRA

23  membership, or lack thereof, could be introduced at an evidentiary hearing.  However, as

24  discussed above, the issue of S.W.'s NRA membership is not at the crux of petitioner's

25  McDonough claim.  Rather, it is the fact that S.W. had not answered truthfully that he was familiar

26  with the area where the crimes occurred, and indeed had himself been robbed at gunpoint in the

27  _____

28  [29]  The parties agree that the United States Supreme Court's decision in Cullen v. Pinholster, 131
       S. Ct. 1388, 1398 (2011), does not bar an evidentiary hearing here.

United States District Court
Northern District of California

area, that would have provided a basis for a challenge "for cause" as required by <u>McDonough</u>.

<u>See</u> 464 U.S. at 556.  An evidentiary hearing without the testimony of S.W. would not resolve

what he personally knew or did not know about the neighborhood where the crimes occurred.

Regarding the question of S.W.'s racial bias, the Court first notes that the many racist

statements S.W. made in his 2003 declaration are not contradicted by anything he said during jury

selection in 1990.  Thus the only issue for potential resolution is not so much a factual dispute as it

is a question of credibility, i.e., whether S.W. actually harbored racist views against petitioner.

The Court is hard-pressed to find a reason why S.W. would choose to falsely make such racially

derogatory statements.  The statements speak for themselves.  The ability to make them at all

reveals a deep-seated racism.  In any event, it is difficult to imagine what evidence could possibly

be presented to prove or disprove what S.W. meant by these statements.  Any testimony from

people who knew S.W. along the lines that he made non-racist statements at some other point in

time or conducted himself in a non-racist manner would not diminish S.W.'s own highly damning

admissions.

Respondent, in his reply brief, variously proposes putting on the stand S.W.'s family

members, friends, and/or the investigator who obtained S.W.'s declaration.  Counsel for

respondent does not represent that he has actually contacted any of these purportedly potential

witnesses, let alone ascertained that they would (1) appear in court, and (2) impeach S.W.'s

declaration.  Even setting aside the hearsay problems such evidence would present, it is hard to

imagine how such evidence could overcome the declaration made by S.W. himself.  If S.W.

himself could not deny bias in this situation, it appears futile to take testimony from any other

person.

Rule 8 of the Rules Governing Section 2254 Cases directs a federal district court to review

the materials listed therein and "to determine whether an evidentiary hearing is warranted."  The

Advisory Committee's notes then state that "If the judge decides that an evidentiary hearing is

neither required nor desirable, he shall make such a disposition of the petition 'as justice shall

require.'"  The notes continue, "[i]f no hearing is required, most petitions are dismissed, but in

unusual cases the court may grant the relief sought without a hearing.  This includes immediate

release from custody or nullification of a judgment under which the sentence is to be served in the future."  See also Downs v. Hoyt, 232 F.3d 1031, 1041 (9th Cir. 2000) ("[T]he fact that a hearing would be permitted does not mean that it is required.  The district court retains discretion whether to hold one."); Bemore v. Chapell, 788 F.3d 1151, 1176-77 (9th Cir. 2015) (remanding with instructions for district court to grant habeas petition even where no evidentiary hearing had been held).  The Court finds this is the type of "unusual" case contemplated by the Advisory Committee's notes to Rule 8.  Given the limited probative value of the theoretical testimony that could impeach S.W.'s 2003 declaration, and the hearsay barriers to admitting such testimony, it appears any evidence offered at a hearing would be too thin to warrant use of the court's limited time and resources.

Finally, respondent argues that petitioner has the burden to establish that S.W. was telling the truth in his declaration.  See Docket No. 27 at 9 n.1.  Respondent cites McKenzie v. McCormick, 27 F.3d 1415, 1418-9 (9th Cir. 1994) and Simmons v. Blodgett, 110 F.3d 39, 41-42 (9th Cir. 1997).  These cases do not support respondent's position.  Rather, they apply the basic rule that a habeas petitioner bears the burden of satisfying Section 2254 by showing that the state court's adjudication of a claim resulted in a decision that was contrary to clearly established Supreme Court precedent (Section 2254(d)(1)) or was based on an unreasonable determination of the facts (Section 2254(d)(2)).  Here, petitioner has discharged that burden by establishing, pursuant to Section 2254(d)(1), that the state court erred when it, accepting petitioner's evidence to be true, nonetheless rejected petitioner's juror misconduct claim.[30]

---

[30] The state court's rejection is not analyzed under 28 U.S.C. § 2254(d)(2), i.e., cannot be said to be "based on an unreasonable determination of the facts" because the state court made no factual determination at all.  The state court never held a hearing on the juror misconduct claim and ultimately denied the claim summarily.  A summary decision by a state court does not "implicitly" make any factual findings in support of the decision.  Fisher v. Roe, 263 F.3d 906, 913 (9th Cir. 2001) (refusing to infer factual findings from state court summary denial of habeas petition), overruled in part on other grounds by Payton v. Woodford, 346 F.3d 1204 (9th Cir. 2003).  A petition may be granted under Section 2254(d)(2) where the state court should have made a finding of fact but neglected to do so.  See Taylor v. Maddox, 366 F.3d 992, 1000-01 (9th Cir. 2004) (holding there may be "intrinsic challenges to state-court findings . . . where the state court should have made a finding of fact but neglected to do so").  This is not such a case.  The Supreme Court has never held that a hearing is required in every case of potential juror bias.  See Sims v. Rowland, 414 F.3d 1148, 1153-55 (9th Cir. 2005).

United States District Court
Northern District of California

1    Accordingly, respondent's motion for an evidentiary hearing will be denied.

2                                    **CONCLUSION**

3    For the above reasons, the court GRANTS habeas relief on petitioner's juror misconduct

4    claim.  The Court declines to rule on petitioner's missing records claim and cumulative error

5    claim.  All other claims are DENIED.  Respondent's motion for an evidentiary hearing is

6    DENIED.

7    Accordingly, petitioner's conviction is VACATED.  Respondent shall release petitioner

8    from custody unless the state commences proceedings to retry petitioner within one hundred and

9    twenty (120) days of the date of entry of judgment on this order.  The Clerk shall send an

10    informational copy of this order to the district attorney of Alameda County, in addition to the

11    usual service on counsel of record.

12    The Clerk shall enter judgment and close the file.

13    **IT IS SO ORDERED.**

14    Dated: September 11, 2015

15    _____
                              JON S. TIGAR
16                          United States District Judge

116